E-FILED
Tuesday, 25 June, 2019  03:57:34 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

|  |  |
|---|---|
| STEPHEN HEIDELBERG, Administrator of the Estate of CLEVE HEIDELBERG, JR., | |
| Plaintiff; | |
| v. | Case No. 18-CV-01161 |
| EMANUEL MANIAS, LARRY BERNARD, RONALD HAMM, JERRY BRADY, PAUL HIBSER, STEPHEN HEIDELBERG, Administrator of the Estate  of KENNETH DECREMER, STEPHEN HEIDELBERG, Administrator of the Estate  of Estate  of PAUL HILST, STEPHEN HEIDELBERG, Administrator of the Estate  of BERNARD KENNEDY, STEPHEN HEIDELBERG, Administrator of the Estate  of NOLAN MACKLIN, STEPHEN HEIDELBERG, Administrator of the Estate  OF JOHN RIDDLE, STEPHEN HEIDELBERG, Administrator of the Estate  of WILLIAM SCHALK, ROBERT L. WATSON, JR., Administrator of the Estate  of ROBERT WATSON, STEPHEN HEIDELBERG, Administrator of the Estate  of WILLARD KOEPPEL, STEPHEN HEIDELBERG, Administrator of the Estate  of JOHN SACK, UNKNOWN OFFICERS OF THE PEORIA POLICE DEPARTMENT and THE PEORIA COUNTY SHERIFF'S DEPARTMENT, the CITY OF PEORIA, Illinois, and  the COUNTY OF PEORIA, Illinois, | The Honorable Judge Sara Darrow Magistrate Judge Johnathan E. Hawley  JURY TRIAL DEMANDED |
| Defendants. | |

## SECOND AMENDED COMPLAINT

Plaintiff STEPHEN HEIDELBERG, as the administrator of the estate of CLEVE

HEIDELBERG, JR., by his attorneys HALE & MONICO, LLC, and DONALD R. JACKSON,

**Exhibit A**

ESQ., and complaining of Defendants EMANUEL MANIAS, LARRY BERNARD, PAUL HIBSER, STEPHEN HEIDELBERG, Administrator of the Estate of KENNETH DECREMER, STEPHEN HEIDELBERG, Administrator of the Estate of Estate of PAUL HILST, STEPHEN HEIDELBERG, Administrator of the Estate of NOLAN MACKLIN, STEPHEN HEIDELBERG, Administrator of the Estate of WILLIAM SCHALK, ROBERT L. WATSON, JR., Administrator of the Estate of ROBERT WATSON, STEPHEN HEIDELBERG, Administrator of the Estate  of JOHN SACK, UNKNOWN OFFICERS OF THE PEORIA POLICE DEPARTMENT and THE PEORIA COUNTY SHERIFF'S DEPARTMENT (collectively "Defendant Officers"), STEPHEN HEIDELBERG, Administrator of the Estate of BERNARD KENNEDY, STEPHEN HEIDELBERG, Administrator of the Estate OF JOHN RIDDLE, STEPHEN HEIDELBERG, Administrator of the Estate of WILLARD KOEPPEL, RONALD HAMM (collectively with the Defendant Officers, the "1970 Defendants"), JERRY BRADY, the CITY OF PEORIA, Illinois, and the COUNTY OF PEORIA, Illinois ("Peoria County"), and states:

## INTRODUCTION

1.      Before his conviction was vacated, Cleve Heidelberg, Jr. spent forty-seven years imprisoned for the coldblooded execution of Sergeant Raymond Espinoza, a murder Mr. Heidelberg did not commit and a murder Defendants know he did not commit. Indeed, the 1970 Defendants knew well before his criminal trial that Mr. Heidelberg was innocent. Even more disturbing, they knew that a man named James Clark was the actual killer well before Mr. Heidelberg's criminal trial.

2.      Heidelberg's only connection to the crime was that his car had been used in the commission of the crime. The 1970 Defendants, however, knew that a man named Lester Mason had borrowed Mr. Heidelberg's car and, without Heidelberg's knowledge, had given the car to

Clark. The 1970 Defendants knew these facts because Mason told them these facts before Heidelberg's trial.

3.      But even before Mason gave his statement, the 1970 Defendants had evidence that implicated James Clark in the crime—indeed, they interrogated Clark four months before Mason's statement—and it came as no surprise when Clark confessed to the crime just weeks after Heidelberg was convicted.

4.      Nevertheless and even after Clark confessed, when Heidelberg informed the presiding judge of Clark's confession at his sentencing hearing and requested that Clark be allowed to testify before he was sentenced, defendant Hamm vehemently objected and insisted that Heidelberg be sentenced immediately and put to death. Although the judge sentenced Mr. Heidelberg without hearing testimony from Clark, the judge spared Mr. Heidelberg despite Hamm's fervent argument that Heidelberg did not deserve to live.

5.      Heidelberg's arrest, indictment, detention, prosecution and conviction were based entirely on false evidence fabricated by the 1970 Defendants. Included among that evidence was a false lineup report that purported to claim that two eyewitnesses had picked Heidelberg out of a lineup when the witnesses themselves repeatedly testified that they had not in fact identified him. In addition, the 1970 Defendants conspired to and did manufacture and fabricate false identifications from certain of the Defendant Officers who were involved in a high-speed car chase with James Clark, and from a man named Jerry Lucas.

6.      To secure Heidelberg's wrongful prosecution and conviction, the 1970 Defendants also suppressed and destroyed evidence, including Mason's statement, James Clark's interrogation months before Mr. Heidelberg's trial and the evidence that led to that interrogation, that would have shown that Heidelberg was innocent, as well as evidence that could have been used to

3

undermine the testimony of the State's witnesses, including the testimony of the Defendant Officers themselves.

7.      At the same time, the 1970 Defendants disregarded and intentionally undermined the ample evidence that indicated someone else had committed the murder of Sergeant Espinoza and thwarted Mr. Heidelberg's defense through the harassment and intimidation of critical witnesses whose identities they discovered through their repeated (and admitted) unconstitutional eavesdropping on confidential communications between Heidelberg and his counsel. The eavesdropping also undermined the relationship between Heidelberg and his counsel effectively depriving Mr. Heidelberg of his right to counsel.

8.      A year-long investigation, that culminated in a manual search of FBI files buried deep in the National Archives in Washington D.C., uncovered the gross misconduct of the 1970 Defendants as well as additional evidence which conclusively established Mr. Heidelberg's innocence. The results of the investigation were presented to defendant Brady who was and continues to be the Peoria County State's Attorney.

9.      Although Brady feigned concern over the gross misconduct of the 1970 Defendants, he buried the results of the investigation for three months and, in breach of the duties of his office, took no action to investigate the evidence presented to him. Brady did, however, remain in regular contact with defendant Hamm, his long-time friend and mentor, who was one of the state actors at the center of the investigation. The circuit court ultimately determined that due to an actual conflict Brady had failed to discharge his duties as prosecutor and replaced him with a special prosecutor who was ordered to conduct an independent investigation and prepare a report for the court.

10.    Thereafter and over the course of two years, Brady engaged in egregious and unethical misconduct and a gross abuse of process to thwart both the independent investigation and Mr. Heidelberg's post-conviction proceedings in order to protect Hamm and other state actors and to deny Mr. Heidelberg access to the courts and to his right to judicial redress for the injuries he suffered at the hands of the 1970 Defendants.

11.    The Illinois Appellate Court for the Third District affirmed the circuit court's disqualification of Brady and itself independently determined that the evidence established that Brady had an actual conflict and had failed to conduct a meaningful investigation.

12.    On April 20, 2017, after four days of hearings and testimony from six witnesses, the circuit court vacated Mr. Heidelberg's conviction. In its ruling, the circuit court found that there could be "no dispute" that James Clark had possession of Mr. Heidelberg's car during the time of the commission of the crime and that even the FBI, who assisted in the investigation, knew Clark had Mr. Heidelberg's car.

13.    During the hearings, defendant Hamm lost control on cross-examination and actually admitted that defendant Sack had perjured himself at Mr. Heidelberg's trial and falsified his identification of Mr. Heidelberg. He also admitted that he did not disclose Sack's pre-trial statements admitting he could not identify Mr. Heidelberg as the man driving the get-away car in the high-speed chase and that he did not disclose Sack's perjury to the court or to Mr. Heidelberg.

14.    Defendant Manias also made stunning admissions during the hearings. He admitted that James Clark had been interrogated before Mr. Heidelberg's trial. He admitted that he spied on privileged communications between Mr. Heidelberg and his counsel on two separate occasions. And he admitted that he did not produce his notes from, or the content of, his interviews with the

Defendant Officers who had been involved in the high-speed chase with and/or the subsequent foot search for the perpetrator.

15.     Mr. Heidelberg was 27 years old and just entering the prime of his life when he was wrongfully convicted. He had an excellent job befitting his high intelligence and a 7-year-old son.

16.     When his conviction was vacated, Mr. Heidelberg, having served nearly 47 years for a crime he did not commit, was 74 years old. He died 10 months later.

17.     From the moment of his arrest and throughout the nearly half century of his incarceration, Mr. Heidelberg steadfastly maintained his innocence.

18.     Plaintiff now seeks justice for the harm that Defendants have caused and redress for the loss of liberty and the terrible hardship that Mr. Heidelberg endured and suffered as a result of Defendants' misconduct.

## JURISDICTION AND VENUE

19.     This action is brought pursuant to 42 U.S.C. § 1983 *et. seq.* and Illinois law to redress Defendants' tortious conduct and their deprivation of Heidelberg's rights secured by the U.S. Constitution.

20.     This Court has jurisdiction of Heidelberg's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims pursuant to 28 U.S.C. § 1367.

21.     Venue is proper under 28 U.S.C. § 1391(b). Heidelberg resided in this judicial district through his death. In addition, Heidelberg's criminal case was investigated, tried, and appealed in part of this judicial district, such that a substantial part of the events and omissions giving rise to Heidelberg's claims occurred within this district.

## PARTIES

22.     Stephen Heidelberg is the son of Cleve Heidelberg, Jr. and the duly appointed administrator of his estate, as well as the duly-appointed administrator of the Estates of Kenneth DeCremer, Paul Hilst, Bernard Kennedy, Nolan Macklin, John Riddle, William Schalk, Willard Koeppel, and John Sack.  Robert L. Watson, Jr., is the duly appointed administrator of the Estate of Robert Watson.[1]

23.     On May 26, 1970 and during all relevant times, defendants Emanuel Manias, John Sack, Kenneth DeCremer, Larry Bernard and William Schalk were sheriff's deputies or former sheriff's deputies of the Peoria County Sheriff's Office.

24.     On May 26, 1970 and during all relevant times, defendants Paul Hibser, Robert Lee Watson and Paul Hilst were police officers or former police officers of the Peoria Police Department.

25.     Defendant Willard Koepple was the Sheriff of Peoria County, Illinois from December 1967 to July 1970.

26.     Defendant Bernard Kennedy was the Sheriff of Peoria County, Illinois from July 1970 to December 1975.

27.     On May 26, 1970 and during all relevant times, defendants Ronald Hamm and John Riddle were the Assistant State's Attorneys or former Assistant State's Attorneys who investigated the attempted armed robbery of the Bellevue Drive-In and the murder of Sergeant Espinoza and prosecuted Mr. Heidelberg.

---

[1] For the sake of simplicity and clarity, the estate-defendants will be referred to in the complaint by the names of the decedents, i.e. "Kenneth DeCremer," or "Defendant DeCremer".

28.     Defendant Jerry Brady is and was the duly elected Peoria County State's Attorney at all times during his acts and omissions in connection with Mr. Heidelberg's case as described in this complaint.

29.     Defendant the City of Peoria is an Illinois municipal corporation that was the employer of defendants Paul Hibser, Robert Lee Watson and Paul Hilst, each of whom acted as agents or employees of the City of Peoria. The City of Peoria is liable for all torts committed by defendants pursuant to the doctrine of *respondeat superior*. Additionally, the City of Peoria is a statutory indemnitor of its employees and is responsible for the policies and practices of the Peoria Police Department.

30.     Defendant Peoria County is a body politic and is a statutory indemnitor of defendants Emanuel Manias, John Sack, Kenneth DeCremer, Larry Bernard, William Schalk, Ronald Hamm, John Riddle and Jerry Brady. Peoria County is liable for any judgments related to its agents and employees arising in the course of their employment pursuant to 745 ILCS 10/2-302. In addition, Peoria County is responsible for the policies and practices of the Peoria County Sheriff's Office

31.     Defendants Unknown Officers of the Peoria Police Department and the Peoria County Sheriff's Department participated in the misconduct alleged in this complaint.

32.     Each and every individual defendant, known and unknown, acted under color of law and within the scope of his or her employment or by agreement and in concert and conspiracy with state actors once their employment terminated, including other defendants, at all times relevant to this lawsuit. Each of the individual defendants is sued in his or her individual capacity unless otherwise noted.

## FACTS

### The Murder of Sergeant Raymond Espinoza

33.     On May 26, 1970 at approximately 1:30 a.m., a black man shot and killed a white police officer—and took a white woman hostage—as he fled the scene of a botched armed robbery at the Bellevue Drive-In. Police, responding to calls of officer shot, armed black man wearing a yellow shirt and brown jacket with a female hostage in a Rambler, spotted a Chevy driving at a high rate of speed on Harmon Highway at the merger point of Harmon and Lincoln. Police then engaged in a high-speed chase down Lincoln until they lost sight of the Chevy as it turned onto Blaine Street. The perpetrator continued down Blaine and crashed the car while attempting to turn onto Butler Street.

34.     By the time police reached the crash site, the perpetrator had abandoned the car and fled on foot leaving the hostage and the murder weapon behind. Officers on foot along with two police canines remained at and around the vicinity of the crash while squad cars continued to canvass the area several blocks north where the perpetrator was last seen.

35.     Peoria police officer Jerry Patty and his partner were canvassing the area about two blocks north of the crash site when they spotted a black man running northbound away from the crash site. Officer Patty jumped out of the squad car and chased the man until he lost sight of him several blocks north of the crash site, never to see him again.

36.     Nearly thirty minutes after the foot chase began and twenty-five minutes after Officer Patty lost sight of the perpetrator, police received a call reporting a black man "walk[ing]" in the direction of the crash site and only about a block away. That man was Cleve Heidelberg who had loaned his car to a man named Lester Mason a couple of hours earlier and had been told by Mason to pick up his car in the vicinity of the crash site.

37.     Within less than a minute, Peoria City police and County Sheriff's officers and police canines had descended on Mr. Heidelberg. The officers knocked Heidelberg unconscious, threw him to ground and handcuffed him. After Heidelberg was cuffed and down, they unleashed the canines on him and began viciously kicking him in the head, neck and face while the canines attacked his body. Heidelberg did not move at all during the attack which lasted 10 to 12 minutes.

38.     So certain were the officers that they had their cop killer in hand and without having asked a single question, more than one of them yelled "we ought to kill him and say he was resisting arrest."[2]

39.     And that was the start and finish of the investigation into the murder of Sergeant Espinoza. Thereafter, every action taken by the 1970 Defendants and other Peoria police and Sheriff's officers was calculated to confirm Mr. Heidelberg's guilt and ensure his conviction no matter the actual evidence.

40.     When Mr. Heidelberg was attacked by police, he was wearing his eyeglasses and they remained intact after the assault. When he was processed at the police station before he was taken to the hospital and before the failed lineup, those eyeglasses, along with all other items found on Mr. Heidelberg's person, were confiscated and put under lock in a vault at the Peoria County Jail.

41.     In addition, Mr. Heidelberg was wearing a blue shirt and a gray sports coat not the yellow shirt and brown jacket described by police radio transmissions when he was attacked and then taken into custody by Peoria County and Peoria City police officers.

---

[2] James Polk and his wife Patricia Ann, who had been watching the brutal attack from their home, attempted to come to Mr. Heidelberg's rescue asking the police to please stop the beating to no avail. The attack continued until Mrs. Polk began screaming when she heard officers suggest that Mr. Heidelberg be murdered at police hands.

42.     Throughout the attack, the arresting officers were repeatedly asking Heidelberg to tell them who he was with and were repeatedly telling him that he shouldn't take the rap himself. There were never any reports or radio transmissions that more than one man was involved in the armed robbery nor were there any reports that more than one man was seen in the Chevy. The officer leading the attack and questioning, defendant Robert Lee Watson, was eventually suspended for his role in the attack. Some of the other Defendant Officers were also present at the arrest, including defendants Sack and Hibser.

43.     These defendants were asking Mr. Heidelberg about an accomplice because, contrary to their later claims, they had not been able to sufficiently see the driver of the Chevy to identify his clothes or his face or whether he was wearing glasses during the high-speed chase and because Heidelberg did not match the description broadcast over police radio.

**The Eyewitnesses**

44.     Defendants Bernard and Schalk were the first to arrive at the Drive-In after the shooting where they found Jerry Lucas, a purported paid informant who had been riding with Sergeant Espinoza, cradling Espinoza's bleeding head in his arms and lap. They also found Espinoza's gun shoved down Lucas' pants. Maurice Cremeens, the projectionist at the Drive-In, had remained in the projection booth after calling the Sheriff's office and did not witness the shooting. Mayme Manuel, office manager, witnessed the shooting prior to being taken hostage by the perpetrator. All three eyewitnesses were taken to the Peoria County jail to view a lineup that included Mr. Heidelberg.

**Evidence Recovered from the Drive-In and Crash Site**

45.     At the Drive-In, police found bullets and spent cartridges and a flashlight that the perpetrator had taken from the office at the Drive-In. At the crash site, police found the murder

11

weapon on the driver's seat of the Chevy. They also found, on the driver's side floor of the car, a pair of tinted prescription eyeglasses (described by police as "prescription sunglasses") that had fallen out of the perpetrator's pocket while he was making his escape after shooting Sergeant Espinoza and that had been stepped on and cracked when the perpetrator exited the Chevy and made his escape after the crash. The police also found ignition keys and a portable transistor radio in the car.

46.     Peoria County Officer Robert Cone immediately processed the crash site for fingerprints and other forensic evidence and did not find Heidelberg's fingerprints anywhere on or in the car.

47.     Police determined at some point after his arrest that the Chevy was registered to Mr. Heidelberg.

## The Failed Lineup

48.     After treatment for the injuries sustained in the attack, Mr. Heidelberg was taken to the Peoria County jail, denied a lawyer and forced, that is, physically pushed, into a lineup. Defendant Manias who was the lead detective on the case conducted the lineup. Defendants Hamm, Sack, DeCremer, Watson, Hilst and Hibser as well as other city and county officers were at the jail during the lineup. The lineup consisted of four men and was run twice, the second time in reverse order. Mr. Heidelberg was assigned position #3 in the first run of the lineup and position #2 in the reverse run. The participants in the lineup were in a room adjacent to the witness viewing room with Manias. Manias brought each participant individually to a viewing window on the adjacent wall. The witnesses could only see one lineup participant at a time and at no time did they see the participants all together.

12

49.     Ms. Manuel, the hostage and office manager, was not able to identify any of the men in the lineup as the man who attempted to rob the Drive-In, shot Sergeant Espinoza and took her hostage in either the original lineup or the reverse lineup. In her words: "I didn't see anything . . . I couldn't see anybody," "I didn't see anybody [at the lineup]" and "No [I didn't make an identification], because I couldn't tell who they [the participants] were or what they were, they looked like moving objects."

50.     As for Mr. Cremeens, he identified the man in position #3 (Heidelberg) in the first run of the lineup and the man in position #1 (a man named George Johnson) in the second run. Cremeens also recanted any purported identification during the lineup less than three months after the lineup and three months before trial. In his words, the "man" he identified in the lineup[3] "looked different" than the man he had seen at the Drive-In but the man he identified (who, again, looked different than the man at the Drive-In) "looked like [Heidelberg]" in that "he was clean shaven and had fairly short hair." Thus, Cremeens was unable to identify Heidelberg as either of the men he identified at the lineup.

51.     Likewise, Jerry Lucas did not identify Mr. Heidelberg during the lineup as the man he made eye contact with and saw shoot and kill Sergeant Espinoza. Instead, when Heidelberg was brought to the viewing window, Lucas, who knew Heidelberg (although Heidelberg did not know him), spontaneously uttered the words "That's Cleve."

52.     Manias prepared a written report in which he documented the results of both runs of the lineup. That report was not disclosed to Mr. Heidelberg and was ultimately destroyed by the 1970 Defendants.

---

[3] Again, Cremeens identified two different men during the course of the lineup.

53.     Although defendants Sack, DeCremer, Watson, Hilst and Hibser were at the jail when the lineup was conducted and had participated in the car chase and/or the foot search, not one of them participated in the lineup as a witness. They did not do so because not one of them was able to see the driver of the Chevy sufficiently to identify anything about his clothing or his face or any identifying information other than that he was a black male and they had told this to Manias and Hamm before the lineup was conducted.

54.     Indeed, Manias admitted during the 2017 post-conviction hearings that he interviewed all the county and city officers involved in the high-speed chase and/or foot chase, which included Sack, DeCremer, Watson, Hilst and Hibser, the "night" of the shooting and that he took notes of those interviews. Manias also admitted that he did not turn those notes over to Mr. Heidelberg or Hamm. Hamm, however, was present at the jail and himself spoke with these defendants. In addition, Manias admitted that he discussed his notes and the interviews with Hamm.

55.     In fact, on cross-examination during Heidelberg's post-conviction proceedings, Hamm became extremely agitated and flustered and actually admitted under oath that Sack told him he could not identify Heidelberg. Hamm also admitted that he did not disclose this statement to Heidelberg prior to trial or at any time thereafter. Hamm further admitted that when Sack perjured himself on the stand and identified Heidelberg as driver of the Chevy, he did not inform the court or Heidelberg of the perjury.

56.     Defendant Hibser also publicly admitted during an audio-taped interview with Peoria public radio and during a video-taped re-enactment filmed by NBC that he would not have been able to identify Mr. Heidelberg in the lineup. Neither Hibser nor Hamm nor Manias ever disclosed this information to Heidelberg before, during or at any time after his trial.

57.     The 1970 Defendants also failed to disclose the content of all of the officer interviews to Heidelberg and either suppressed or destroyed any notes or reports documenting the interviews.

**Hamm, Manias and Riddle Ignored This Early and Compelling Evidence**

58.     In the first two hours of their "investigation," Hamm, Manias and Riddle ignored five critical pieces of evidence that should have led them to reconsider whether they had the right man in custody.

59.     First, they failed to question why a perpetrator who had successfully eluded police would return to the crash site nearly thirty minutes after he had escaped when he knew that a manhunt was underway for a cop killer and when the crash site was already swarming with police even as he made his escape.

60.     In fact, the unidentified neighbor who called the police to report that there was a black man "walk[ing] up" his block did so only because of the intense police activity in the area ("the policemen are all around here"). If the neighbor could see the police swarming the area from inside his house, Mr. Heidelberg would have seen and heard them as well. Had he been the perpetrator, he would not have continued to calmly walk into the hive of police activity.

61.     Second, in addition to the extremely unlikely event that the black killer of a white police officer in 1970 Peoria would return to the secondary crime scene was the fact that Mr. Heidelberg was wearing his eyeglasses when he was attacked and taken into custody. The 1970 Defendants knew that the perpetrator's eyeglasses were found in the Chevy. Moreover, Cremeens and Manuel both told Manias and Hamm that the perpetrator was *not* wearing glasses.

62.     Third, they ignored the fact that Mr. Heidelberg was wearing a blue shirt and gray sports coat not a yellow shirt and brown jacket as was broadcast over police radio.

15

63. Fourth, they ignored that Mr. Heidelberg's fingerprints were not found on or in the Chevy.

64. While the above evidence in and of itself was certainly more than sufficient to give the 1970 Defendants pause, that evidence coupled with the fifth piece of evidence, the failed lineup, should have put them on high alert that they had the wrong black man in custody.

65. However, unwilling to re-examine their presumption of guilt and release Mr. Heidelberg as they should have after the failed lineup, the 1970 Defendants played their final card and their last hope later that morning when Officer Cone boarded a plane to Washington D.C. and hand-delivered the flashlight, the keys, the radio and the broken eyeglasses along with the gun, bullets and spent cartridges to the FBI laboratory and requested a ballistics and fingerprint examination.

### The FBI Telegram

66. Two days after the failed lineup, the 1970 Defendants were informed through a May 28, 1970 telegram from the FBI that Heidelberg's prints were not on the murder weapon. These defendants also knew that Heidelberg's prints were not found on or in the Chevy. The 1970 Defendants did not disclose the telegram and at least one further FBI latent fingerprint report documenting the results of the fingerprint testing of the items found in the Chevy and at the Drive-In to Mr. Heidelberg. Indeed, defendant Hamm told the court that no such reports existed.

67. Without his prints on the murder weapon or Chevy and with no eyewitness identifications, the 1970 Defendants knew that they did not have probable cause to arrest Mr. Heidelberg for, much less charge him with, the murder of Sergeant Espinoza. Ownership of the car alone was insufficient because the car could have been stolen or, as was the case here, Heidelberg could have loaned his car to someone else.

16

68.     Undeterred by this utter lack of evidence and still as convinced of Heidelberg's guilt as the arresting officers were when they contemplated murdering him before they even knew his name, the 1970 Defendants, rather than releasing Mr. Heidelberg as the law required, embarked on a course of stunning misconduct to ensure he was prosecuted for and convicted of Sergeant Espinoza's murder.

69.     That course of misconduct included: (i) spying on privileged communications between Heidelberg and his counsel (and later using the information obtained through that spying to intimidate alibi and occurrence witnesses and thwart Mr. Heidelberg's defense); (ii) destroying the original lineup report; (iii) hiring a witness to testify against Heidelberg; (iv) suppressing exculpatory FBI fingerprint reports; (v) suppressing their interview of the actual killer within weeks of the murder as well as suppressing the facts and circumstances which led to these interviews; (vi) intimidating defense witnesses and (vii) fabricating eyewitness identifications.

**Manias Spies On Heidelberg And His Counsel**

70.     Two days after receiving the telegram, defendant Manias placed a late-night call to Heidelberg's public defender Jack Brunnmeyer's home sometime after 10:00 p.m. on May 30, 1970 and left an urgent message for him. Within thirty minutes, Brunnmeyer returned the call and Manias falsely told him that Heidelberg had confessed and was insisting on making an immediate statement to police. Once Brunnmeyer arrived (at approximately 11:15 p.m.), Manias spied on privileged attorney/client communications for over an hour and learned several critical facts that should have been investigated but instead triggered the manufacture of a series of false police reports as well as fabricated police identifications designed to thwart Heidelberg's defense and ensure his conviction.

71.     During that hour, Manias learned that: (i) Heidelberg had loaned his car to "a Lester Mason;" (ii) Heidelberg had been at the "T&T Club" during the commission of the crime; (iii) other people had seen Mr. Heidelberg at the club; (iv) when Heidelberg was on his way to retrieve his car, he saw "alot [sic] of Police cars in the Area" but nonetheless continued to the location where Mason had told him he had left Heidelberg's car; and (v) Heidelberg's counsel warned him not to tell anyone about his alibi defense for fear of police tampering with alibi witnesses.

72.     Manias, without fear of any consequences, documented this instance of unconstitutional eavesdropping in a report that was put in Heidelberg case file. None of the 1970 Defendants disclosed the report or Manias' unconstitutional conduct to Heidelberg or the court or any competent prosecutorial authority at any time prior to or during his trial or during his post-trial section 72 proceedings. Manias was not disciplined; he was promoted. Even more egregious, Hamm, Riddle and the remaining 1970 Defendants used the privileged information Manias obtained in this and other instances of eavesdropping as a road map to construct their fabricated case against Mr. Heidelberg and to drive a wedge between Heidelberg and his counsel.

73.     Indeed, because these defendants acted on the privileged information they received in the earliest stages of the investigation and throughout the pre-trial period, Heidelberg became convinced that his counsel was disclosing confidential information about his defense to Hamm and Riddle. As such, Heidelberg filed a motion to proceed *pro se* at a critical time in his case in which he accused his counsel of such disclosures. Although the trial judge told Heidelberg that he faced complex legal issues and the death penalty and that proceeding *pro se* would be a "tragedy," he granted Heidelberg's motion.

74.     Defendant Koepple knew or should have known of the unconstitutional eavesdropping taking place within his office. Indeed, Koepple knew of Manias' misconduct from

the very first days of the investigation and relieved him of his duties as lead detective assigning him to work at the Peoria County Jail during the night shift. However, Koepple did not take any action to expose Manias' misconduct, including his eavesdropping to Heidelberg or any competent authority and he failed to prevent further eavesdropping and other misconduct by Manias and the other Defendant Officers while Heidelberg was in their custody at the jail.

75.    Likewise, defendant Kennedy, who succeeded Koepple and who knew or should have known of Manias' misconduct, not only failed to intervene or expose Manias, he actually promoted him to the position of Sergeant to fill the vacancy created by the death of Sergeant Espinoza.

76.    As a direct result of the 1970 Defendants actions, Mr. Heidelberg was wholly deprived of his constitutional right to counsel.

77.    And Mr. Heidelberg's defense was so thwarted and his trial was so tainted that he was effectively denied not just his right to a fair trial but his right to trial altogether.

**The Fabricated Lineup Report**

78.    The 1970 Defendants now knew that Mr. Heidelberg intended to raise an alibi defense. They also knew that a "Lester Mason" (and perhaps others) could testify that Mason borrowed Heidelberg's car and that several other people had seen Heidelberg at the "T&T Club" and elsewhere during the time the shooting had occurred.

79.    Rather than investigate these critical facts, at defendant Macklin's direction, the original lineup report was destroyed and Manias prepared a second lineup report in which he falsely reported that Manuel and Cremeens had identified Mr. Heidelberg in both the original and reverse run of the lineup and further falsely claimed that Heidelberg had waived his right to an attorney and voluntarily participated in the lineup with no attorney present.

19

80.     The 1970 Defendants who were present at the jail when the lineup was conducted knew or should have known that the second lineup report was false. In fact, during his investigation and only two days after the lineup was conducted, Hamm interviewed Manuel and she told him she could not see any of the participants in the lineup nor could she make an identification because her glasses had been broken during the commission of the crime. Hamm also knew Cremeens had identified two different men at the lineup.

81.     In addition to fabricating a lineup report, the 1970 Defendants capitalized on Lucas' spontaneous utterance "That's Cleve" to fabricate an additional eyewitness identification. Specifically, defendant Macklin asked Lucas whether "he was acquainted with the suspect, Heidelberg" and "if he would testify that Heidelberg was the guilty party that shot and killed Espinoza." Lucas told Macklin that he did know Heidelberg and agreed to identify him as the man who shot Sergeant Espinoza. Macklin promptly paid Lucas $40, an amount equivalent to over $250 today. Under the guise of paying Lucas as a confidential informant, Macklin continued making payments to Lucas up to and through the trial in an amount equal to about $2000 today.

82.     There were no records to support Macklin's claim that Lucas worked as a confidential informant for the police at any time prior to the shooting and, as Macklin admitted, the payment he made to Lucas during their meeting was the first payment ever made by the police to Lucas. In addition to receiving a steady stream of cash, police were also paying his room and board expenses and had agreed to do so through Mr. Heidelberg's trial.

83.     After purchasing his identification, Manias and Macklin also falsely claimed that Lucas had identified Heidelberg at the lineup.

84.     Manias, Macklin, Hamm and Riddle had additional meetings with Lucas during which they instructed him to falsely claim that Manuel and Cremeens whispered their

identifications into an officer's ear and to suppress the content of his initial meeting with Macklin. The 1970 Defendants did not disclose the meetings with Lucas or their content to Mr. Heidelberg prior to trial.

85.     The falsified lineup report and Lucas' purchased identification served two very important purposes. First, the falsified identifications gave the 1970 Defendants the "probable cause" necessary to arrest Heidelberg, charge him with the crime and keep him incarcerated. Second, it enabled Manias to testify at trial that Manuel and Cremeens identified Heidelberg in the lineup conducted almost immediately after the crime occurred.

**The 1970 Defendants Fabricate Officer Identifications And Police Reports**

86.     Because Lucas was an unemployed hustler with an extensive criminal record, the 1970 Defendants knew they needed more than his identification to defeat Mason's occurrence testimony and Heidelberg's alibi testimony.

87.     They also knew they needed an explanation for the fact that Mr. Heidelberg was wearing a blue shirt and gray sports coat when he was arrested not the yellow shirt and brown jacket reported by witnesses and broadcast over the police radio. In addition, they had to contend with Manuel and Cremeens' statements that the perpetrator was not wearing glasses. To that end, they suppressed and fabricated more evidence.

88.     First, they suppressed the tapes of the radio transmissions and falsely reported to Heidelberg and the court that they had been destroyed. In fact, the tapes were never destroyed and had been transcribed by these defendants on June 18, 1970. The tapes were never produced to Heidelberg and the transcript was produced on the eve of trial depriving Heidelberg of the time necessary to examine or investigate or utilize their content in his defense.

89.     Second, they suppressed and/or destroyed the notes and reports documenting the interviews of Sack, DeCremer, Watson, Hilst and Hibser during which they told Manias and Hamm that they could not identify the driver of the Chevy.

90.     Third, they agreed that Sack, DeCremer and Watson would prepare fabricated police reports in which they would falsely document that they had seen the driver of the Chevy during the high-speed chase and that he was wearing a blue shirt, a gray sports coat and glasses. They also agreed that Watson would falsely document that he knew Heidelberg and recognized him as the driver during the high-speed chase.

91.     Fourth, the 1970 Defendants further agreed that Sack, DeCremer and Watson would falsely testify that Heidelberg was the driver of the Chevy. The 1970 Defendants also agreed that Hilst would falsely testify that he saw the driver during the high-speed chase and that he was wearing a blue shirt, gray sports coat and glasses and that Hibser would falsely testify that he saw the driver exit the Chevy after it crashed and that the driver was the same man (Heidelberg) that was arrested over thirty minutes later.

92.     Fifth, the 1970 Defendants agreed that Bernard and Schalk would prepare a fabricated police report in which they would document that Lucas had identified himself over Sergeant Espinoza's squad radio and that Bernard and Schalk would falsely testify that when they arrived at the Drive-In, they noticed that Lucas was wearing a yellow shirt and brown jacket. In addition to these fabrications, Bernard and Schalk suppressed the true description of the clothes Lucas was wearing that night—exculpatory evidence that was critical to Mr. Heidelberg's ability to demonstrate that the wrong man was apprehended. Bernard and Schalk's fabrication and suppression was critical to providing purported probable cause to arrest, charge, detain and prosecute Mr. Heidelberg, and in convicting him, because Bernard and Schalk were the only

officers who questioned Lucas at the crime scene and who, therefore, through their fabrication and suppression, were able to (falsely) account for the discrepancy between the radioed description of the offender's clothing (yellow shirt/brown jacket) and the clothes Heidelberg was wearing when he was arrested (blue shirt/gray sports coat).

93.    The 1970 Defendants also went to work on Manuel and Cremeens. They met with them repeatedly and fed them facts about the case and told them what the Defendant Officers were claiming to pressure and induce them to agree to testify falsely that Heidelberg was the perpetrator. And Manuel and Cremeens did just that—they falsely identified Heidelberg at his trial as the perpetrator of the attempted armed robbery and murderer of Sergeant Espinoza.

94.    Neither the meetings with Manuel and Cremeens nor the content of the discussions at the meetings were ever disclosed to Heidelberg prior to trial.

95.    Moreover, their fabricated identifications were buttressed at trial through the use of the fabricated lineup report

96.    Likewise, Sack, DeCremer and Watson's fabricated in-court identifications (which included the false claims that the driver of the Chevy, the undisputed offender, was wearing a blue shirt and gray sports jacket) were buttressed through the use of fabricated reports and through Bernard and Schalk's fabrication that Lucas was wearing a yellow shirt and brown jacket and their false report that Lucas had so identified himself over radio transmissions.

### The Pre-Trial Interrogation of James Clark

97.    Also prior to Mr. Heidelberg's trial, two FBI agents interrogated James Clark about the murder of Officer Espinoza while he was in the Rock Island County jail awaiting trial on charges of armed robbery. Clark denied involvement but it became clear to him that police knew

he was in Heidelberg's car. To "counter this," Clark told the agents that he had been in Heidelberg's car for a few minutes on May 26, 1970.

98.    During Mr. Heidelberg's post-conviction proceedings, Manias admitted that James Clark was in fact interrogated at the Rock Island County jail. Although Manias claimed he could not recall whether the interrogation occurred in July 1970, he admitted the interrogation "may" have occurred before Heidelberg's trial.

99.    A police report in Heidelberg's criminal files confirms Clark's July 1970 arrest in Rock Island, Illinois and also confirms that he pleaded guilty on September 18, 1970. Thus, the latest the Rock Island interrogation could have taken place was mid-September 1970, two and a half months before Heidelberg's trial commenced. The report detailing Clark's arrest and guilty plea was not produced to Heidelberg before trial or at any time prior to a 2016 FOIA request.

100.    For nearly fifty years, Mr. Heidelberg resolutely suspected and therefore alleged that the 1970 Defendants suppressed or destroyed an FBI fingerprint report that identified James Clark's prints on one of the items found at the Drive-In or in the Chevy. And for nearly fifty years, various state actors, including the 1970 Defendants, have denied that any such report exists.

101.    However, neither the 1970 Defendants nor any state actor ever disclosed the pre-trial interrogation of James Clark prior to Manias' admissions during the 2017 post-conviction hearings nor did they ever produce the evidence that led to the interrogation. In fact, there are no police reports or any other documents recording statements from any individual that identify James Clark as a potential suspect. But there are additional reports relating to James Clark's arrest in Rock Island.

102.    And, in a slip that would give even Freud pause, another report dated June 8, 1970, refers to "Cleve Heidelberg" as "James Heidelberg."

### Lester Mason

103.     In addition to his admission that he eavesdropped on privileged communications between Heidelberg and his counsel just a few days after the shooting, Manias also admitted during Heidelberg's 2017 post-conviction hearings that notes he had taken of another conversation between Heidelberg and his counsel were prepared the morning of the shooting after the failed lineup when Heidelberg was first allowed to meet with a lawyer. Thus, the 1970 Defendants knew within hours of the shooting that Heidelberg had loaned his car to Lester Mason and that Heidelberg was in the area of the crash because Mason had told him to go to that general vicinity to pick up his car.

104.     Manias' notes were not produced to Heidelberg at any time prior to his 2017 post-conviction proceedings and, in fact, they were only produced then on the eve of the hearings.

105.     Manias admitted that he did not attempt to interview Mason after spying on these privileged communications and claimed Mason "wasn't available" to him. In fact, Mason, who was in incarcerated from June 1970 through the end of the trial and for several years thereafter, was always available to Manias and the 1970 Defendants. He was also available to defendant Brady during his purported investigation of Mr. Heidelberg's case.

106.     The 1970 Defendants did not interview Mason until November 1970 because they did not want to expose their eavesdropping. They determined to wait until Heidelberg disclosed Mason on his notice of alibi defense and then use that disclosure as a pretext for "interviewing" Mason. Their intention was not to interview Mason; it was to threaten, intimidate and/or bribe Mason into fabricating evidence against Heidelberg or keeping his mouth shut.

107.     The court allowed Heidelberg to delay filing his notice of alibi defense until an expected ruling from the Illinois Supreme Court on the issue of whether requiring a criminal

defendant to disclose his/her alibi witnesses was constitutional was issued. The 1970 Defendants patiently waited for five months but, with no ruling and the trial scheduled to start in two weeks, they decided to go ahead and interview Mason before it was too late.

108.    As Hamm admitted during Heidelberg's 2017 post-conviction hearings, he questioned Mason twice before Heidelberg's trial.

109.    He first questioned Mason in early November 1970. Riddle and an unknown Peoria County Sheriff's officer were with Hamm. During that meeting, Hamm and Riddle told Mason that Heidelberg was claiming that he had loaned his car to Mason on the night/morning of the shooting. Mason told them that he had in fact borrowed Heidelberg's car and given it to James Clark and that Clark, not Heidelberg, had the car during the time of the robbery and shooting. Hamm and Riddle told Mason that Heidelberg was trying to pin the crime on him and that if he testified on Heidelberg's behalf and Heidelberg was found not guilty, he could be charged with the crime.

110.    On November 12, 1970, Mr. Heidelberg filed his notice of alibi defense disclosing his alibi witnesses. Mason was not on the list because he was an occurrence witness not an alibi witness and Heidelberg was not required to disclose Mason as an occurrence witness under the rules of discovery in criminal proceedings as they existed at the time of his trial.

111.    On November 13, 1970, the very next day, Hamm and Riddle amended their witness list to include Mason. In 2016, Hamm claimed that during that meeting, Mason denied borrowing Heidelberg's car and, in Heidelberg's 2017 post-conviction proceedings, he claimed he added Mason to his witness list because he liked what Mason had to say. However, Hamm did *not* call Mason as a witness during Heidelberg's trial.

112.    When Heidelberg asked for a writ to bring Mason from prison to the court to testify, the 1970 Defendants knew that Mason would testify that he had borrowed Heidelberg's car and given it to James Clark. To stop that testimony, Hamm and Riddle went to Mason's cell in the Peoria County Jail the night before he was to testify and brought Mason's common law wife, Mary, with them. At Hamm and Riddle's direction, Mary told Mason that Heidelberg, through his witnesses, was trying to lay the crime at Mason's feet. Hamm and Riddle then allowed Mason and Mary to have a conjugal visit.

113.    Because of the threats from Hamm and Riddle, Mason was not sure whether he was going to testify at Heidelberg's trial. When Mason was brought to the courthouse the next day and almost immediately before he testified, Riddle, with Hamm's knowledge, put Mason in a wired room[4] and instructed him to listen to the testimony of Junius Whitt.

114.    In summary, Whitt testified that he, a man he referred to as "Curtis Smith," Lester Mason, Matthew Clark (James' younger brother) and Mike Biehl were together the late night/early morning of the shooting and that he, "Smith" and Mason discussed committing a robbery together. Smith proposed robbing a Drive-In and the men eventually dropped Whitt off at his house to change his clothes and get his guns while Smith and Mason drove Matthew Clark and Biehl to a club down the street. Smith returned to Whitt's house a few minutes later and Whitt decided to withdraw from the plan but he loaned one of his guns to Smith.

---

[4] Because Mr. Heidelberg continued to challenge the integrity of his trial and repeatedly argued that he could not under any circumstances receive a fair trial in Peoria County, the trial court ordered that a witness room be fitted with speakers wired to the courtroom and that Heidelberg be removed from the courtroom to that witness room during times he challenged the court and objected to the continuation of the trial.

115.    Because Whitt did not know that Mason had also withdrawn from the plan after Mason and Smith dropped off Matthew Clark and Biehl, his testimony left the impression that Mason was still on board and thus also implicated Mason in the actual commission of the crime.

116.    After listening to Whitt's testimony, Mason exercised his Fifth Amendment rights in response to virtually every question put to him at trial. Heidelberg also called Matthew Clark, who had refused to speak with Heidelberg at any time prior to, during or after his trial, to the stand but he too took the Fifth in response to every question put to him. As Matthew would later reveal after James Clark's death, James had confessed to him just a few hours after the shooting and he took the Fifth to protect his brother from the death penalty or life in prison.

117.    The 1970 Defendants did not disclose Mason's statements that he had borrowed Heidelberg's car and had given it to James Clark and that James Clark had possession of Heidelberg's car during the time of the commission of the crime. Nor did they disclose the tactics they used to intimidate Mason and stop him from testifying.

118.    Mason's testimony was critical to Heidelberg's defense. Mason was alone when he borrowed Heidelberg's car. He was also alone when he gave Heidelberg's car to James Clark and he did so without Heidelberg's knowledge. Thus, Mason was the only witness who could provide an explanation for the use of Heidelberg's car in the commission of the crime.

119.    Mason was also the only witness who knew that Clark crashed Heidelberg's car. Mason and Clark had agreed that Clark would call Mason at a local bar so they could meet up and Clark could return Heidelberg's car. When Clark called Mason, however, he told him that "things didn't go right" and told him where he could pick up Heidelberg's car. Mason then found Heidelberg in a nearby club and told him he had left Heidelberg's near the general vicinity of the crash site. He did not tell Heidelberg that Clark had had his car or that the car had been used in the

commission of a crime. Heidelberg hitched a ride with a friend who dropped him off in the area of the crash site where Heidelberg was arrested as he searched for his car.

120.    Although Whitt used the alias "Curtis Smith" to protect James Clark, the 1970 Defendants knew that Smith was actually James Clark. When Heidelberg's pre-trial search for a "Curtis Smith" was unsuccessful, the 1970 Defendants falsely told him that a "Curtis Smith" did in fact exist but that they had not been able to locate him. Thus, not only did they fail to disclose Smith's true identity, they misled Heidelberg into continuing his futile search for a man they knew did not exist.

121.    If the 1970 Defendants had disclosed their July 1970 interrogation of James Clark and Clark's admission that he had been in Heidelberg's car or the evidence that led them to Clark, or Mason's statement that Clark had Heidelberg's car during the time of the commission of the crime, Heidelberg could have (as the 1970 Defendants should have) shown Manuel and Cremeens a picture of Clark and asked them whether he was the man they saw that night at the Drive-In and he could have otherwise further investigated Clark's involvement in the crime. He also could have called Clark as a witness at his trial and even elicited a confession from Clark before he was convicted. After all, Clark did confess just weeks after Heidelberg was convicted.

122.    In committing the misconduct described in the preceding paragraphs, the 1970 Defendants made an agreement with one another, and with others currently unknown to Plaintiff, to individually, jointly, and/or in conspiracy fabricate and suppress evidence to initiate and perpetuate false criminal charges against Mr. Heidelberg, to maliciously prosecute him, to secure his wrongful conviction and incarceration and to deprive him of his right to defend at himself at trial.

**Heidelberg Is Found Guilty**

123.     As a direct result of the violation of Mr. Heidelberg's Sixth Amendment rights, the 1970 Defendants deprived him of his right to present a defense against the false charges brought by these defendants. Their actions also constituted a fraud upon the court and the jury.

124.     And as a direct result of the suppression and destruction of material exculpatory and impeaching evidence and the fabrication of inculpatory evidence as set forth above, the jury found Mr. Heidelberg guilty of the murder of Sergeant Espinoza and the attempted armed robbery of the Bellevue Drive-In.

**The Confession of James Clark**

125.     On the heels of Mr. Heidelberg's conviction, James Clark was sent to the same prison that housed Heidelberg to serve two concurrent sentences of 6 to 8 years for the armed robberies he committed in July 1970 in Rock Island, Illinois. Shortly after he arrived, Clark began sending notes to Heidelberg through a man named Robert Butler. In those notes, Clark told Heidelberg that he was considering writing to Heidelberg's trial judge or other authorities to let them know what had really happened on May 26, 1970. Heidelberg left that prison, however, without the men ever having met. A short time later, Heidelberg's trial counsel interviewed Clark who stopped short of fully confessing.

126.     During the 2017 post-conviction hearings, Hamm falsely denied that he had any knowledge of a confession by Clark while he was involved in Mr. Heidelberg's criminal proceedings. In fact, at Heidelberg's January 25, 1971 sentencing hearing, Hamm successfully objected to Heidelberg's request that his sentencing be delayed and that he be allowed to bring James Clark to testify before the court.

127.    In February 1971, James Clark publicly confessed in an interview with the Peoria Journal Star. In October 1971, Clark gave a detailed affidavit of confession. The facts of Clark's confession were materially consistent with (but not identical to) the testimony of Officer Patty, Manuel, Cremeens and Whitt. Notably, Mr. Heidelberg did not request a transcript of the testimony at his trial until January 19, 1972 and the transcription of the first day of testimony was not completed until March 16, 1972 and transcription of the last day of testimony was completed on August 11, 1972. The confession is also consistent with Matthew Clark and Lester Mason's account of events as they transpired on May 26, 1970.

**The 1971-73 Post-Trial Proceedings**

128.    After the court sentenced Mr. Heidelberg, he filed a writ of coram nobis (the "section 72 proceedings") alleging, among other things, that Peoria County Sheriff's officers, Peoria City police officers and Hamm and Riddle knew and suppressed the true identity of "Curtis Smith." Mr. Heidelberg also alleged that Peoria County officers and prosecutors eavesdropped on privileged communications with his counsel throughout the investigation.

129.    Notwithstanding their pre-trial interrogation of James Clark and the evidence in their possession that led them to Clark and notwithstanding their knowledge of and collusion in the eavesdropping described above and their possession of Manias' written report documenting a specific instance of such eavesdropping, Hamm and Riddle, in conspiracy with the other 1970 Defendants, engaged in a gross abuse of process and predatory resistance to Mr. Heidelberg's valid claims with an ulterior motive and purpose—the cover-up of their and the remaining 1970 Defendants' suppression and destruction of material exculpatory and impeachment evidence and their fabrication of inculpatory evidence.

130.    A few months after Mr. Heidelberg filed his writ, Hamm resigned his position as an Assistant State's Attorney but, acting individually, jointly, and in conspiracy with Riddle and the other 1970 Defendants, Hamm continued to use the litigation process for the improper purpose of covering up his and the other 1970 Defendants' misconduct and depriving Heidelberg of the essential facts crucial to his pursuit of valid claims and his ability to prove his innocence and end his wrongful conviction and incarceration.

131.    The 1970 Defendants also attempted to fabricate and did fabricate additional evidence to discredit James Clark's confession.

132.    First, Riddle met with Mason and told him that he had heard that Mason's wife, Mary, was facing charges regarding some stolen checks. He then asked Mason if had seen Heidelberg. When Mason replied that he had, Riddle told him that if he testified for Heidelberg that would help Heidelberg but right now Mason and Mary needed help and he (Riddle) needed help too. Mason asked him what he meant and Riddle told him to think very carefully about what Riddle was about to tell him. Riddle then again falsely told Mason that Heidelberg was trying to pin the crime on him and asked him if Heidelberg had told Mason that he (Heidelberg) committed the crime. Mason told Riddle that Heidelberg did not commit the crime nor did Heidelberg ever tell Mason that that he committed the crime. Riddle told Mason that, if he wanted to see Mary get help, he had better change that response if he was called to testify in court.

133.    Riddle then asked Mason if he had been able to get his sentence reduced. Mason told him he hadn't and Riddle told him not to worry and that he would take care of it for him. Riddle then told him to think about what he had said and that he and Hamm would help both Mary and Mason. Riddle reiterated that Mason could not get on the stand and testify that Heidelberg was

innocent nor could he testify that James Clark or "Curtis Smith" committed the crime if he wanted their help.

134.    Riddle then arranged for Mary to be sentenced to one year of probation and met with Mason again. After the second meeting, Mason felt he owed Riddle for "saving" Mary and agreed to and did give a false court-reported statement implicating Mr. Heidelberg. Four days after giving the statement, Mason documented his meetings and discussions with Riddle and ultimately refused to sign the court-reported statement. However, Riddle blocked Mason's testimony by falsely telling the court that he had a signed affidavit from Mason contradicting Heidelberg's claims that Mason was willing to appear and testify. Although Riddle eventually had to admit that he could not produce the affidavit, the court refused to allow Mason to testify in Heidelberg's section 72 proceedings.

135.    Because Riddle was unsure of whether Mason would ultimately give the false testimony he wanted (in fact, Mason never did), Riddle, Hamm, and other co-conspirators including the Unknown Defendant Officers, knowing that Matthew Clark was a recovering drug addict, used Matthew's girlfriend to plant drugs in his home so they could falsely charge him with possession. After they charged him, Riddle told Matthew that he would dismiss the charges if Matthew would agree to falsely incriminate Mr. Heidelberg in the attempted robbery of the Drive-In and the murder of Espinoza. In addition, Riddle told Matthew that if he didn't incriminate Heidelberg, his brother (James Clark) would be in "big trouble." Matthew Clark refused to falsely incriminate Heidelberg.

136.    Riddle also objected to any live testimony from James Clark regarding his confession stating to the court: "Would you want him here, your Honor? We don't want him here."

The cover-up was successful and the court ultimately refused to allow Clark and Mason to give live testimony before dismissing Mr. Heidelberg's section 72 proceedings on April 25, 1973.

137.    In committing the misconduct described in the preceding paragraphs, Riddle, Hamm and the 1970 Defendants made an agreement with one another, and with others currently unknown to Plaintiff, to individually, jointly, and/or in conspiracy, to further fabricate and suppress evidence and to engage in the improper use of litigation to cover-up their misconduct and to perpetuate Mr. Heidelberg's wrongful conviction and incarceration and to deprive him of meaningful access to the courts.

138.    This egregious abuse of process and malicious prosecution continued decade after decade as Mr. Heidelberg attempted to bring his valid claims and prove his innocence. James Clark was never allowed to testify in any court proceeding and passed away on May 5, 2015. Shortly thereafter, defendant Brady joined the conspiracy and continued the abuse of process and malicious prosecution with the ulterior motive and sole purpose of covering up the misconduct of the 1970 Defendants generally and of his long-time friend and mentor defendant Hamm specifically.

**Defendant Brady Is Disqualified From Acting As Prosecutor In Heidelberg's Case**

139.    After James Clark's death in May 2015, Matthew Clark came forward and disclosed that, within a few hours of the attempted robbery and shooting at the Drive-In, James showed up at their parents' home and confessed to Matthew that he had shot and killed Sergeant Espinoza. Matthew also disclosed that James and Lester Mason had possession of Heidelberg's car the night/morning of the shooting and that James had later told him that his fingerprints had connected him (James) to the crime.

140.   Matthew's testimony during the post-conviction hearings regarding James' confession to him included material facts not contained in James' affidavit of confession and those facts could only have been known to the shooter at the time James told them to Matthew. The additional facts are also corroborated by the testimony of multiple witnesses at trial and by forensic evidence.

141.   Matthew Clark also testified that their much younger brother Mark Clark was killed at the hands of Chicago police during a raid on the Black Panthers on December 4, 1969, just months before James shot and killed Sergeant Espinoza. Matthew testified that James told him he could have escaped when Espinoza drove up to the Drive-In but decided to hide and ambush and murder Sergeant Espinoza in an act of revenge for the killing of Mark Clark. These facts are also corroborated by the testimony of multiple witnesses at trial and by forensic evidence.

142.   Matthew also testified that Lester Mason and James Clark had possession of Mr. Heidelberg's car the night/morning of the shooting and that Heidelberg was not with them at any time.

143.   Matthew, who suffers from bone cancer and cannot travel and who testified at the post-conviction hearings through a video-taped evidence deposition, had not seen or had any contact with Heidelberg since his 1970 trial. Nor did he have any contact with Heidelberg after he came forward.

144.   Likewise, Mason came forward and reiterated his account of his interactions with Hamm and Riddle and the events that transpired on the night/morning of the shooting. Mason had not had any contact with Heidelberg since 1974 when he gave an affidavit attesting, among other things, that he had borrowed Heidelberg's car and given it to James and later told Heidelberg he could pick up his car in the vicinity of the crash site.

145.    Heidelberg's counsel shared this and other substantial evidence, including evidence from Heidelberg's FBI files and Manias' written report detailing the eavesdropping described above and requested that Brady investigate Heidelberg's case. Heidelberg's counsel also continued to investigate and transmit additional evidence to Brady as it was discovered.

146.    Rather than commence an investigation, defendant Brady joined in the continuing agreement and conspiracy to cover-up the misconduct of the 1970 Defendants, including the misconduct of his long-time friend and mentor defendant Hamm.

147.    To that end, Brady, who knew that Heidelberg, Mason and Matthew Clark were elderly and that Heidelberg and Matthew were in extremely poor health (Matthew was suffering and continues to suffer from bone cancer), failed and refused to interview any of them and failed and refused to interview Hamm, Manias or Hibser.

148.    Brady did, however, speak to Hamm by phone on at least 18 occasions during Heidelberg's counsel's investigation. Not one of those calls were of sufficient length to enable any interview or search for truth. Indeed, Brady sat on the evidence for months and then summarily informed Heidelberg's counsel that although there were "issues of concern," he would not be re-opening Heidelberg's case.

149.    As Heidelberg would later discover, Brady also suppressed additional documents, including Manias' notes from at least one instance of eavesdropping.

150.    Because of Brady's refusal to investigate, Heidelberg petitioned the circuit court for appointment of a special prosecutor. Although Brady claimed he had engaged in "an extensive and exhaustive" investigation, he could not produce any evidence of any investigation whatsoever.

151.    The circuit court found that an actual conflict disqualified Brady from acting as prosecutor and investigating Heidelberg's case and appointed the Illinois Attorney General's Office ("AGO") as special prosecutor.

152.    Nonetheless, Brady continued his abuse of process and improper use of the litigation process for the sole purpose of perpetuating the cover-up and engaged in a predatory resistance to the petition and used his influence to continue and perpetuate Heidelberg's malicious prosecution and unconstitutional deprivation of liberty.

153.    Brady in fact filed a frivolous motion to reconsider the appointment and when that was denied, he filed a motion to appoint a special prosecutor in Heidelberg's post-conviction proceedings which had commenced shortly after the filing of Heidelberg's petition to appoint a special prosecutor.

154.    The appellate prosecutor's division has an independent unit of prosecutors who act only in cases in which a special prosecutor has been appointed and the unit is actually called "Special Prosecution Unit." As stated on the appellate prosecutor's website:

> If a conflict of interest arises in a State's Attorneys office, and the State's Attorney wants *an independent, detached review and prosecution by an outside person*, or if special assistance is needed due to the complexity of a case, the Agency makes the services of the Special Prosecution Unit available. (emphasis added)

See http://www.ilsaap.org/special_prosecution_unit.htm. Brady, however, bypassed that unit and successfully sought the appointment of Matt Jones, a local Peoria appellate prosecutor under Brady's control and influence, who also just happened to be the prosecutor assigned to oppose Heidelberg's requests for parole.

155.    The day after Jones was appointed, Brady filed a notice of appeal of the circuit court's order appointing the AGO as special prosecutor (the "Appointment Order") to investigate Heidelberg's case. He also filed motions to stay the Appointment Order pending appeal. Both the

circuit court and the appellate court denied his motion. These actions were taken in conspiracy with Hamm and other 1970 Defendants to continue the cover-up of the 1970 Defendants' misconduct and the malicious prosecution of Heidelberg and to thwart Heidelberg's valid claims and deny him meaningful access to the courts in pursuit of those claims.

156.    In addition, within two business days of the appointment of the AGO as special prosecutor, Brady began an extensive email correspondence with the AGO. Although heavily (and inexplicably[5]) redacted, the emails reveal that the AGO researched and drafted pleadings on behalf of Brady to assist in his efforts to thwart the AGO's own appointment and the independent investigation the AGO was ordered to conduct. Beyond redacting, the AGO also suppressed email correspondence and other documents reflecting communications between it and Brady. The AGO also failed and refused to interview Matthew Clark or Lester Mason even after it had been advised that Clark's bone cancer was spreading and that Clark himself feared he would die before he was able to testify to the truth of Heidelberg's innocence and undo the damage and injustice done to Heidelberg in part through his silence.

157.    After Heidelberg's conviction was vacated, the AGO, without having conducted any investigation, moved to dismiss its appointment. The circuit court granted the AGO's motion but the appellate court struck the order granting the motion and the AGO remains in place as a purported independent special prosecutor. Notwithstanding the appellate court's order, the AGO, acting in conspiracy with Brady and others, persisted in its refusal to investigate Heidelberg's case.

158.    Matt Jones, the purported special prosecutor in Heidelberg's post-conviction case, also participated in the drafting of pleadings to defeat the Appointment Order and thwart the

---

[5] The AGO was *not* appointed to represent Brady and although the AGO did act as shadow counsel in contempt of the Appointment Order, it cannot claim any privilege with respect to its communications with Brady or any pleadings or other documents it prepared on behalf of Brady.

independent investigation and remained in contact with Brady and the AGO throughout his appointment. Jones was also surreptitiously feeding information to the press and keeping the press apprised of events in the case as they unfolded. Jones also mocked Heidelberg's efforts to secure bail after his conviction was vacated and derisively referred to Heidelberg as "Shango," an old African name brought to the Americas through slavery that Heidelberg had adopted in tribute to his heritage while in prison.

159.    Jones, in conspiracy with Brady and Hamm and others, also used the litigation process for an improper purpose and mounted a predatory resistance to Heidelberg's valid post-conviction claims to perpetuate the cover-up and protect the 1970 Defendants, including Hamm.

160.    At no point during this time did Brady act as a prosecutor. Indeed, he was disqualified by court order and the appellate court not only affirmed his disqualification but it independently found that Brady had an actual conflict based on his relationship with Hamm and had failed to conduct a meaningful investigation. Nonetheless, using the power and authority of his office and his personal and professional relationships, Brady exerted influence to initiate, continue and perpetuate the abuse of process and to continue and perpetuate Heidelberg's malicious prosecution to maintain the cover-up and delay Heidelberg's vindication in hopes that Heidelberg, Mason and Matthew Clark would never be able to expose the misconduct of the 1970 Defendants and that Heidelberg would never be able to assert his valid claims, obtain his freedom and seek redress for the harms done to him.

### Heidelberg's Conviction Is Vacated

161.    After three days of testimony from six witnesses, the circuit court vacated Mr. Heidelberg's conviction, finding that the evidence against him at his criminal trial was of little if any probative value in that it consisted almost exclusively of in-court identifications which were

extremely weak and not entitled to much, if any, weight, particularly when viewed in light of the new evidence which was not available to the jury.

162.    Specifically, the court noted that Manuel could not identify Mr. Heidelberg at the lineup or at the June 4, 1970 hearing and that Cremeens identified two different men during the lineup. As for the in-court identifications by Sack, DeCremer, Watson, and Hibser, the court noted that Sack admitted to Hamm that he was not certain of his identification, and the remaining identifications, like Sack's, were based on the officers' claims that they were able to see the driver of the get-away car at night during the course of a high-speed chase of between "70-100 mph" and that the description of the perpetrator's clothes in the radio logs was inconsistent with the officers' identifications. The court also noted that there was no forensic evidence tying Heidelberg to the crime.

163.    The only other piece of evidence (which the court referred to as having been the "anchor" of the evidence at Heidelberg's trial) was the use of his car in the commission of the crime and his presence in the vicinity of the crash site. However, the court noted there was a significant time gap between the driver exiting the car and the apprehension of Heidelberg and that the State knew almost immediately after the crime from Manias' eavesdropping "[w]hy [Heidelberg's] car was involved."

164.    The court also found the testimony of Matthew Clark and Lester Mason who had asserted their Fifth Amendment rights at Heidelberg's trial was of critical importance and further weakened the "anchor" because it established that James Clark had Heidelberg's car that night/morning and that defendant Riddle "understood the importance of [their] testimony" at the time of Heidelberg's trial. The court found their testimony to be not only credible but beyond dispute because even the FBI knew James Clark was in Heidelberg's car that night/morning. As

the court put it, there can be no "dispute" that James was "the person in the vehicle, not Cleve Heidelberg," As the court concluded: "The Court, therefore, finds that it's *highly probable* that another jury, when considering all the evidence old and new together, would come to a different verdict."

165. In short, because all parties, including the State and Defendants in this action, agreed that the driver of the Chevy was the perpetrator of the crime (Manuel, the hostage, was found in the Chevy), the court's finding that James Clark and not Mr. Heidelberg was the driver of the car was an adjudication of Heidelberg's actual factual innocence that was binding on the State and effectively terminated the criminal case against Mr. Heidelberg in a manner indicative of innocence.

166. Notwithstanding this finding of fact not to mention Hamm and Manias' devastating admissions during their testimony, Brady, in conspiracy with Jones and Hamm and others, appealed the court's ruling for the sole purpose of perpetuating the cover-up and protecting Hamm, himself and the 1970 Defendants from liability for their misconduct, including their violation of Mr. Heidelberg's constitutional rights, their abuse of process and their malicious prosecution of Heidelberg, and to deny Heidelberg his right to meaningful access to the courts and to assert his valid claims to redress the harm and injustice done to him.

167. Indeed, Brady caused Jones to the file the notice of appeal in open court and just minutes after the court announced its ruling. Jones did not take a single minute to review the court's findings or to consider Hamm and Manias' dispositive admissions during their testimony. In fact, there was no basis in law or fact to support the appeal.[6]

---

[6] Jones also opposed bail and argued that the court should require a $5,000,000 bond for a 74-year-old man in such poor health that he couldn't even walk a half block without resting.

168.     And, as it turned out, after the notice was filed, the appeal was ignored and the due date for the State's opening brief came and went without a word from the State. Eventually, the State admitted that it had forgotten all about the appeal (an appeal that was so pressing it was prematurely filed) and sought and received a nearly three-month extension during which it cobbled together nonsensical arguments unsupported by law or fact that could never be sustained under well-settled and binding precedent.

169.     Just a few days before the State's closing brief was due, Mr. Heidelberg, out on bail for less than 10 months and with a 24-hour monitoring device attached to his person, died in his sleep. Rather than file the closing brief, Brady caused the State to file a motion to dismiss the appeal claiming the appeal was now moot. However, the appeal was far from moot from the State's perspective. There remained an actual case and controversy—the reversal of the order vacating Mr. Heidelberg's conviction and in particular the findings of factual innocence by the circuit court.

170.     Had there been any purpose other than the cover-up of the misconduct set forth in this complaint and had there been a single argument that could have been made in reply to Heidelberg's response brief, the State would have filed its brief and opposed any attempt by Heidelberg's estate to dismiss it (no such attempt was ever made).

**Heidelberg's Wrongful Conviction and Imprisonment**

171.     In 1970, as a result of 1970 Defendants' misconduct and based on the false evidence described in this complaint, Heidelberg was arrested, indicted, prosecuted, and convicted of murder. The trial court spared Heidelberg the death penalty, and he was sentenced to 99 to 175 years in prison.

172.     Without the 1970 Defendants' fabrication, manufacture, suppression and destruction of evidence, Heidelberg never would have been arrested, indicted, prosecuted, or

convicted. At no point in time between 1970 and the present day has there been any credible evidence giving rise to probable cause to suspect Heidelberg of the murder of Sergeant Espinoza.

173.    In addition, without the 1970 Defendants' violation of Mr. Heidelberg's right to effective counsel and to present a defense, Heidelberg would not have been deprived of the advice and counsel and evidence necessary to present a defense and prove his innocence.

174.    Because of the 1970 Defendants' misconduct, Heidelberg was taken away from, and missed out on, the lives of his family and friends. He returned home to relationships changed or lost by decades away. While in prison, Heidelberg's mother, father and three of his sisters died.

175.    Heidelberg was robbed of the prime of his life. He was deprived of opportunities to gain an education, to engage in meaningful labor, to develop a career, and to pursue his interests and passions. He was unable to participate in the life or rearing of his son or have other children and was deprived of all the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

176.    During his 47 years of wrongful imprisonment, Heidelberg was detained in harsh and dangerous conditions in maximum-security prisons. Numerous times he was detained in solitary confinement.

177.    Because Heidelberg was sentenced to 99 to 175 years in prison, he feared he would die inside the prison walls.

178.    In addition to the severe trauma of wrongful imprisonment and Heidelberg's loss of liberty, Defendants' misconduct continued to cause Heidelberg extreme physical and psychological pain and suffering, humiliation, constant fear, nightmares, anxiety, depression, despair, rage, and other physical and psychological effects through the date of his death.

179.     Defendant Brady, acting individually and jointly and in conspiracy with the 1970 Defendants and other co-conspirators, joined in and ratified this misconduct and engaged in an abuse of process designed to perpetuate the cover-up and deny Heidelberg his freedom and his constitutional right of access to the courts and seek redress for injury and harms done to him and to perpetuate and continue Heidelberg's wrongful conviction and incarceration and malicious prosecution.

## COUNT I
### 42 U.S.C. § 1983 – Post-Legal Process Detention Without Probable Cause
### (Deprivation of Liberty without Probable Cause)
### (Fourth and Fourteenth Amendments)

180.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

181.     In the manner described above, the 1970 Defendants, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Heidelberg of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against him without any probable cause for doing so and in spite of the fact that they knew he was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

182.     In so doing, the 1970 Defendants caused Heidelberg to be deprived of his liberty without probable cause and subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

183.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and with malice.

184.     Defendant Brady joined in the conspiracy and ratified the misconduct set forth in this complaint and, after he was removed as prosecutor, perpetuated and continued Heidelberg's

44

unconstitutional deprivation of liberty through the date of his death.

185.     As a result of the 1970 Defendants' and defendant Brady's misconduct described in this Count, Heidelberg suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above through the date of his death.

## COUNT II
### 42 U.S.C. § 1983 – Due Process, Wrongful Conviction & Illegal Confinement
### (Fourteenth Amendment)

186.     Plaintiff incorporates each paragraph of this complaint as if fully restated herein.

187.     As described in detail above, the 1970 Defendants, while acting individually, jointly, and/or in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Heidelberg of his constitutional right to a fair trial and his right not to be wrongfully convicted.

188.     In the manner described more fully above, the 1970 Defendants deliberately withheld exculpatory evidence from Heidelberg, the court and from competent prosecutors and authorities not involved in the conspiracy, thereby misleading and misdirecting the criminal prosecution of Heidelberg.

189.     The 1970 Defendants also fabricated and manufactured evidence and solicited false evidence—including witness statements and witness testimony that they knew to be false and perjured—fabricated police reports falsely implicating Heidelberg in the crime, obtained Heidelberg's conviction using that false evidence, and failed to correct fabricated evidence that they knew to be false when it was used against Heidelberg during his criminal case.

190.     The 1970 Defendants also destroyed physical evidence that, if subjected to forensic testing, would have demonstrated Heidelberg's innocence. The 1970 Defendants destroyed this

physical evidence knowing that it had exculpatory value. In the alternative, these defendants destroyed this potentially exculpatory evidence in bad faith.

191.    The 1970 Defendants' misconduct directly resulted in the unjust and wrongful criminal prosecution and conviction of Heidelberg and the deprivation of Heidelberg's liberty, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Heidelberg could not have and would not have been pursued.

192.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Heidelberg's clear innocence.

193.    Defendant Brady joined in the conspiracy and ratified such misconduct and as set forth in this complaint perpetuated and continued the injury and damage to Heidelberg through the date of his death.

194.    As a result of the 1970 Defendants' and defendant Brady's misconduct, Heidelberg suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, forced and involuntary prison labor, and other grievous and continuing injuries and damages as set forth above.

**COUNT III**

**42 U.S.C. § 1983 – Deprivation of Right To Counsel and To Present A Defense**
**(Sixth and Fourteenth Amendments)**

195.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

196.    In the manner described above, the 1970 Defendants, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, spied on privileged communications between Heidelberg and his counsel commencing from the date of arrest and continuing throughout the pre-trial proceedings. This

misconduct was intended to and did undermine Heidelberg's confidence and trust in his counsel and his ability to work with his counsel to prepare his defense.

197.  In addition, the 1970 Defendants used the information obtained through their unconstitutional spying to wholly thwart Heidelberg's defense by depriving him of essential evidence crucial to his defense as more fully described above. This misconduct irreparably tainted and corrupted Heidelberg's trial and caused his wrongful conviction and incarceration.

198.  As a result of the 1970 Defendants' misconduct, Heidelberg suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous injuries and damages that continued through the date of his death.

## COUNT IV
## 42 U.S.C. §1983 – Failure to Intervene

199.  Heidelberg incorporates each paragraph of this complaint as if fully restated here.

200.  In the manner described above, during the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Heidelberg's constitutional rights, even though they had the duty and opportunity to do so.

201.  As a result of Defendants' failure to intervene to prevent the violation of Heidelberg's constitutional rights, Heidelberg suffered pain and injury, as well as emotional distress. These Defendants had ample, reasonable opportunities as well as the duty to prevent this harm but failed to do so.

202.  As a result of Defendants' misconduct described in this Count, Heidelberg suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT V

## 42 U.S.C. § 1983 – Conspiracy to Deny Access to Courts

203.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

204.    Pleading in the alternative and to the extent any of the claims asserted in this complaint are deemed barred by *res judicata*, the 1970 Defendants, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, denied Heidelberg access to the courts to assert these claims, in violation of the First and Fourteenth Amendments.

205.    Including but not limited to the misconduct described above, these defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement to conceal, obscure, and destroy evidence related to their investigation of Sergeant Espinoza's murder and to their unconstitutional conduct and thereby to deprive Heidelberg of essential facts that were crucial to his pursuit of these claims.

206.    In so doing, the 1970 Defendants and their co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for their actions in the course of the Espinoza homicide investigation.

207.    In furtherance of their conspiracy, these defendants and their co-conspirators committed overt acts and were otherwise willful participants in joint activity up to and through the date of Heidelberg's death.

208.    Pursuant to the agreement described in this Count, Defendants did conceal, obscure, and destroy documentary evidence relating to their investigation of the Espinoza homicide. The destroyed evidence bears directly on Heidelberg's innocence. Prior to destroying this and other relevant evidence, the 1970 Defendants and their agents knew that the evidence

tended to prove Heidelberg's innocence, and they destroyed the evidence in an effort to conceal evidence of their wrongdoing.

209. To the extent any of the claims in this complaint are deemed barred by *res judicata*, the actions of 1970 Defendants described in this Count deprived Heidelberg of facts that were crucial to Heidelberg's meaningful pursuit of a legal action and thereby denied him his right to access the courts. In so doing, the 1970 Defendants directly interfered with Heidelberg's ability to meaningfully pursue a legal action and diminished the value of his legal action or, in the alternative, prevented him from pursuing a legal action at all.

210. The misconduct described in this Count was objectively unreasonable and was undertaken by the 1970 Defendants intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Heidelberg's clear innocence.

211. As a result of the 1970 Defendants misconduct described in this Count, Heidelberg suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, monetary loss and loss of his legal claims, and other grievous and continuing injuries and damages as set forth above.

212. Heidelberg's injuries described in this Count were caused by the policies, practices, and customs of the Peoria Police Department and the Peoria County Sheriff's Office, as set out above.

## COUNT VI
### State Law Claim – Intentional Infliction of Emotional Distress

213. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

214. The actions, omissions, and conduct of Defendants as set forth above were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken

with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Heidelberg, as is more fully alleged above.

215.     As a direct and proximate result of Defendants' actions, Heidelberg suffered and continued to suffer emotional distress and other grievous and continuing injuries and damages through the date of his death as set forth above.

## COUNT VII
### State Law Claim – Civil Conspiracy

216.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

217.     As described more fully in the preceding paragraphs, Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Heidelberg for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose and/or to achieve a lawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Heidelberg of these rights.

218.     In furtherance of their conspiracy, each of the co-conspirators committed overt acts and were otherwise willful participants in joint activity, including acting to further the cover-up and perpetuate his wrongful conviction and incarceration and to continue the denial of Heidelberg's constitutional rights, including his right to seek redress for the injury and harms done to him.

219.     The violations of Illinois law described in this complaint, including Defendants' intentional infliction of emotional distress, were accomplished by Defendants' conspiracy.

220.     The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Heidelberg's clear innocence.

221.    As a result of Defendants' misconduct described in this Count, Heidelberg suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above through the date of his death.

## COUNT VIII
### State Law Claim – Malicious Prosecution

222.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

223.    In the manner described above, Defendants, individually, jointly, and/or in conspiracy with one another, as well as within the scope of their employment, falsely accused Heidelberg of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against him with malice and without any probable cause for doing so.

224.    In so doing, Defendants caused Heidelberg to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

225.    The proceedings against Mr. Heidelberg terminated in a manner indicative of innocence and thereafter abated ab initio as a matter of law pursuant to 725 ILCS 5/115-4.5.

226.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in total disregard of the truth and Heidelberg's clear innocence.

227.    As a result of Defendants' misconduct described in this Count, Heidelberg suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and injuries and damages as set forth above that continued through the date of his death.

## COUNT IX
## State Law Claim--Abuse of Process

228.   Plaintiff incorporates each paragraph of this complaint as if fully restated here.

229.   Defendants Brady and Hamm and other co-conspirators, conspired to and did use the litigation process for an improper purpose and with an ulterior motive and engaged in predatory resistance to Heidelberg's valid claims as described in this complaint.

230.   In addition, defendants Brady and Hamm in conspiracy with Jones misrepresented the law to the circuit court claiming that the court had no jurisdiction to grant bail to Mr. Heidelberg and successfully obtained an order denying bail to Mr. Heidelberg and perpetuating and continuing his unconstitutional confinement. After the circuit court's order was overturned on appeal, Defendants Brady and Hamm in conspiracy with Jones opposed Mr. Heidelberg's request for bail and successfully sought and obtained an order requiring a cash bond in the amount of $50,000 and twenty-four monitoring thereby continuing Mr. Heidelberg's unconstitutional deprivation of liberty when they had no intention of ever retrying him and in fact had no evidence to support probable cause for the charges, or with which to retry him, after Hamm, Manias and Hibser's dispositive admissions, the testimony of Lester Mason and Matthew Clark and the circuit court's factual finding that James Clark was the driver of the Chevy and that the 1970 Defendants and the FBI knew that James Clark was the driver of Chevy. All of the defendants in this action have conceded that the driver of the Chevy was the man who committed the crimes of which Mr. Heidelberg was convicted.

231.   As a result of this misconduct described in this Count, the sole purpose of which was to perpetuate and continue the cover-up, Mr. Heidelberg was seized and arrested and unlawfully detained and thereby suffered loss of liberty, great mental anguish, humiliation,

degradation, physical and emotional pain and suffering, and other grievous and injuries and damages as set forth in this complaint that continued through the date of his death.

## COUNT X
### State Law Claim – *Respondeat Superior*

232.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

233.    While committing the misconduct alleged in the preceding paragraphs, Defendants were employees, members, and agents of the City of Peoria or Peoria County, acting at all relevant times within the scope of their employment.

234.    Defendants City of Peoria and Peoria County are liable as principal for all torts committed by its agents.

## COUNT XI
### State Law Claim – Indemnification

235.    Plaintiff incorporates each paragraph of this complaint as if fully restated herein.

236.    Illinois statute provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

237.    Defendants were employees, members, and agents of the City of Peoria or Peoria County, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

238.    The City of Peoria and Peoria County are responsible to pay any judgment entered against their employees. Heidelberg therefore demands judgment against the City of Peoria and Peoria County in the amounts awarded to Heidelberg against the individual Defendants as damages, attorneys' fees, costs and interest.

WHEREFORE, Plaintiff Stephen Heidelberg, as the duly appointed administrator of the estate of Cleve Heidelberg, Jr., respectfully requests that this Court enter a judgment in his favor and against Defendants, awarding compensatory damages in excess of $100,000,000, attorneys' fees and costs against each Defendant and, because they acted willfully, wantonly, and/or maliciously, punitive damages against each of the individual Defendants, and such other and further relief as this Court deems just and appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

Stephen Heidelberg, as administrator
of the estate of Cleve Heidelberg, Jr.

BY:

/s/ Amy A. Hijjawi
One of His Attorneys

Andrew M. Hale
Amy A. Hijjawi

Hale & Monico LLC
53 W. Jackson Blvd., Suite 330
Chicago, IL 60604
(312) 870-6926

Donald R. Jackson, Esq.
456 Fulton Street
Suite 218
Peoria, IL  61602
(309) 637-1010