E-FILED
Monday, 30 November, 2020  04:01:53 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| STEPHEN HEIDELBERG, Administrator of the Estate of CLEVE HEIDELBERG, JR., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:18-cv-01161-SLD-JEH |
| EMANUEL MANIAS; LARRY BERNARD; RONALD HAMM; PAUL HIBSER; SUSAN I. BRADY, Administrator of the Estate of GERALD W. BRADY, JR.; DAVID WENTWORTH, II, Administrator of the Estate of KENNETH DECREMER; DAVID WENTWORTH, II, Administrator of the Estate of PAUL HILST; DAVID WENTWORTH, II, Administrator of the Estate of BERNARD KENNEDY; DAVID WENTWORTH, II, Administrator of the Estate of NOLAN MACKLIN; DAVID WENTWORTH, II, Administrator of the Estate of JOHN RIDDLE; DAVID WENTWORTH, II, Administrator of the Estate of WILLIAM SCHALK; ROBERT L. WATSON, JR., Administrator of the Estate of ROBERT LEE WATSON; DAVID WENTWORTH, II, Administrator of the Estate of WILLARD KOEPPEL; DAVID WENTWORTH, II, Administrator of the Estate of JOHN SACK; UNKNOWN OFFICERS OF THE PEORIA POLICE DEPARTMENT and THE PEORIA COUNTY SHERIFF'S DEPARTMENT; the CITY OF PEORIA, ILLINOIS; and the COUNTY OF PEORIA, ILLINOIS, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | | |

ORDER

Before the Court are motions to dismiss filed by Defendants Willard Koeppel and

Bernard Kennedy (through their Independent Administrator, David Wentworth, II), ECF No.

1

104; Defendants Robert Lee Watson (through his Independent Administrator Robert L. Watson, Jr.), Paul Hilst, Kenneth DeCremer, Nolan Macklin, William Schalk, and John Sack (through their Independent Administrator David Wentworth, II), Emanuel Manias, Larry Bernard, and Paul Hibser, ECF No. 105; Gerald W. Brady, Jr. (through his administrator Susan I. Brady), John Riddle (through his Independent Administrator David Wentworth, II), and Ronald Hamm, ECF No. 107; and the City of Peoria and the County of Peoria, ECF No. 108, along with Defendants' joint Motion for Leave to File a Reply, ECF No. 120; Motion for Leave to File Supplemental Authority, ECF No. 121; and Motion to Apprise Court of Case Law Development, ECF No. 124. For the following reasons, the motions to dismiss are GRANTED IN PART and DENIED IN PART, the Motion for Leave to File a Reply is GRANTED, the Motion for Leave to File Supplemental Authority is GRANTED, and the Motion to Apprise Court of Case Law Development is GRANTED.

## BACKGROUND[1]

### I. The Parties

Koeppel and Kennedy are sued for their actions as Sheriffs of Peoria County (collectively, "Defendant Sheriffs" or "the Sheriff Defendants"); Manias, Sack, DeCremer, Bernard, Schalk, and Macklin[2] for their actions as deputy sheriffs of the Peoria County Sheriff's Office and Hibser, Watson, and Hilst for their actions as police officers with the Peoria Police Department (collectively, "Defendant Officers" or "the Officer Defendants"); Hamm and Riddle for their actions as Assistant State's Attorneys of the Peoria County State's Attorney's Office

---

[1] At the motion to dismiss stage, the court "accept[s] as true all well-pleaded facts in the complaint, and draw[s] all reasonable inferences in [the plaintiff's] favor." *Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). Thus, the factual background is drawn from Plaintiff's Second Amended Complaint ("SAC"), ECF No. 97.

[2] The Second Amended Complaint does not list Macklin as a deputy sheriff, but he is sued for his actions in that role. *See* Defs. City of Peoria's & County of Peoria's Mot. Dismiss Second Am. Compl. 4.

(collectively, "Prosecutor Defendants" or "Defendant Prosecutors" and along with the Sheriff Defendants and the Officer Defendants, "the 1970 Defendants"); and Brady for his actions as Peoria County State's Attorney. Each of these Defendants is sued in his individual capacity. The City of Peoria is sued as Hibser, Watson, and Hilst's employer and statutory indemnitor, and the County of Peoria is sued as the statutory indemnitor of Manias, Sack, DeCremer, Bernard, Schalk, Macklin,[3] Hamm, Riddle, and Brady.

## II. Heidelberg's Arrest

At approximately 1:30 a.m. on May 26, 1970, a black man fled the scene of a botched armed robbery at the Bellevue Drive-In, killing a police officer, Sergeant Raymond Espinoza, and taking a woman, Mayme Manuel, hostage in the process. Police responding to the call were told that an "armed black man wearing a yellow shirt and brown jacket" had absconded with the hostage in a Chevy, and when they spotted a Chevy travelling at a high speed in the area, a car chase commenced. Second Am. Compl. ¶ 33. The driver of the Chevy crashed the car but had escaped on foot by the time the police arrived. Two officers spotted a black man running away from the crash site and gave chase but ultimately lost sight of him.

Thirty minutes later, Cleve Heidelberg, a black man wearing a blue shirt and a gray sports coat, was walking a block away from the crash site on his way to pick up his car, the Chevy. He had loaned it to a man named Lester Mason a few hours previously, and Mason had told him that he had left it in the vicinity. When the police received a call that a black man—who turned out to be Heidelberg—was walking in the area, officers immediately arrested him.

---

[3] Again, the SAC does not specifically list the County of Peoria as a statutory indemnitor of Macklin, but that follows from his role as deputy sheriff.

### III. The Investigation and Prosecution

Bernard and Schalk were the first officers on the scene at the Bellevue Drive-In after Sergeant Espinoza was shot. Upon arriving, they found Jerry Lucas, "a purported paid informant who had been riding with Sergeant Espinoza, cradling Espinoza's bleeding head in his arms and lap," along with Maurice Cremeens, an employee of the theater. *Id*. ¶ 44. They, along with Manuel (who had been found in the Chevy after the crash), were taken to the Peoria County jail to view a lineup, which included Heidelberg. Neither Manuel nor Lucas were able to identify any lineup participant as the perpetrator. Cremeens identified Heidelberg in the first run of the lineup but pointed to a different man in the second run. Manias prepared a written report documenting these results, which the 1970 Defendants ultimately destroyed. None of the officers who had participated in the car chase or the subsequent search viewed the lineup—they had, in fact, told Manias and Hamm that none of them had been able to see the driver of the Chevy sufficiently to identify him. Manias interviewed the officers that night and took notes of the interviews. These notes were never turned over to Heidelberg or to Hamm, the Assistant State's Attorney.

Officers processed the crime scene but did not find Heidelberg's fingerprints anywhere on or in the car. They found the murder weapon in the car, along with a few other items there and at the theater. These items were sent to the FBI for a ballistics and fingerprint examination. The FBI later sent a telegram to the 1970 Defendants, informing them that Heidelberg's prints were not on the murder weapon. Neither this telegram nor a further FBI latent fingerprint report documenting the results of the fingerprint testing done on the items were disclosed to Heidelberg; instead, "Hamm told the court that no such reports existed." *Id*. ¶ 66. Based on these results and the failed lineup, "the 1970 Defendants knew that they did not have probable

cause to arrest Mr. Heidelberg for, much less charge him with, the murder of Sergeant Espinoza." *Id*. ¶ 67.  Despite this, they took action to ensure that he was convicted of the crime.

Manias spied on confidential communications between Heidelberg and his attorney and learned that Heidelberg had loaned his car to Mason, that he had been in a club surrounded by witnesses during the time the crime was committed, and that he had only been in the area where he was arrested to pick up his car.  Manias documented what he had learned from eavesdropping in a report, which was never disclosed before or during Heidelberg's trial and post-conviction proceedings.  The 1970 Defendants used the information gleaned by Manias to build a case against Heidelberg.  Because the 1970 Defendants' actions suggested that they knew the contents of these privileged conversations, Heidelberg came to believe that his attorney was disclosing information to the prosecution and chose to proceed pro se.

To bolster the false case against Heidelberg, Macklin ordered the original lineup report to be destroyed and Manias to prepare a false lineup report which stated that Manuel and Cremeens had identified Heidelberg as the perpetrator in both runs of the lineup.  Macklin also asked Lucas to testify that Heidelberg was the culprit; Lucas agreed and was paid for his testimony by Macklin in an amount equal to $2000 today.  Manias, Macklin, Hamm, and Riddle met with Lucas and further "instructed him to falsely claim that Manuel and Cremeens whispered their identifications into an officer's ear." *Id*. ¶ 84.  To cover up the fact that Heidelberg, when he was arrested, had been wearing a different outfit than the one the police had been informed over the radio was worn by the perpetrator, the 1970 Defendants suppressed the tapes of the radio transmissions, falsely reporting to Heidelberg that they had been destroyed.  They eventually produced the transcript of the tapes to Heidelberg on the eve of his trial.  They also agreed to fabricate other pieces of evidence that would indicate that the car driver had actually been

5

wearing a blue shirt and gray sports coat and that it was Lucas who was wearing the yellow shirt and brown jacket.  The 1970 Defendants additionally "induce[d Manuel and Cremeens] to agree to testify falsely that Heidelberg was the perpetrator."  *Id*. ¶ 93.  None of this information was disclosed to Heidelberg prior to his trial.

Also not disclosed to Heidelberg was the fact that the FBI had interrogated a man named James Clark about the murder while he was in jail awaiting trial on a separate charge.  Clark admitted that he had been in Heidelberg's car briefly on the day of the murder.  "For nearly fifty years, Mr. Heidelberg resolutely suspected and therefore alleged that the 1970 Defendants suppressed or destroyed an FBI fingerprint report that identified James Clark's prints on one of the items found at the Drive-In or in the Chevy."  *Id*. ¶ 100.  But the 1970 Defendants have consistently denied that such a report exists.

The 1970 Defendants were concerned that Mason's testimony at trial might show Heidelberg's innocence and took steps to ensure that Mason would not help Heidelberg.  Hamm and Riddle met with Mason in early November 1970 and told Mason that Heidelberg was trying to pin the crime on him—Mason could be charged with the crime if he testified on Heidelberg's behalf and Heidelberg was acquitted.  The night before Mason was to testify, Hamm and Riddle went to visit him again with the same message.  Because of their threats and other actions taken by Hamm and Riddle the next day, Mason exercised his Fifth Amendment rights and refused to testify.

Heidelberg also called Matthew Clark, James Clark's brother, to the stand; he, too, exercised his Fifth Amendment rights.  What Matthew did not reveal until James's death in 2015 was that James had confessed to Matthew that he was guilty of the murder just a few hours after it happened.  Matthew refused to testify at Heidelberg's trial in order to protect his brother.

6

The jury found Heidelberg guilty of the murder and the attempted armed robbery, and he was sentenced to 99 to 175 years in prison.

## IV. Post-Trial Proceedings

After he was sentenced, Heidelberg filed a writ of coram nobis.  The 1970 Defendants, including Hamm (despite his resignation as Assistant State's Attorney a few months later), took action to prevent Heidelberg from successfully challenging his conviction.  Riddle met with Mason and convinced him to give a false court-reported statement incriminating Heidelberg, although Mason later changed his mind and did not sign it.  Riddle and Hamm orchestrated the planting of drugs in Matthew Clark's home to force him to implicate Heidelberg in lieu of being charged with possession, although Matthew refused.  Even though James Clark had publicly confessed to the crime in February 1971 and had given a detailed affidavit of confession in October 1971, Riddle successfully prevented James from testifying in court.  The court ultimately dismissed the proceedings.

## V. Reinvestigation of Heidelberg's Case

After James Clark died in May 2015, Matthew disclosed that James had confessed his guilt to him just hours after the murder had occurred.  Mason also came forward and stated that he had borrowed Heidelberg's car and lent it to James that day.  Based on their statements and other evidence that had been discovered, Heidelberg's counsel requested that Brady, the current State's Attorney, reinvestigate the case.  Brady instead joined the conspiracy and acted to cover up the 1970 Defendants' conduct, including that of Hamm, his old friend and mentor.  Brady refused to interview Mason, Matthew Clark, and the living 1970 Defendants and suppressed additional documents, ultimately declining to reopen the case.

Heidelberg petitioned the court for the appointment of a special prosecutor to investigate the case. The court appointed the Illinois Attorney General's Office ("AGO") as special prosecutor, finding that Brady was disqualified due to a conflict of interest. The AGO continues to be a special prosecutor in this case.

## VI. Postconviction Relief

Heidelberg had also petitioned for postconviction relief. Brady successfully obtained the appointment of Matt Jones, a local appellate prosecutor, as special prosecutor in the postconviction case. Brady, although disqualified from formally participating in the process, continued to work with Jones to oppose Heidelberg's request for relief and cover up the actions of the 1970 Defendants.

The circuit court vacated Heidelberg's conviction on April 20, 2017, because "the evidence against him at his criminal trial was of little if any probative value in that it consisted almost exclusively of in-court identifications which were extremely weak and not entitled to much, if any, weight, particularly when viewed in light of the new evidence which was not available to the jury." *Id*. ¶ 161. Jones immediately filed a notice of appeal. However, a few days before the State's closing brief was due, Heidelberg died in his sleep. He had been out on bond for less than ten months and had a 24-hour monitoring device attached to him. At Brady's insistence, the State filed a motion to dismiss the appeal as moot.

## VII. Instant Litigation

Plaintiff brought this suit on April 19, 2018. ECF No. 1. This Court entered an Order on March 26, 2019 granting in part and denying in part Defendants' motions to dismiss the original complaint. ECF No. 59. On June 25, 2019, Plaintiff filed an eleven-count Second Amended Complaint ("SAC"), ECF No. 97:

- Count I (§ 1983): Post-Legal Process Pretrial Detention Without Probable Cause (Deprivation of Liberty Without Probable Cause) (Fourth and Fourteenth Amendments), Second Am. Compl. ¶¶ 180–185,

- Count II (§ 1983): Due Process, Wrongful Conviction & Illegal Confinement (Fourteenth Amendment) (*Brady v. Maryland*, fabrication of evidence, destruction of evidence, failure to investigate), *id*. ¶¶ 186–194,

- Count III (§ 1983): Deprivation of Right to Counsel and to Present a Defense (Sixth and Fourteenth Amendments), *id*. ¶¶ 195–198,

- Count IV (§ 1983): Failure to Intervene, *id*. ¶¶ 199–202,

- Count V (§ 1983): Conspiracy to Deny Access to Courts, *id*. ¶¶ 203–212,

- Count VI (state law): Intentional Infliction of Emotional Distress, *id*. ¶¶ 213–215,

- Count VII (state law): Civil Conspiracy, *id*. ¶¶ 216–221,

- Count VIII (state law): Malicious Prosecution, *id*. ¶¶ 222–227,

- Count IX (state law): Abuse of Process, *id*. ¶¶ 228–231,

- Count X (state law): *Respondeat Superior*, *id*. ¶¶ 232–234,

- Count XI (state law): Indemnification, *id*. ¶¶ 235–238.

## DISCUSSION

## I. Motion for Leave to File a Reply, Motion for Leave to File Supplemental Authority, and Motion to Apprise Court of Case Law Development

Defendants have moved for leave to file a joint Reply to Plaintiff's Responses to their Motions to Dismiss, arguing that a Reply is needed because "Plaintiff introduced new issues, arguments and case citations that were not anticipated, as well as incorrect representations of law." Defs.' Mot. Leave File Reply 1, ECF No. 120. Plaintiff has not filed any opposition to this motion. For all motions not for summary judgment, "[n]o reply to the response is permitted

without leave of Court."  CDIL-LR 7.1(B)(3).  "Typically, reply briefs are permitted if the party opposing a motion has introduced new and unexpected issues in his response to the motion, and the Court finds that a reply from the moving party would be helpful to its disposition of the motion."  *Shefts v. Petrakis*, No. 10-cv-1104, 2011 WL 5930469, at *8 (C.D. Ill. Nov. 29, 2011).  A court may also permit a reply "in the interest of completeness."  *Zhan v. Hogan*, No. 4:18-cv-04126, 2018 WL 9877970, at *2 (C.D. Ill. Dec. 18, 2018).  Because the proposed Reply would be helpful to the Court and in the interest of completeness, Defendants' Motion for Leave to File a Reply is GRANTED.

Additionally, Defendants have filed a Motion for Leave to File Supplemental Authority, ECF No. 121, and a Motion to Apprise Court of Case Law Development, ECF No. 124, to which Plaintiff has not filed any opposition.  These motions are GRANTED.

## II. Motions to Dismiss

### a. Legal Standard

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  At the motion to dismiss stage, the key inquiry is whether the complaint is "sufficient to provide the defendant with 'fair notice' of the plaintiff's claim and its basis."  *Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 934 (7th Cir. 2012) (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)); *see also Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) (noting that courts also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice").  While "detailed factual allegations are unnecessary, the complaint must have 'enough facts to state a claim to relief that is plausible on its face.'"  *Pierce v. Zoetis, Inc*., 818 F.3d 274, 277–78 (7th Cir. 2016) (quoting *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

When deciding on a motion to dismiss, "[t]he complaint's well-pleaded factual allegations, though not its legal conclusions, are assumed to be true," *Phillips v. Prudential Ins. Co. of America*, 714 F.3d 1017, 1019 (7th Cir. 2013), and the court must also "draw all inferences in the light most favorable to the nonmoving party," *Vesely v. Armslist LLC*, 762 F.3d 661, 664 (7th Cir. 2014).  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  *Iqbal*, 556 U.S. at 679.

Where, as in this case, the filing of an amended complaint has prompted a second round of motions to dismiss, defendants are not barred from making arguments for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) that they did not bring up in their earlier motions. *See Ennenga v. Starns*, 677 F.3d 766, 773 (7th Cir. 2012) (noting that "a litigant need not consolidate all failure-to-state-a-claim arguments in a single dismissal motion;" for example, "a statute-of-limitations defense is not waived if raised for the first time in a successive motion to dismiss").  An argument based on "[f]ailure to state a claim upon which relief can be granted . . . may be raised . . . in any pleading allowed or ordered under Rule 7(a)."  Fed. R. Civ. P. 12(h)(2).

### b. Analysis

All Defendants move to dismiss Count I's Fourth Amendment claim as time-barred, and all 1970 Defendants move to dismiss its Fourteenth Amendment claim as foreclosed.  The Officer and Sheriff Defendants move to dismiss Count II's *Brady* claim because of qualified immunity or, in the alternative, because of a failure to allege that a *Brady* violation took place. The 1970 Defendants generally move to dismiss the remaining claims because Plaintiff's use of

11

group pleading in the SAC fails to give each Defendant notice of the claims asserted against him. They move to dismiss the remaining claims in Count II for failure to state a claim and the failure to investigate claim because the right to an investigation does not exist. The 1970 Defendants except for Manias and Hamm move to dismiss Count III because no other Defendant is alleged to have eavesdropped or used information learned from eavesdropping. All 1970 Defendants move to dismiss Count IV's failure to intervene claim for failure to plead the elements of the claim and, in the case of the Prosecutor Defendants, because the right was not clearly established at the time. They move to dismiss Count V's conspiracy to deny access to the courts claim because Plaintiff does not state what claim was allegedly lost. All Defendants move to dismiss the malicious prosecution claim because Plaintiff does not show that the criminal proceedings against Heidelberg terminated in a manner indicative of innocence, and all apart from Hamm, Manias, Bernard, and Schalk move to dismiss the Intentional Infliction of Emotional Distress claim to the extent the corresponding constitutional claims are dismissed. If the IIED and malicious prosecution claims are dismissed, they also argue for dismissal of the civil conspiracy claim. Hamm and Brady move to dismiss the abuse of process claim because Plaintiff has not shown that process was abused. Riddle moves to dismiss all claims against him on the basis of absolute prosecutorial immunity; in the alternative, he joins with the other Defendants to dismiss the claims on other bases. Koeppel and Kennedy move to dismiss any claim to the extent that it is based on supervisory liability. The City and County of Peoria move to dismiss any indemnification claim to the extent that the underlying claim against their indemnitees fails, the City of Peoria moves to dismiss any *respondeat superior* claim to the same extent, and the County of Peoria moves to dismiss all *respondeat superior* claims against it because it was not the employer of any individual Defendant. They also seek to dismiss any *Monell* claim because

it has not been adequately alleged. All Defendants request that the Court find punitive damages

from the state law claims unavailable because of Heidelberg's death, and the deceased

Defendants asked the Court to likewise find punitive damages from the constitutional claims

unavailable because of their deaths.

### i. Statute of Limitations for Count I's Fourth Amendment Claim (Wrongful Post-Process Pretrial Detention)[4]

In Count I of the SAC, Plaintiff alleges that the 1970 Defendants and, later, Brady

violated Heidelberg's Fourth Amendment rights by accusing him of the Espinoza murder despite

knowing that he was innocent and by subjecting him to judicial proceedings without probable

cause, depriving him of liberty. Second Am. Compl. ¶¶ 181–182, 184.[5] Defendants argue that

this claim should be dismissed because it is time-barred. Def. Officers' Mot. Dismiss Second

Am. Compl. 4, ECF No. 105.[6] Relying on *Manuel v. City of Joliet*, 137 S. Ct. 911 (2017)

("*Manuel I*") and *Manuel v. City of Joliet*, 903 F.3d 667 (7th Cir. 2018) ("*Manuel II*"),

Defendants assert that Plaintiff's unlawful pretrial detention claim "accrued, at the latest, when

Heidelberg's pretrial detention ended upon his conviction in 1970" and, to be timely, needed to

be brought within two years of that date. *Id*. at 4–5. Plaintiff counters that recent Supreme Court

and Seventh Circuit case law compels the opposite conclusion. Instead, according to

*McDonough v. Smith*, 139 S. Ct. 2149 (2019), *Manuel II*, and *Lewis v. City of Chicago*, 914 F.3d

---

[4] The plain text of Count I does not make clear whether it is limited to pretrial detention or is also intended to cover post-conviction detention; it merely asserts claims for post-legal process detention without probable cause. Because Count II of the complaint alleges violations of the Fourteenth Amendment for wrongful conviction and post-conviction deprivation of liberty, Second Am. Compl. ¶ 191, and because Plaintiff's Response to the Motion to Dismiss does not correct Defendants' assumption that Count I only applies to pretrial detention, Pl.'s Resp. Def. Officers' Mot. Dismiss Second Am. Compl. 8, this Court construes Count I as being limited to claims for wrongful *pretrial* detention.

[5] Count I also seeks relief under the Fourteenth Amendment. This is discussed below. *See infra* II(b)(ii).

[6] The argument in Defendant Officers' motion is adopted by Defendant Prosecutors, Def. Prosecutors' Mot. Dismiss Second Am. Compl. 4, 7, 11, ECF No. 107, and by Defendant Sheriffs, Def. Sheriffs' Mot. Dismiss Second Am. Compl. 15, ECF No. 104.

472 (7th Cir. 2019), the claim accrued on the date that Heidelberg's conviction was vacated. Pl.'s Resp. Def. Officers' Mot. Dismiss Second Am. Compl. 2–4, ECF No. 117.

Neither party disputes that the correct statute of limitations for this claim is two years. *See Lewis*, 914 F.3d at 478 ("A § 1983 claim borrows the statute of limitations for analogous personal-injury claims in the forum state; in Illinois that period is two years."). Plaintiff's Fourth Amendment claim will survive if he filed suit within two years of the date on which his claim accrued.

Three Supreme Court opinions provide the framework for resolving this issue. First, in *Heck v. Humphrey*, the Court addressed whether a currently incarcerated person could bring a case under § 1983 to challenge the constitutionality of his conviction. 512 U.S. 477, 478 (1994). The Court held that a potential § 1983 plaintiff cannot file suit while his conviction is still valid. *Id*. at 486–87 ("[A] § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus."). This serves a practical purpose: should the plaintiff win his § 1983 case after having been adjudged guilty in the criminal case, the inconsistency would violate "a strong judicial policy against the creation of two conflicting resolutions arising out of the same or identical transaction" and hinder the goals of "finality and consistency." *Id*. at 484–85 (quotation marks omitted). Thus, "a § 1983 cause of action for damages attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated." *Id*. at 489–490.[7]

---

[7] The holding in *Heck* only applies where "a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence." *Heck*, 512 U.S. at 487. In contrast, a claim under § 1983 for unlawful arrest accrues at the issuance of process or arraignment because it is at that time that the damages attributable to the unlawful arrest cease. *Wallace v. Kato*, 549 U.S. 384, 390–391 (2007).

Next, in *Manuel I*, the Supreme Court was confronted with the question of whether the

Fourth Amendment applies after legal process is initiated and ultimately remanded the case to

the Seventh Circuit for a determination of when such Fourth Amendment claims accrue.  137 S.

Ct. at 920, 922.  The Seventh Circuit found that the Fourth Amendment wrongful imprisonment

claim accrued on the date the plaintiff was released from custody following the prosecution's

dismissal of the case prior to trial.  *Manuel II*, 903 F.3d at 669.  Highlighting a point of logic, the

court noted that "a claim cannot accrue until the would-be plaintiff is entitled to sue, yet [based

on *Heck*] the existence of detention forbids a suit for damages contesting that detention's

validity."  *Id*. at 670.

Finally, the Supreme Court determined in *McDonough* that for § 1983 fabricated-

evidence claims, "[o]nly once the criminal proceeding has ended in the defendant's favor, or a

resulting conviction has been invalidated within the meaning of *Heck*, will the statute of

limitations begin to run."  139 S. Ct. at 2158 (citation omitted).  The Court rejected the

contention that a suit challenging the validity of criminal proceedings that ended in acquittal is

more analogous to a false arrest claim (in which case the claim would have accrued upon the

initiation of legal process, *Wallace v. Kato*, 549 U.S. 384, 389–390 (2007)), than to *Heck*.

*McDonough*, 139 S. Ct. at 2159.  Instead, the same principles that guided the Court to deny an

incarcerated plaintiff's right to file a § 1983 claim challenging the validity of his conviction

compelled the *McDonough* court to require acquittal or invalidation to trigger the limitations

period for wrongful acts affecting the validity of the criminal proceedings.  False arrest claims

have "a life independent of an ongoing trial or putative future conviction," while McDonough's

claim, concerning the "evidence used to secure an indictment and at a criminal trial," instead

"directly challenges—and thus necessarily threatens to impugn—the prosecution itself."  *Id*.

15

Pulling together these various threads, it is clear that to let the limitations period for wrongful detention claims run while a potential § 1983 plaintiff is imprisoned and thus barred under *Heck* from asserting that claim would effectively deny him the chance to bring it at all (if incarcerated for more than two years). *McDonough* goes a step further and requires an indication of invalidity for the claim to accrue, even where the deprivation of liberty only occurred pretrial. However, this is not the end of the inquiry. Defendants correctly point out that *McDonough* is binding precedent only as to § 1983 fabrication of evidence claims arising under the Fourteenth Amendment. Defs.' Joint Reply 12, ECF No. 120-1. *See McDonough*, 139 S. Ct. at 2155 n.2 (noting that the Court was commenting only on the Fourteenth Amendment claim at issue). It is necessary to turn to the Seventh Circuit to fill in the gaps.

In *Savory v. Cannon*, the Seventh Circuit held that the plaintiff's malicious prosecution claim (brought under the Fourth and Fourteenth Amendments) accrued when he was pardoned, not on the earlier date on which his sentence had been commuted, because prior to the pardon, his conviction was still intact and could not be challenged collaterally through a § 1983 action. 947 F.3d 409, 412, 417–18 (7th Cir. 2020).[8] Applying *Savory*'s holding on the malicious prosecution claim to the wrongful detention claim at issue here,[9] Heidelberg's Fourth Amendment claim accrued when his conviction was vacated and thus was no longer valid and he was released.

Defendants instead urge this Court to follow the Seventh Circuit's pre-*McDonough* unpublished opinion in *Knox v. Curtis*, 771 F. App'x 656 (7th Cir. 2019), Def. Officers' Mot. Dismiss Second Am. Compl. 5, which concluded that the plaintiff's Fourth Amendment claim

---

[8] *Savory* also explored what suffices as a favorable termination: while some indication of a conviction's invalidity is required, "an affirmative finding of innocence" is not necessary. *Savory*, 947 F.3d at 429.

[9] § 1983 Fourth Amendment malicious prosecution claims are no longer favored; instead, such claims should be characterized as wrongful detention claims. *See Manuel II*, 903 F.3d at 670.

was timely because he filed within two years of both the date on which he was released on bond and the date on which he was convicted (the court declined to pinpoint the specific date on which the claim accrued), *Knox*, 771 F. App'x at 658.   *Knox* is an unpublished opinion, and this Court is not bound to follow it.   *See* 7th Cir. R. 32.1(b).   Its impact is further diminished because other unpublished Seventh Circuit opinions come to the opposite conclusion.   *See Lee v. Clinton*, 793 F. App'x 443, 444 (7th Cir. 2020) (finding that *Heck* barred the plaintiff's § 1983 claims even after his sentence was over, as his conviction had not yet been called into question); *Sanders v. St. Joseph County, Indiana*, 806 F. App'x 481, 484 n.2 (7th Cir. 2020) (noting that "[i]f, however, a conclusion that [the plaintiff's] confinement was unconstitutional would imply the invalidity of an ongoing criminal proceeding or a prior criminal conviction, then *Heck* would continue to bar [the plaintiff's] claim after his release and until either those proceedings terminated in his favor or the conviction was vacated").   *Knox* does not sway this Court to accept Defendants' contention.[10]

The Court finds that Plaintiff's wrongful detention claim accrued when Heidelberg's conviction was vacated.   This occurred on April 20, 2017.   Mar. 26, 2019 Order 7, ECF No. 59. Thus, it was on that date that the criminal case terminated in Heidelberg's favor under one of the

---

[10] Defendants also ask this Court to consider and accept the reasoning of certain district court cases finding pretrial detention claims to accrue at conviction, although they acknowledge that district courts have come out different ways on this issue. Defs.' Reply 12–13, ECF No. 120-1*; see Brown v. City of Chicago*, No. 18 C 7064, 2019 WL 4958214, at *3–4 (N.D. Ill. Oct. 8, 2019) (holding the plaintiff's claim to accrue upon his conviction); *Smith v. City of Chicago,* No. 18 C 4918, 2019 WL 4242503, at *3 (N.D. Ill. Sept. 6, 2019) (finding the plaintiff's claim to have accrued upon his release from physical custody).   *But see Switzer v. Village of Glasford*, No. 1:18-cv-1421, 2019 WL 3291519, at *5 (C.D. Ill. July 22, 2019) (finding that the plaintiff's pretrial detention claims accrued when the charges against him were finally dismissed, not on the earlier date when he was released from pretrial detention); A*ndersen v. City of Chicago*, No. 16 C 1963, 2019 WL 6327226, at *5 (N.D. Ill. Nov. 26, 2019) (holding that the claim accrued when the plaintiff's conviction was reversed).   While Defendants initially asked this Court to take notice of *Hill v. City of Chicago*, No. 19 C 6080, 2020 WL 509031, at *4 (N.D. Ill. Jan. 31, 2020) (finding the plaintiff's claim to have accrued upon his conviction), Defs.' Mot. Leave File Suppl. Authority 2, ECF No. 121, they later acknowledged that the district court had reconsidered the issue and reinstated the Fourth Amendment wrongful pretrial detention claim in *Hill v. City of Chicago*, No. 19 C 6080, 2020 WL 4226672, at *2 (N.D. Ill. July 23, 2020), Defs.' Mot. Apprise Court Case Law Development 2, ECF No. 124.   Because district courts have come out in opposite directions on this issue, this Court does not find the individual cases Defendants ask it to follow persuasive.

methods listed in *Heck* and the limitations period began to run.  This suit was initiated on April 19, 2018.  ECF No. 1.  Because the case was brought within two years of the date the conviction was vacated, this claim is timely.  Defendants' motion to dismiss the Fourth Amendment wrongful pretrial detention claim based on the statute of limitations is denied.

### ii. Viability of Count I's Fourteenth Amendment Post-Legal Process Pretrial Detention Without Probable Cause Claim

Defendants also seek to dismiss the Fourteenth Amendment claims in Count I, arguing that § 1983 claims for wrongful pretrial detention may only be brought under the Fourth Amendment.  Def. Officers' Mot. Dismiss Second Am. Compl. 5.[11]  Plaintiff counters that the language of *McDonough* suggests that the Fourteenth Amendment is also implicated "when the *same* fabricated evidence . . . used to secure a deprivation [of] liberty before trial is also used *at* trial."  Pl.'s Resp. Def. Officers' Mot. Dismiss Second Am. Compl. 8.

The Seventh Circuit has made it clear that for pretrial wrongful detention claims, the Fourth Amendment provides the sole remedy, with the Fourteenth Amendment coming into play only after trial.  *See Lewis*, 914 F.3d at 478 ("It's now clear that a § 1983 claim for unlawful pretrial detention rests *exclusively* on the Fourth Amendment.").  Plaintiff's argument that *McDonough*'s language overrides this directive is unavailing; rather, the Supreme Court merely sidestepped the question of whether the Second Circuit's treatment of the plaintiff's § 1983 fabricated evidence claim as arising under the Fourteenth Amendment was correct.  *See McDonough*, 139 S. Ct. at 2155 ("We assume without deciding that the Second Circuit's articulations of the right at issue and its contours are sound, having not granted certiorari to resolve those separate questions.").  Contrary to Plaintiff's assertion, *McDonough* does not

---

[11] Hamm, Riddle, and the Sheriff Defendants adopt the Officer Defendants' motion.  *See* Def. Prosecutors' Mot. Dismiss Second Am. Compl. 7, 11; Def. Sheriffs' Mot. Dismiss Second Am. Compl. 15.

establish that pretrial wrongful detention claims may be brought under the Fourteenth

Amendment.  The Fourteenth Amendment claim in Count I is therefore dismissed.

### iii. Immunity for Defendant Riddle

Defendant Riddle moves to dismiss all of the claims against him on the basis of absolute

prosecutorial immunity.  Def. Prosecutors' Mot. Dismiss Second Am. Compl. 8, ECF No. 107.

As Riddle notes, the Court previously dismissed many of the claims against Hamm for the same

reason.  *Id*. at 9.  *See* Mar. 26, 2019 Order 31, 33 (finding that Hamm was entitled to absolute

immunity for all actions undertaken to fulfill his prosecutorial duties but was "not entitled to

absolute immunity with respect to alleged actions he took in an investigatory or administrative

capacity").  Riddle argues that he "is entitled to the same absolute immunity as Hamm because

he is alleged to have done many of the same things Hamm did in receiving immunity" in the role

of prosecutor.  Def. Prosecutors' Mot. Dismiss Second Am. Compl. 9.  He further contends that,

because the SAC fails to show that he participated in the investigation to the same degree as

Hamm, his liability rests solely on his role as prosecutor, and he is entitled to immunity for all

claims even where Hamm is not.  *Id*. at 9–10.  Plaintiff concedes that, "[t]o the extent that

defendant Riddle's actions mirrored those of Hamm's for which Hamm was granted that

immunity . . . the same absolute immunity applies to Riddle."  Pl.'s Resp. Def. Prosecutors' Mot.

Dismiss Second Am. Compl. 10.  However, Plaintiff disputes Riddle's claim to greater

immunity, arguing that "Riddle also acted in an investigatory role for which, like Hamm, he is

not entitled to immunity."  *Id*.

"A prosecutor is absolutely immune from suit for all actions and decisions undertaken in

furtherance of his prosecutorial duties."  *Fields v. Wharrie*, 672 F.3d 505, 510 (7th Cir. 2012)

("*Fields I*").  However, where a prosecutor is acting not as a legal advocate but as an

19

investigator, he is entitled only to the qualified immunity that would be granted to police officers carrying out those same duties. *Id*. at 511.[12]  Courts distinguish these two roles by looking to the function of the action undertaken.  An action is prosecutorial if "the prosecutor is, at the time, acting as an officer of the court" and the action itself is "related[] to the judicial phase of the criminal process." *Id*. at 510.  *See also id*. at 513 (finding that "[o]nce a defendant is indicted" and the prosecutor begins working towards trial, prosecutorial immunity attaches to his actions). In contrast, "[p]rosecutors do not function as advocates before probable cause to arrest a suspect exists," so any action undertaken during a preliminary investigation is not prosecutorial.  *Id*. at 512.  Prosecutorial immunity attaches to the failure to comply with disclosure obligations and the suppression of evidence, *id*. at 513, the initiation of a criminal prosecution, *Imbler v. Pachtman*, 424 U.S. 409, 431 (1976), the evaluation and preparation of evidence collected by the police for presentation at trial, *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993), and court appearances to obtain search warrants, *Burns v. Reed*, 500 U.S. 478, 491 (1991).  The immunity applies even when the prosecutorial action was done maliciously or unreasonably.  *Smith v. Power*, 346 F.3d 740, 742 (7th Cir. 2003).  However, "[a] prosecutor cannot retroactively immunize himself from conduct by perfecting his wrong-doing through introducing the fabricated evidence at trial;" he is still liable for actions taken while in an investigatory role.  *Fields v. Wharrie*, 740 F.3d 1107, 1114 (7th Cir. 2014) (*Fields II*).  The majority of district courts in Illinois conclude Illinois's scope of absolute prosecutorial immunity is the same as under federal law.  *See Beaman v. Souk*, 863 F. Supp. 2d 752, 760–64 (C.D. Ill. 2012); *Hobbs v. Cappelluti*, 899 F. Supp. 2d 738, 769 (N.D. Ill. 2012); *cf. Fields II*, 740 F.3d at 1114–15 (explaining the uncertainty over the extent of Illinois's rule of absolute prosecutorial immunity).

---

[12] Any argument made in the alternative that Riddle is entitled to qualified immunity for actions taken as an investigator will be addressed in the appropriate claim-specific section below.

Like Hamm, Riddle is entitled to absolute immunity for actions undertaken in his role as prosecutor.  This includes allegedly failing to produce evidence to Heidelberg before trial, Second Am. Compl. ¶ 88, 99; *see Fields I*, 672 F.3d at 514 (finding that "*Brady* and *Giglio* violations . . . are . . . inherently prosecutorial in nature" and thus are entitled to absolute immunity), agreeing to present false testimony at trial, Second Am. Compl. ¶ 91, 92, *see Manning v. Miller*, 355 F.3d 1028, 1032 (7th Cir. 2004) (noting that conspiring to commit perjury is a prosecutorial action), meeting with Mason in November 1970 and again the night before he was to testify to induce him not to testify on Heidelberg's behalf, Second Am. Compl. ¶¶ 109, 112, meeting with Mason to prevent him from testifying that Heidelberg was innocent during the post-conviction proceedings, *id*. ¶ 132, planting drugs in Matthew Clark's home to force him to falsely incriminate Heidelberg in exchange for dropping the drug charges, *id*. ¶ 135, *see Buckley*, 509 U.S. at 272–73 ("[A]n out-of-court effort to control the presentation of [a] witness' testimony [is] entitled to absolute immunity because it [is] fairly within [the prosecutor's] function as an advocate." (second and fifth alteration in original) (quotation marks omitted)); and objecting to the inclusion of live testimony from James Clark during the post-conviction proceedings, Second Am. Compl. ¶ 136.

Riddle is not entitled to absolute immunity for the actions that he took while acting as an investigator, which include his alleged involvement in eavesdropping on the conversation between Heidelberg and his attorney Jack Brunnmeyer, *id*. ¶ 72–73, destroying the original lineup report and preparing a false second lineup report, *id*. ¶ 79–80, suppressing radio transmission tapes, *id*. ¶ 88, suppressing notes of interviews with police officers, *id*. ¶ 89, agreeing to prepare fabricated police reports, *id*. ¶ 92, and suppressing or destroying an FBI report matching James Clark to a fingerprint in the car, *id*. ¶ 100.

21

As with Hamm, *see* Mar. 26, 2019 Order 34, further factual development is needed before making a determination as to whether Riddle's participation, along with Manias, Macklin, and Hamm, in the alleged meetings with Lucas during which they instructed him to make false claims and in similar meetings with Manuel and Cremeens, Second Am. Compl. ¶ 84, 93, was prosecutorial or investigatory.

While Riddle claims that every allegation made against him is based solely on his prosecutorial conduct, the complaint refers to several instances where he was acting as an investigator.  Riddle's motion to dismissed based on his prosecutorial immunity is granted as to his prosecutorial conduct but denied otherwise.

### iv. Qualified Immunity of Defendant Officers and Sheriffs for *Brady* Claim

In Count II of the SAC, Plaintiff alleges that the 1970 Defendants violated Heidelberg's Fourteenth Amendment rights by "deliberately withh[olding] exculpatory evidence."  Second Am. Compl. ¶ 188.[13]  Defendant Officers and Sheriffs move to dismiss this claim as it pertains to them, arguing that they are entitled to qualified immunity.  Def. Officers' Mot. Dismiss Second Am. Compl. 6.[14]

Qualified immunity is intended to "protect[] government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  To evaluate whether qualified immunity is warranted, courts engage in a two-part analysis, "determin[ing] (1) whether facts alleged or shown by a plaintiff make out a violation of a constitutional right, and

---

[13] Count II also contains allegations that the 1970 Defendants fabricated evidence, destroyed potentially exculpatory evidence, and failed to adequately investigate.  Second Am. Compl. ¶¶ 189–190.  Defendants' motions to dismiss these claims are addressed below.  *See infra* II(b)(v)(A)–(C).

[14] Defendant Sheriffs adopt Defendant Officers' argument.  Def. Sheriffs' Mot. Dismiss Second Am. Compl. 15.

(2) if so, whether that right was clearly established at the time of the defendant's alleged misconduct." *Lewis*, 914 F.3d at 477.  A right is clearly established when "'[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'"  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (alterations in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  "[E]xisting precedent must have placed the statutory or constitutional question beyond debate," although "a case directly on point" is not necessary.  *Id.*[15]  The right the plaintiff seeks to vindicate "must be established . . . in a particularized manner."  *Henry v. Hulett*, 969 F.3d 769, 785 (7th Cir. 2020).

In this claim, Plaintiff is asserting a violation of the state's duty, established by *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose all exculpatory information regarding the case against Heidelberg.  Pl.'s Resp. Def. Officers' Mot. Dismiss Second Am. Compl. 8.  Defendant Officers and Sheriffs argue that, as of 1970, the year of the alleged violation, it had not been clearly established that these "*Brady* obligations" extended to police officers, and so they are entitled to qualified immunity for this claim.  Def. Officers' Mot. Dismiss Second Am. Compl. 6–7.  In the alternative, even if qualified immunity does not apply, these Defendants contend that Plaintiff has not plausibly alleged that they failed to comply with the requirements of *Brady*.  *Id*. at 8–9.

### A. Obligations of Police Officers Under *Brady* in 1970

*Brady*, which was decided in 1963, found "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady*, 373 U.S. at 87.  Central to the Supreme Court's holding was the goal of

---

[15] There is one other way to show that a right was clearly established: a party may "show[] that the violation was so obvious that a reasonable person would have known of the unconstitutionality of the conduct at issue."  *Brokaw v. Mercer County*, 235 F.3d 1000, 1022 (7th Cir. 2000).  Because the Court finds that *Brady v. Maryland*, 373 U.S. 83 (1963), provides a sufficient existing precedent, it does not address this additional test.

ensuring fairness: "our system of the administration of justice suffers when any accused is treated unfairly." *Id*. Such unfair treatment is manifestly present when, by withholding exculpatory evidence, the prosecution "helps shape a trial that bears heavily on the defendant." *Id*. at 88.

While *Brady* involved prosecutors violating due process, it has since been recognized that police officers, too, have obligations under *Brady* to disclose exculpatory information. In *Jones v. City of Chicago*, the Seventh Circuit held that police officers who withheld police files that would have allowed the defense to undermine the credibility of prosecution witnesses were not entitled to qualified immunity because their actions were clearly a constitutional violation under *Brady*. *Jones v. City of Chicago*, 856 F.2d 985, 995—96 (7th Cir. 1988). In *Steidl v. Fermon*, the court reiterated that "[t]he proposition that it is unconstitutional for law enforcement officers to withhold or suppress exculpatory evidence finds its roots in *Brady*," a case which "easily qualifies as clearly established law." 494 F.3d 623, 628 (7th Cir. 2007). There is no debate that, as it currently stands, *Brady* requires police officers to disclose exculpatory evidence.

Defendant Officers and Sheriffs base their argument for qualified immunity on the idea that none of the Seventh Circuit cases stating that *Brady* applies to police officers had been decided by or involved conduct that took place before 1970, the year of the alleged violation of Heidelberg's rights, and thus the duty of police officers to disclose was not clearly established at the time. Def. Officers' Mot. Dismiss Second Am. Compl. 7. Indeed, the first case in which the Seventh Circuit explicitly noted police officers' *Brady* obligations was *Jones*, which was decided in 1988 and involved officer conduct from 1981. *Id*. Because the Seventh Circuit had not explicitly "extended *Brady* obligations to police officers in 1970," Defendants argue, they had not been put on notice of their duty to disclose evidence. *Id*.

24

The key to resolving this issue is determining whether police officers' disclosure obligations were established in *Brady* itself or whether they arose from a subsequent source of law. Several Seventh Circuit decisions locate the origins of officers' duty to disclose in the *Brady* opinion. For example, in *Beaman v. Freesmeyer*, the court noted that "it is true that the idea that police officers must turn over materially exculpatory evidence has been on the books since 1963." 776 F.3d 500, 509 (7th Cir. 2015) (concluding that the *Brady* claim was foreclosed for other reasons). Likewise, in *Camm v. Faith*, the court cites to *Beaman* and states in a footnote that "it has long been clearly established that *Brady* obligations extend not just to prosecutors but also to investigators." *Camm v. Faith*, 937 F.3d 1096, 1111 n.3 (7th Cir. 2019). This seems to indicate that officers' disclosure duties were clearly established in 1963. Defendants, however, dismiss this language, arguing that these statements are *dicta* and should not be followed. Def. Officers' Mot. Suppl. Mot. Dismiss Second Am. Compl. 2–4, ECF No. 110.

Even if this Court were to disregard these alleged dicta, that *Brady* obligations applied to police officers as of 1963 is the only logical way to interpret the Seventh Circuit's *Brady* case law. In finding that police officers in 1981 had a duty to disclose evidence, the Seventh Circuit in *Jones* refers only to *Brady*. *Jones*, 856 F.2d at 995. Later cases cite *Jones* for the proposition that "[i]t was already clearly established as early as 1981 that police could not withhold exculpatory information from prosecutors," *Goudy v. Cummings*, 922 F.3d 834, 844 (7th Cir. 2019), and even use *Jones*'s reasoning to find violations of *Brady* by police officers prior to 1981, *see Newsome v. McCabe*, 256 F.3d 747, 752–53 (7th Cir. 2001) ("[W]as it clearly established in 1979 and 1980 that police could not withhold from prosecutors exculpatory information . . . ? The answer is yes: The *Brady* principle was announced in 1963, and we

25

applied it in *Jones* to affirm a hefty award of damages against officers who withheld exculpatory

information in 1981." (citations omitted)), *abrogated by Manuel I*, 137 S. Ct. 911.  None identify

a case that was decided between 1963 and the 1981 events of *Jones* that clarified that police

officers had a duty to disclose exculpatory information.  Thus, the only case that could have

clearly established the disclosure duties of the police officers in *Jones* is *Brady* itself.  If *Brady*

created duties for police officers in 1963, then those duties certainly existed in 1970, when the

events of the case at hand took place.  Defendant Officers and Sheriffs are not entitled to

qualified immunity for their alleged failure to disclose exculpatory evidence.

### B. Fulfillment of *Brady* Obligations

Although the protections of qualified immunity do not apply, Plaintiff must still plausibly

plead that the Officer and Sheriff Defendants failed to carry out their *Brady* obligations to prevail

on the motions to dismiss.  These Defendants have moved in the alternative to dismiss Plaintiff's

*Brady* claims because Plaintiff alleges that they violated *Brady* by failing to disclose exculpatory

evidence to Heidelberg, whereas *Brady* only requires that police officers disclose such evidence

to the prosecution.  Def. Officers' Mot. Dismiss Second Am. Compl. 8–9.  Plaintiff responds that

disclosing evidence to the prosecutors would not have sufficed in this case because the

prosecutors were co-conspirators of the police officers and therefore were not competent parties

to receive the disclosures.  Pl.'s Resp. Def. Officers' Mot. Dismiss Second Am. Compl. 13–14.

Furthermore, Plaintiff contends, even if Defendants are correct, discovery is required to ascertain

whether the officers did, in fact, turn over all exculpatory evidence in their possession to the

prosecutors.  *Id*. at 14.

The *Brady* obligation to turn over exculpatory evidence to a criminal defendant belongs

to the government as a whole.  *See Fermon*, 494 F.3d at 630 ("The Supreme Court considers it

. . . well established that the duty to disclose is one held by the state or government as a whole."). This duty is partitioned based on the role of each government actor, with "[p]olice officers generally discharg[ing] their *Brady* obligations by turning over [exculpatory] evidence to the prosecutors, who in turn have a duty to disclose the evidence to the defense." *Goudy*, 922 F.3d at 837. However, there is a caveat: an officer only satisfies his duty by disclosure "to a 'competent authority,'" and a prosecutor who is conspiring with the officer to frame a criminal defendant is not competent to receive the evidence. *Whitlock v. Brueggemann*, 682 F.3d 567, 576 (7th Cir. 2012) (quoting *Fermon*, 494 F.3d at 630) ("It is not likely that the police may take shelter behind a prosecutor who is conspiring with them to fabricate false evidence against innocent suspects."). *See also Humphrey v. City of Anderson*, 1:19-cv-00764, 2020 WL 3060363, at *5 (S.D. Ind. Jun. 8, 2020) (noting that a co-conspiratorial prosecutor's presence at an officer's coercive interrogation of a suspect did not satisfy the *Brady* rule); *Brady v. Dill*, 187 F.3d 104, 114 (1st Cir. 1999) ("[T]he constitutional wrong results from the officer's failure to deliver material information to competent authorities.").

In Count II, Plaintiff claims that "Defendants deliberately withheld exculpatory evidence from Heidelberg, the court and from competent prosecutors and authorities not involved in the conspiracy." Second Am. Compl. ¶ 188. Throughout the complaint, Plaintiff lists myriad pieces of evidence Defendants failed to disclose to Heidelberg: the original lineup report, *id*. ¶ 52; notes documenting interviews with officers involved in the car chase, *id*. ¶ 57; a telegram from the FBI stating that Heidelberg's prints were not on the murder weapon, *id*. ¶ 66; an FBI latent fingerprint report, *id*., the report by Manias documenting his eavesdropping on Heidelberg's meetings with his attorney, *id*. ¶¶ 72, 103–104; the tapes of the radio transmissions broadcast over the police radio stating the suspect was wearing a yellow shirt and brown jacket, *id*. ¶¶ 87–

88; the contents of the meetings with Manuel and Cremeens, *id*. ¶¶ 93–94; a report detailing the

arrest of James Clark and his guilty plea, *id*. ¶ 99; Mason's statements that he had borrowed

Heidelberg's car and lent it to James Clark the night of the murder and the tactics the 1970

Defendants used to stop Mason from testifying, *id*. ¶ 117; that testimony about a "Curtis Smith"

was actually about James Clark, *id*. ¶ 120; and Clark's admission that he had been in

Heidelberg's car that night, *id*. ¶ 121.  Plaintiff also alleges that Bernard and Schalk suppressed a

description of the clothes Lucas was wearing that night, *id*. ¶ 92, and that Manias failed to turn

over to either Hamm or Heidelberg the notes he had taken the night of the shooting containing

interviews with the officers involved in the chase (although he did inform Hamm of the notes'

existence), *id*. ¶¶ 53–54.

  Interpreted in the light most favorable to Plaintiff, the SAC sufficiently states a claim for

relief as to Defendants' *Brady* obligations.  As elaborated on below, *see infra* II(b)(v)(I), Plaintiff

has plausibly alleged prosecutors Hamm and Riddle were involved in a conspiracy with the

Officer Defendants and Sheriff Defendants to violate Heidelberg's rights and thus were not

competent to receive *Brady* disclosures from the officers, *see Brueggemann*, 682 F.3d at 576.[16]

That Plaintiff fails to specify as to every piece of evidence that the Officer and Sheriff

Defendants did not disclose to a competent authority is not fatal to his claim.  First, given that

Plaintiff is not likely to have access at the pleading stage to detailed information about the

internal processes of the police, the Sheriff's Office, and the State's Attorney's Office, he will

---

[16] Defendants argue in the alternative that even if Hamm and Riddle were not competent authorities, it was not
clearly established in 1970 that the police officers would have to turn over evidence to a prosecutor not conspiring
with them to fulfill their *Brady* obligations.  Def. Officers' Mot. Dismiss Second Am. Compl. 9.  However, the same
cases that refer to police officers' disclosure obligations as arising from *Brady* refer to the duty as one of disclosure
to a "competent authority."  *See, e.g.*, *Fermon*, 494 F.3d at 630.  Thus, if the duty of police officers to disclose
evidence arose under *Brady* in 1963, then the duty to disclose to a competent authority (not merely a prosecutorial
co-conspirator) also originated from *Brady*.

need to conduct discovery to be able to specify with particularity the movement of each piece of evidence.  *See Warren ex rel. Warren v. Dart*, No. 09-cv-3512, 2010 WL 4883923, at *7 (N.D. Ill. Nov. 24, 2010) (finding that "dismissal would be premature" where the plaintiffs had not yet had the chance to "conduct full discovery," although after that they would "need to marshal detailed facts about each individual [d]efendant's personal role").  Second, Count II clarifies that the evidence was withheld not just from Heidelberg but from "the court and from competent prosecutors and authorities not involved in the conspiracy."  Second Am. Compl. ¶ 188.  *See Fermon*, 494 F.3d at 630 (finding an allegation that police officers failed to carry out their *Brady* obligations plausible where the complaint stated that the officers "fail[ed] to disclose the exculpatory evidence to, among others, the judges, juries, post trial prosecutors, and the Governor and his staff" (quotation marks and emphasis omitted)).  Third, the duty to disclose evidence to Heidelberg was held by the state parties "as a whole," *id.*, and Plaintiff may allege that Heidelberg failed to receive the evidence as a result of each state party failing to carry out his specified role.  If the Officer and Sheriff Defendants shared exculpatory evidence with the Prosecutor Defendants but not with competent authorities, and the Prosecutor Defendants did not disclose it to Heidelberg, then all parties violated Heidelberg's Fourteenth Amendment right to have exculpatory evidence disclosed to him.  Plaintiff has plausibly alleged a *Brady* violation, and Defendant Officers' and Sheriffs' motions to dismiss this claim are denied.

### v. Plausibility of Remaining Direct Claims

Defendants move to dismiss most of the remaining direct claims in the SAC, arguing that Plaintiff has failed to meet the plausibility pleading standard.  As a preliminary matter, Defendants object to Plaintiff's use of so-called "group pleading," which, they contend, fails to give adequate notice to each Defendant as to the claims asserted against him.  Def. Sheriffs' Mot.

29

Dismiss Second Am. Compl. 7–11.  The main grievance is Plaintiff's attribution of numerous

actions to "the 1970 Defendants," a group which includes every individual Defendant apart from

Brady.  *See id*.; Def. Prosecutors' Mot. Dismiss Second Am. Compl. 4; Def. Officers' Mot.

Dismiss Second Am. Compl. 4.  As a result, they believe that "the SAC should be dismissed to

the extent any claim against any Defendant rests on group pleaded allegations."  Def. Sheriffs'

Mot. Dismiss Second Am. Compl. 10–11.

Group pleading, which is when a plaintiff attributes individual actions to a group of

defendants rather than specifying which party did what, "ma[kes] it exceedingly difficult for the

[d]efendants to respond to her claims and for the Court to oversee this litigation."  *Eilenfeldt v.

United C.U.S.D. #304 Bd. of Educ.*, No. 4:12-cv-04029-SLD-JAG, 2013 WL 12248080, at *3

(C.D. Ill. Mar. 25, 2013).  However, group pleading does not automatically require dismissal at

the pleading stage and, in some cases, may be more appropriately addressed through a motion for

summary judgment.  *See, e.g*., *Rivera v. Lake County*, 974 F. Supp. 2d 1179, 1194 (N.D. Ill.

2013) ("[A]n allegation directed at multiple defendants can be adequate to plead personal

involvement.  This Court recognizes that . . .  where a plaintiff has been injured as the

consequence of the actions of an unknown member of a collective body, identification of the

responsible party may be impossible without pretrial discovery." (citation omitted)); *Bolden v.

City of Chicago*, 293 F. Supp. 3d 772, 775 n.3 (N.D. Ill. 2017) ("[The court] read[s] the

complaint to allege that every one of the defendant officers committed the acts attributed to

'defendant officers,' and [the court] accept[s] that as true.  If the facts belie such a group

allegation, some of the officers may not face liability.").  The Court will assess on a claim-by-

claim basis whether group pleading issues prevent each Defendant from receiving the notice he

is due.

A. Fabrication of Evidence

In Count II, Plaintiff alleges that the 1970 Defendants fabricated evidence, with which they secured Heidelberg's conviction, resulting in a deprivation of Heidelberg's Fourteenth Amendment right to a fair trial.  Second Am. Compl. ¶¶ 187, 189.  This Court previously granted a motion by Bernard to dismiss a fabrication claim in the original complaint due to an insufficient showing of causation but granted Plaintiff leave to replead, Mar. 26, 2019 Order 36, 52, which he did.  Defendant Officers (apart from Bernard and Schalk, who now acknowledge that Plaintiff has sufficiently alleged a fabrication claim against them) move to dismiss the repleaded claim because the allegations in the SAC are too vague and conclusory to plausibly plead that their alleged fabrication of evidence caused Heidelberg's loss of liberty.  Def. Officers' Mot. Dismiss Second Am. Compl. 10.  They additionally argue that they cannot be held liable for their allegedly fabricated testimony at trial because witnesses in such a situation are immune from civil liability.  *Id*. at 10–11.  Defendant Sheriffs adopt Defendant Officers' argument, Def. Sheriffs' Mot. Dismiss Second Am. Compl. 15, ECF No. 104, as do Hamm and Riddle, Def. Prosecutors' Mot. Dismiss Second Am. Compl. 7, 11.

A police officer or a prosecutor acting in an investigatory role "who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty in some way."  *Brueggemann*, 682 F.3d at 580.  To adequately plead a fabrication claim, a plaintiff must show that "(1) the [§ 1983] defendants deliberately falsified evidence in bad faith or engaged in other misconduct (2) that caused a deprivation of [the § 1983 plaintiff's] liberty."  *Williams v. City of Chicago*, 315 F. Supp. 3d 1060, 1074 (N.D. Ill. 2018).  As stated above, the 1970 Defendants' motions to dismiss focus on the issue of causation.  While "a relatively broad standard for causation applies" because of the

31

"inherently speculative task of analyzing causation in fabrication claims," *id*. at 1075, a causal connection between the evidence and the harm must nonetheless be pleaded.  A state actor may be held liable for fabricating evidence even though he is immune from liability for any testimony at trial regarding the fabricated evidence—there is still "[a]n unbroken causal chain connect[ing] the acts of evidence fabrication to [the criminal defendant's] wrongful conviction and imprisonment."  *Avery v. City of Milwaukee*, 847 F.3d 433, 443 (7th Cir. 2017).

As a preliminary matter, the Court will disregard any allegations in the SAC as to fabricated testimony given by Defendants, as they are immune from liability for any allegedly false testimony, *see id*.  Aside from testimony, Plaintiff alleges a number of instances of fabrication.  He states that, after Macklin ordered the original lineup report to be destroyed, "Manias prepared a second lineup report in which he falsely reported that Manuel and Cremeens had identified Mr. Heidelberg in both the original and reverse run of the lineup and further falsely claimed that Heidelberg had waived his right to an attorney and voluntarily participated in the lineup with no attorney present."  Second Am. Compl. ¶ 79.  He claims that several of the 1970 Defendants took a series of actions that resulted in fabricated testimony from Lucas.  Macklin allegedly solicited Lucas to "'testify that Heidelberg was the guilty party that shot and killed Espinoza,'" for which Macklin paid Lucas and continued to pay him "[u]nder the guise of paying [him] as a confidential informant."  *Id*. ¶ 81.  Subsequently, "Manias and Macklin also falsely claimed that Lucas had identified Heidelberg at the lineup."  *Id*. ¶ 83.  Four Defendants— Manias, Macklin, Hamm, and Riddle—allegedly "had additional meetings with Lucas during which they instructed him to falsely claim that Manuel and Cremeens whispered their identifications into an officer's ear."  *Id*. ¶ 84.[17]  Additionally, Plaintiff pleads that Sack,

---

[17] As noted above, a finding on whether Hamm and Riddle are entitled to absolute prosecutorial immunity for this action awaits further factual development.  *See supra* II(b)(iii).

DeCremer, and Watson "prepare[d] fabricated police reports in which they would falsely document that they had seen the driver of the Chevy during the high-speed chase" wearing the same clothes in which Heidelberg was arrested and "Watson would falsely document that he knew Heidelberg and recognized him as the driver during the high-speed chase." *Id*. ¶ 90. Finally, he claims that the 1970 Defendants "induce[d Manuel and Cremeens] . . . to testify falsely that Heidelberg was the perpetrator." *Id*. ¶ 93.

Plaintiff asserts that these pieces of fabricated evidence caused harm to Heidelberg in two ways. First, "[t]he falsified lineup report and Lucas' purchased identification . . . gave the 1970 Defendants the 'probable cause' necessary to arrest Heidelberg, charge him with the crime and keep him incarcerated." *Id*. ¶ 85. *See, e.g.*, *Patrick v. City of Chicago*, 213 F. Supp. 3d 1033, 1047 (N.D. Ill. 2016) (noting that, while district courts have differed in whether they consider pretrial harm sufficient to state a fabricated evidence claim, the Seventh Circuit's decision in *Armstrong v. Daily*, 786 F.3d 529 (7th Cir. 2015) suggests that an inclusive approach is more appropriate); *Collier v. City of Chicago*, 14 C 2157, 2015 WL 5081408, at *7 (N.D. Ill. Aug. 26, 2015) (denying summary judgment on a fabricated evidence claim where the plaintiff offered evidence that fabricated evidence was used to charge him and detain him in custody for 15 months while awaiting trial).

Second, the fabricated reports and pretrial identifications of Heidelberg "buttressed" the fabricated in-court identifications, Second Am. Compl. ¶ 96 (for example, by "enabl[ing] Manias to testify at trial that Manuel and Cremeens identified Heidelberg in the lineup conducted almost immediately after the crime occurred." *Id*. ¶ 85), and "as a direct result . . . the jury found Mr. Heidelberg guilty of the murder of Sergeant Espinoza and the attempted armed robbery of the Bellevue Drive-In," *Id*. ¶ 124. This claim is supported by Plaintiff's assertion that the circuit

court vacated Heidelberg's conviction because "the evidence against [Heidelberg] at his criminal trial was of little if any probative value in that it consisted almost exclusively of in-court identifications which were extremely weak and not entitled to much, if any, weight, particularly when viewed in light of the new evidence which was not available to the jury," such as the original lineup report.  *Id*. ¶¶ 161–162.  Thus, the fabricated evidence transformed the weak in-court identifications into testimony that was persuasive enough to find Heidelberg guilty of the crime.  *See Brueggemann*, 682 F.3d at 582 (finding a sufficient causal connection where the fabricated evidence "was introduced against [the criminal defendants] at trial [and] was instrumental in their convictions").  The same goes for the 1970 Defendants' inducement of false testimony from Manuel and Cremeens: Plaintiff alleges that "[t]he 1970 Defendants . . . met with [Manuel and Cremeens] repeatedly and fed them facts about the case and told them what the Defendant Officers were claiming to pressure and induce them to agree to testify falsely that Heidelberg was the perpetrator," which they did.  Second Am. Compl. ¶ 93.  Absent Manuel's and Cremeens' false testimony, the case, based in great part on witness identifications, would have been much weaker.

For these reasons, the fabrication of evidence claim will go forward as to all 1970 Defendants.

### B. Destruction of Evidence

In Count II's Fourteenth Amendment claim, Plaintiff alleges that "[t]he 1970 Defendants also destroyed physical evidence that, if subjected to forensic testing, would have demonstrated Heidelberg's innocence," with knowledge of its exculpatory value or, alternatively, "in bad faith."  Second Am. Compl. ¶ 190.  The 1970 Defendants move to dismiss this claim because Plaintiff provides no details about what evidence was destroyed and how it could have proven

Heidelberg's innocence.  Def. Officers' Mot. Dismiss Second Am. Compl. 11.[18]  With regard to

Plaintiff's allegation that they destroyed the original lineup report, they argue that the report has

not been shown to be material because the witnesses testified at trial.  *Id.*

A destruction of evidence claim "has two essential elements: (1) the defendant destroyed

exculpatory evidence in bad faith or engaged in other misconduct (2) that caused a deprivation of

the plaintiff's liberty."  *Armstrong*, 786 F.3d at 551.  As for the first element, a plaintiff must

allege, in addition to bad faith on the part of the government, that "the exculpatory nature of the

evidence was apparent before its destruction" and "that he could not obtain the same evidence

anywhere else."  *United States v. Fletcher*, 634 F.3d 395, 407 (7th Cir. 2011).  "[B]ad faith

requires more than carelessness, it requires a 'conscious effort to suppress exculpatory

evidence.'"  *Id.* at 408 (quoting *United States v. Chaparro-Alcantara*, 226 F.3d 616, 624 (7th

Cir. 2000)).

As the previous section explains, presenting the original lineup report to the jury would

have significantly weakened the in-court identifications of the witnesses and cast doubt on the

credibility of their testimony, possibly leading to an acquittal.  *See supra* (II)(b)(v)(A).  Thus,

Plaintiff has adequately alleged that the report was material.  Plaintiff further claims that the

1970 Defendants "either suppressed or destroyed any notes or reports documenting the

interviews" by Manias of the officers involved in the chase, in which they admitted they could

not have identified the driver of the car.  Second Am. Compl. ¶¶ 53, 57.  Because the officers

testified that they could identify the driver as Heidelberg, *see, e.g.*, *id.* ¶ 91 ("[T]he 1970

Defendants further agreed that Sack, DeCremer and Watson would falsely testify that Heidelberg

was the driver of the Chevy."), these notes would have cast into suspicion testimony by the

---

[18] Hamm, Riddle, and the Sheriff Defendants join in their motion.  Def. Prosecutors' Mot. Dismiss Second Am.
Compl. 2, 7; Def. Sheriffs' Mot. Dismiss Second Am. Compl. 15.

officers as to the identity of the culprit, significantly decreasing the chance that Heidelberg would have been found guilty. Plaintiff also states that "the 1970 Defendants suppressed or destroyed an FBI fingerprint report that identified James Clark's prints on one of the items found at the Drive-In or in the Chevy." *Id*. ¶ 100. A report that showed another strong suspect would have cast significant doubt on Heidelberg's presumed culpability. Because Plaintiff has sufficiently identified allegedly destroyed evidence that would have been material to Heidelberg's defense, it does not defeat his claim that he attributes the destruction to all of the 1970 Defendants—at this stage, the Court accepts as true that each of these Defendants was involved in the destruction. The destruction of evidence claim survives.

### C. Failure to Investigate

Defendants also seek to dismiss Count II of the SAC to the extent that it alleges a constitutional violation based on a failure to investigate. Def. Officers' Mot. Dismiss Second Am. Compl. 11–12. It is well established that a § 1983 plaintiff "does not have a constitutional right to have the police investigate his case at all, still less to do so to his level of satisfaction." *Rossi v. City of Chicago*, 790 F.3d 729, 735 (7th Cir. 2015). Any failure to investigate claim in Count II is therefore dismissed.

### D. Deprivation of Right to Counsel

In Count III, Plaintiff claims that the 1970 Defendants deprived Heidelberg of his Sixth and Fourteenth Amendment rights by "sp[ying] on privileged communications between Heidelberg and his counsel," which "undermine[d] Heidelberg's confidence and trust in his counsel and his ability to work with his counsel to prepare his defense." Second Am. Compl. ¶ 196. They also allegedly "used the information obtained through their unconstitutional spying to wholly thwart Heidelberg's defense by depriving him of essential evidence crucial to his

36

defense," which "irreparably tainted and corrupted Heidelberg's trial." *Id.* ¶ 197.  The Officer
Defendants (apart from Manias, who acknowledges that Count III survives against him) move to
dismiss Count III because, they argue, only Manias is alleged to have eavesdropped on
Heidelberg.  Def. Officers' Mot. Dismiss Second Am. Compl. 12.  The Sheriff Defendants and
Riddle seek dismissal of the claim for the same reason.  Def. Sheriffs' Mot. Dismiss Second Am.
Compl. 15; Def. Prosecutors' Mot. Dismiss Second Am. Compl. 2.  Hamm concedes that Count
III's Sixth Amendment claim against him may go forward.  *Id.* at 8.

    In the SAC, Plaintiff alleges that Manias called Heidelberg's attorney and falsely told
him that Heidelberg wanted to make an immediate confession, after which he "spied on
privileged attorney/client communications for over an hour" and "documented this instance of
unconstitutional eavesdropping in a report."  Second Am. Compl. ¶¶ 70, 72.  Defendants then
"acted on the privileged information they received" by way of Manias's eavesdropping,
convincing Heidelberg "that his counsel was disclosing confidential information about his
defense to Hamm and Riddle."  *Id.* ¶ 73.  As a result, Heidelberg chose to proceed pro se.  *Id.*
Only Manias is alleged to have participated in the eavesdropping, and Plaintiff does not specify
how the officers used the information to Heidelberg's detriment.  Thus, this claim is dismissed as
to all Officer and Sheriff Defendants except for Manias.

    The SAC shows that Riddle played the same role that Hamm did with regard to the
information gleaned from Manias's eavesdropping. Because the claim goes forward against
Hamm, the claim also survives against Riddle.

                                    E. Failure to Intervene

    In Count IV, Plaintiff brings a § 1983 claim for Defendants' alleged failure to intervene
to prevent the violation of Heidelberg's constitutional rights.  Second Am. Compl. ¶ 200.  The

Officer Defendants (and by adoption the Sheriff Defendants, Def. Sheriffs' Mot. Dismiss Second

Am. Compl. 15) argue that this claim should be dismissed because "[t]here is not a single

paragraph that provides any Defendant Officer with any notice of any plausible claim that he had

reason to know another law enforcement official committed a constitutional violation, *and* that

he had a realistic opportunity to intervene to prevent the alleged harm from occurring."  Def.

Officers' Mot. Dismiss Second Am. Compl. 13.  Hamm and Riddle agree and further move to

dismiss this claim "because the law was not clearly established in the 1970s that prosecutors had

a duty to intervene with police officers."  Def. Prosecutors Mot. Dismiss Second Am. Compl. 7,

11.

 "An officer who is present and fails to intervene to prevent other law enforcement

officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer

had reason to know . . . that any constitutional violation has been committed by a law

enforcement official[] *and* the officer had a realistic opportunity to intervene to prevent the harm

from occurring."  *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994).  The officer alleged to have

failed to intervene need not have had authority over the violating officer; the "responsibility to

intervene applies equally to supervisory and nonsupervisory officers."  *Id*. at 285–86 (noting that

"[e]ach police officer present has an independent duty to act.").

  The Seventh Circuit has found that a failure to intervene claim may go forward even

when a complaint "fails to *explicitly* specify the existence of an opportunity for [an officer] to

have intervened" if "the facts demonstrate several opportunities during which [the officer] could

have acted."  *Id*. at 285.  At the motion to dismiss stage, "the existence of a reasonable time for

intervention and a reasonable probability of success, which flows from the facts set out in the

complaint, will be presumed true."  *Id*. at 286; *see also Lanigan v. Village of East Hazel Crest*,

110 F.3d 467, 478 (7th Cir. 1997) ("Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.").

Plaintiff has alleged throughout the complaint that, even where certain 1970 Defendants did not actively participate in a given constitutional violation, they were aware of it or agreed to the conduct. *See, e.g.*, Second Am. Compl. ¶ 67 ("[T]he 1970 Defendants knew that they did not have probable cause to arrest Mr. Heidelberg."); *id.* ¶ 78 ("The 1970 Defendants . . . knew that a 'Lester Mason' (and perhaps others) could testify that Mason borrowed Heidelberg's car and that several other people had seen Heidelberg at the 'T&T Club' and elsewhere during the time the shooting had occurred."); *id.* ¶ 92 ("[T]he 1970 Defendants agreed that Bernard and Schalk would prepare a fabricated police report."). Thus, each 1970 Defendant allegedly knew that Heidelberg had been arrested unlawfully and was being prosecuted despite his innocence and with fabricated evidence yet did nothing to stop it. As there is nothing to suggest that any 1970 Defendant did not have the opportunity to take action over the course of the investigation and the prosecution, it is presumed, at this stage, that each could have intervened but failed to do so.

Hamm and Riddle's proffered qualified immunity defense does not pass muster at this stage. As they are immune from liability for any prosecutorial conduct, *see supra* II(b)(iii), they face this claim only for their actions as investigators. *See Fields I*, 672 F.3d at 511 ("[A] prosecutor has job responsibilities that are not prosecutorial in nature. . . . Actions and decisions made in accordance with [this] set of responsibilities entitle him only to the qualified immunity granted to the police and other members of the prosecution team who share those duties.").[19]

---

[19] Hamm and Riddle ask the Court to follow two Northern District of Illinois decisions that grant qualified immunity to prosecutors because of a lack of cases specifically concerning prosecutors'—not police officers'—duties to

The Seventh Circuit in 1972 held that police officers who, in 1968, had failed to intervene to prevent other officers from beating the plaintiff and thereby violating his civil rights were liable under § 1983 for the harm caused to the victim. *Byrd v. Brishke*, 466 F.2d 6, 10–11 (7th Cir. 1972). Relying on a 1961 Supreme Court case, *Monroe v. Pape*, 365 U.S. 167 (1961), *overruled by Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978), the court found that liability for failure to intervene arises from general tort principles on nonfeasance and cited as an example a 1968 Fifth Circuit case in which a sheriff was held liable under § 1983 for failing to release the plaintiff from custody despite being informed that the charges against him had been dismissed. *Byrd*, 466 F.2d at 10–11 (citing *Whirl v. Kern*, 407 F.2d 781, 785–86, 788 (5th Cir. 1968)). *See also Monroe*, 365 U.S. at 187 ("[§ 1983] should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions."). These tort principles have been in place long before 1970. Qualified immunity is unavailable to Hamm and Riddle at the motion to dismiss stage, just as it is to the officers in this case. The failure to intervene claim survives as to all 1970 Defendants.

### F. Conspiracy to Deny Access to Courts

In Count V, Plaintiff "[p]lead[s] in the alternative and to the extent any of the claims asserted in this complaint are deemed barred by *res judicata*" that the 1970 Defendants denied Heidelberg access to the courts to bring these claims by "depriv[ing] Heidelberg of essential

---

intervene at the time of the alleged violations, treating police officers and prosecutors acting as investigators differently for the qualified immunity analysis. Def. Prosecutors' Mot. Dismiss Second Am. Compl. 7–8 (citing *Serrano v. Guevara*, 315 F. Supp. 3d 1026, 1038 (N.D. Ill. 2018); *Patrick v. City of Chicago*, 213 F. Supp. 3d 1033, 1054 (N.D. Ill. 2016)). Not only is this Court not bound by these decisions, but *Patrick* even acknowledges that "[c]ourts in this district are split on whether prosecutors have a duty to intervene," *Patrick*, 213 F. Supp. 3d at 1054 (citing *Rivera v. Lake Cty.*, 974 F. Supp. 2d 1179, 1191 (N.D. Ill. 2013) (denying a motion to dismiss a failure to intervene claim against the prosecutor defendants because "they chose to act as police officers and to participate in the interrogation" at issue, and in so doing, "they put themselves in a position where they were exercising police powers and would have had a realistic opportunity to step forward and prevent a fellow officer from violating a plaintiff's right[s]" (alteration in original) (quotation marks omitted))).

facts that were crucial to his pursuit of these claims." Second Am. Compl. ¶¶ 204–205. The

1970 Defendants move to dismiss this claim for failure to plausibly allege the claim's elements.

Def. Officers' Mot. Dismiss Second Am. Compl. 15.[20]

"[E]fforts by state actors to impede an individual's access to courts may provide the basis

for a constitutional claim under section 1983." *Cannon v. Burge*, 752 F.3d 1079, 1098 (7th Cir.

2014). For such a claim to survive a motion to dismiss, a plaintiff must allege "something

sufficient to give the defendant 'fair notice' of the access claim, including the identification of

the underlying claim that was lost; a description of the 'official acts frustrating the litigation';

and the identification of a 'remedy that may be awarded as recompense but not otherwise

available in some suit that may yet be brought.'" *Fermon*, 494 F.3d at 633 (quoting *Christopher

v. Harbury*, 536 U.S. 403, 415–416 (2002)). In identifying a lost claim, a plaintiff may not "look

forward to a class of future litigation, but [must instead look] backward to a time when specific

litigation ended poorly, or could not have commenced, or could have produced a remedy

subsequently unobtainable." *Christopher*, 536 U.S. at 414 (footnotes omitted). "[T]he

complaint should state the underlying claim . . . just as if it were being independently pursued,

and a . . . plain statement should describe any remedy available under the access claim and

presently unique to it." *Id*. at 417–18.

Plaintiff has failed to specify which claim the 1970 Defendants prevented Heidelberg

from bringing into court. The SAC contains nothing but a short statement that, "[t]o the extent

any of the claims in this complaint are deemed barred by *res judicata*, the actions of 1970

Defendants described in this Count deprived Heidelberg of facts that were crucial to

Heidelberg's meaningful pursuit of a legal action and thereby denied him his right to access the

---

[20] Defendant Prosecutors and Sheriffs adopt their argument. Def. Prosecutors' Mot. Dismiss Second Am. Compl. 7,
11; Def. Sheriffs' Mot. Dismiss Second Am. Compl. 15.

courts." Second Am. Compl. ¶ 209. None of the claims in the SAC have been deemed to be barred by *res judicata*, and Plaintiff has identified no additional claims that Heidelberg was unable to bring into court as a result of the 1970 Defendants' actions. Because Plaintiff has not adequately plead a claim of denial of access to the courts, his allegation that the 1970 Defendants engaged in a conspiracy to carry out such a denial likewise cannot survive. This claim is dismissed as to all 1970 Defendants.

G. Intentional Infliction of Emotional Distress

Count VI of the SAC alleges the intentional infliction of emotional distress ("IIED"). Second Am. Compl. ¶¶ 213–215. The Court previously held that the IIED claim was timely. Mar. 26, 2019 Order 47–49. Hamm, Manias, Bernard, and Schalk concede that this claim survives against them. Def. Prosecutors' Mot. Dismiss Second Am. Compl. 8; Def. Officers' Mot. Dismiss Second Am. Compl. 16–17. The other Officer Defendants seek dismissal of this claim to the extent that any of the corresponding constitutional claims fail against any of them. Def. Officers' Mot. Dismiss Second Am. Compl. 16–17. Brady argues the same. Def. Prosecutors' Mot. Dismiss Second Am. Compl. 11. The Sheriff Defendants assert that the complaint does not plausibly allege that their actions met the requirements for IIED, Def. Sheriffs' Mot. Dismiss Second Am. Compl. 13, and Riddle likewise believes that this claim should be dismissed against him, Def. Prosecutors' Mot. Dismiss Second Am. Compl. 2.

In Illinois, to assert an IIED claim, a plaintiff "must [allege] that (1) the defendants' conduct was extreme and outrageous; (2) the defendants knew that there was a high probability that their conduct would cause severe emotional distress; and (3) the conduct in fact caused severe emotional distress." *Swearnigen-El v. Cook County Sheriff's Dep't*, 602 F.3d 852, 864 (7th Cir. 2010). Conduct is only outrageous when it is "so extreme as to go beyond all possible

bounds of decency, and to be regarded as intolerable in a civilized community." *Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 211 (Ill. 1992). A wrongful conviction can be the source of the extreme emotional distress required for an IIED claim. *See Parish v. City of Elkhart*, 614 F.3d 677, 683 (7th Cir. 2010).

Because the Fourth Amendment claim in Count I, the Fourteenth Amendment claim in Count II, and the failure to intervene claim in Count IV survive as to all Defendant Officers, their motion to dismiss the IIED claim is denied. As for Brady, because Count I's Fourth Amendment claim survives against him, the IIED claim likewise survives. And Plaintiff has adequately alleged the elements of IIED as to Riddle and the Sheriff Defendants. At least one constitutional claim survives against each of these Defendants. *See, e.g.*, *supra* II(b)(i). They knew that their conduct was likely to cause severe distress because they were aware that Heidelberg was innocent. *See, e.g.*, Second Am. Compl. ¶ 1 ("Indeed, the 1970 Defendants knew well before his criminal trial that Mr. Heidelberg was innocent. Even more disturbing, they knew that a man named James Clark was the actual killer well before Mr. Heidelberg's criminal trial."). Finally, Heidelberg suffered extreme emotional distress as a result of being wrongfully convicted. *See Parish*, 614 F.3d at 683. *See also* Second Am. Compl. ¶ 178 ("Defendants' misconduct continued to cause Heidelberg extreme physical and psychological pain and suffering, humiliation, constant fear, nightmares, anxiety, depression, despair, rage, and other physical and psychological effects through the date of his death."). The IIED claim will go forward against Riddle, Koeppel, and Kennedy as well.

### H. Malicious Prosecution

In the first Order, the Court dismissed Plaintiff's malicious prosecution claim but granted him leave to replead. March 26, 2019 Order 46–47. Plaintiff did so in the SAC. Second Am.

Compl. ¶¶ 222–27.  Defendants seek to dismiss the claim, arguing that Plaintiff has again failed

to plausibly plead that the criminal case against Heidelberg terminated in a manner indicative of

innocence.  Def. Officers' Mot. Dismiss Second Am. Compl. 17.[21]  Instead, they contend, while

Heidelberg's conviction was indeed vacated, the criminal charges against him remained pending

at the time of his death, and it was only due to his death that the appeal was dismissed.  *Id*. at 17–

18.  Plaintiff responds that his new allegations on this point suffice to show termination in

Heidelberg's favor.  Pl.'s Resp. Def. Officers' Mot. Dismiss Second Am. Compl. 19–20.

To assert a claim of malicious prosecution under Illinois law, a plaintiff must allege (1)

"that the defendant brought the underlying suit maliciously and without probable cause," (2)

"that the former action was terminated in his or her favor," and (3) "some special injury or

special damage beyond the usual expense, time or annoyance in defending a lawsuit."  *Cult*

*Awareness Network v. Church of Scientology Int'l*, 685 N.E.2d 1347, 1350 (Ill. 1997) (quotation

marks omitted).  Whether the requirement that the previous suit has ended in the plaintiff's favor

has been fulfilled "is to be determined . . . by the *circumstances* under which [the] disposition is

obtained."  *Id*. at 1352–53.  To be favorable, a termination must be "indicative of the innocence

of the accused."  *Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996); *see, e.g.*, *Velez v. Avis*

*Rent A Car Sys., Inc.*, 721 N.E.2d 652, 656–57 (Ill. App. Ct. 1999) (holding that Avis's refusal to

proceed to trial despite ample opportunity to do so "indicate[d] that the disposition was premised

upon a lack of probable cause and was indicative of the innocence of the plaintiff.").  However,

"[w]here the case is disposed of in a manner that leaves the question of the accused's innocence

unresolved, there generally can be no malicious prosecution claim by the accused."  *Dobiecki v.*

---

[21] The Prosecutor Defendants and the Sheriff Defendants join the Officer Defendants in their motion to dismiss this claim.  *See* Def. Prosecutors' Mot. Dismiss Second Am. Compl. 2, 4, 7; Def. Sheriffs' Mot. Dismiss Second Am. Compl. 15.

*Palacios*, 829 F. Supp. 229, 235 (N.D. Ill 1993); *see also Swick*, 662 N.E.2d at 1243 (finding the question of innocence unresolved where the plaintiff "did not prove that the State lacked reasonable grounds to pursue the criminal charges").  It is the burden of the party alleging malicious prosecution to prove a favorable termination.  *Id.*

It should be noted that the standard for showing a favorable termination for the purpose of a state-law malicious prosecution claim is more demanding than that under *Heck*.  *See Savory*, 947 F.3d at 430 ("To proceed on that tort claim, Illinois requires that the plaintiff prove that the underlying criminal proceedings terminated in a manner *indicative of the innocence* of the accused, a higher standard than *Heck*'s favorable termination accrual rule.").  As such, this Court's resolution of the issues surrounding Plaintiff's Fourth Amendment claim in Count I, *see supra* II(b)(i), is not dispositive of whether there was a favorable termination as to his malicious prosecution claim.

The Court dismissed Plaintiff's original malicious prosecution claim because it found that Plaintiff had not adequately pled that the criminal proceedings against Heidelberg terminated in a manner indicative of innocence.  March 26, 2019 Order 45.  First, the Court expressed that Plaintiff had not clarified in his complaint whether the criminal proceedings against Heidelberg had, indeed, ended—an appeal of the order vacating his conviction was pending at the time of Heidelberg's death.  *Id*. at 45–46.  Second, even if Plaintiff had alleged a termination pursuant to 725 ILCS 5/115-4.5 (the Illinois statute providing for the termination of proceedings due to a defendant's death[22]), the Court noted that neither it not Plaintiff had identified any binding case law establishing that a 725 ILCS 5/115-4.5 dismissal counts as favorable for the purpose of a

---

[22] Under Illinois law, "[w]henever the prosecuting attorney learns of the death of the defendant prior to the entry of a final and appealable judgment in a criminal case, he or she shall promptly notify the other party and file a certificate of notice of the defendant's death with the circuit court before which the case is pending.  Upon filing of the certificate, the court shall enter an order abating the proceedings ab initio."  725 ILCS 5/115-4.5.

malicious prosecution claim. *Id.* at 46–47. However, the Court granted leave to replead the

claim, noting that it was "not persuaded that Plaintiff cannot, as a matter of law, show" that in

this particular instance the circumstances indicate that the termination was due to innocence. *Id.*

In the SAC, Plaintiff alleges that Heidelberg's conviction was vacated by the circuit court

after it found that "the evidence against him at his criminal trial was of little if any probative

value." Second Am. Compl. ¶ 161.[23] The State filed an appeal of the decision that same day.

*Id.* ¶ 167. Despite the State's initial failure to meet the deadline to file their opening brief, it

obtained an extension and ultimately filed the brief. *Id.* ¶ 168. However, "[j]ust a few days

before the State's closing brief was due, Mr. Heidelberg, out on bail . . . , died in his sleep." *Id.*

¶ 169. His death prompted the State to file a motion to dismiss the appeal as moot (although

Plaintiff goes on to say that from the government's perspective, "[t]here remained an actual case

and controversy—the reversal of the order vacating Mr. Heidelberg's conviction and in

particular the findings of factual innocence by the circuit court"). *Id.*

It is now evident from the complaint that Heidelberg's death did result in the termination

of the ongoing criminal proceedings against him. But it is still not clear whether this termination

was favorable. Plaintiff seems to have interpreted the prior dismissal of this claim as a

technicality: "the Court simply found that because Plaintiff had not informed the Court whether

the charges against Mr. Heidelberg were dismissed, the allegations in support of the claim were

insufficient." Pl.'s Resp. Def. Officers' Mot. Dismiss Second Am. Compl. 19. He believes that

---

[23] Plaintiff states that "because all parties, including the State and Defendants in this action, agreed that the driver of the Chevy was the perpetrator of the crime . . . the court's finding that James Clark and not Mr. Heidelberg was the driver of the car was an adjudication of Heidelberg's actual factual innocence that was binding on the State and effectively terminated the criminal case against Mr. Heidelberg in a manner indicative of innocence." Second Am. Compl. ¶ 165. Despite this language seemingly indicating an argument that the conviction being vacated counts as the requisite favorable termination, the Court rejected this argument in the previous order. *See* Mar. 26, 2019 Order 45. The malicious prosecution claim will rise or fall based on the Court's decision as to the 725 ILCS 4/115-4.5 dismissal.

a simple new allegation in Count VIII that "[t]he proceedings against Mr. Heidelberg terminated in a manner indicative of innocence and thereafter abated ab initio as a matter of law pursuant to 725 ILCS 5/115-4.5," Second Am. Compl. ¶ 225, suffices to carry the day. This interpretation ignores the second basis for the claim's prior dismissal: that Plaintiff had not shown how a dismissal based on death indicated innocence. Mar. 26, 2019 Order 46. The statements quoted above represent the entirety of the new allegations on this claim, and they again do not provide enough for the Court to find that there was a favorable termination. Nor has Plaintiff in his Response pointed to any case law showing that termination in these circumstances is favorable. Because Plaintiff has not satisfied his burden of showing a favorable termination, the malicious prosecution claim is dismissed.[24]

## I. Civil Conspiracy

In Count VII, Plaintiff makes a state law claim for civil conspiracy, alleging that Defendants agreed to frame Heidelberg for the Espinoza murder and conspired to both achieve

---

[24] Plaintiff seeks leave to "further amend Count VIII to plead, in the alternative, that Mr. Heidelberg's criminal proceedings terminated when the State failed to retry him within the time period set forth in 725 ILCS 5/103-5, Illinois' speedy-trial statute, which time period expired no later than December 2017," and "to further amend Count VIII to clarify that he is alleging two distinct malicious prosecutions:" that in the criminal proceedings and that in the appeal initiated in the postconviction proceedings. Pl.'s Resp. Def. Officers' Mot. Dismiss Second Am. Compl. 20–21. He also "requests leave to amend Count V to plead, in the alternative, the loss of the malicious prosecution claim as part of his denial of access claim against the 1970 Defendants and Defendant Brady if the Court dismisses or otherwise disposes of the claim during the course of this action." *Id.* at 21. Where a case is dismissed with leave to reinstate and the defendant moves for a trial but is not granted one before the expiration of the statutory speedy-trial period, there has been a favorable termination. *See Ferguson v. City of Chicago*, 820 N.E.2d 455, 461–62 (Ill. 2004). Heidelberg's conviction was vacated on April 20, 2017. Mar. 26, 2019 Order 7. An appeal of that ruling was pending at the time of his death, at which time he was out on bail. Second Am. Compl. ¶ 169. Under 725 ILCS 5/103-5, "[e]very person on bail or recognizance shall be tried by the court having jurisdiction within 160 days from the date defendant demands trial." 725 ILCS 5/103-5(b). Plaintiff does not allege in the SAC that Heidelberg's attorney filed a speedy-trial demand after the conviction was vacated, although he argues in a response that the speedy-trial time period expired on December 2017. Pl.'s Resp. Def. Officers' Mot. Dismiss Second Am. Compl. 20. Without more information, the Court cannot extend leave to amend the SAC at this time to include the speedy trial claim. Plaintiff may seek leave in the future to amend the complaint, adducing more facts to aid the Court in determining if this alternative suffices to state a claim. Plaintiff's second request for leave does not state an adequate ground for relief. Plaintiff's malicious prosecution claim has been dismissed for failure to allege a favorable termination; Plaintiff has not alleged that a tortious act of Defendants caused the lack of a favorable termination. Thus, this would not count as a denial of access to the courts.

that result and to protect themselves from liability.  Second Am. Compl. ¶ 217.  Manias,

Bernard, and Schalk concede that this claim is sufficiently pleaded against them, but the

remaining Defendant Officers move to dismiss the claim to the extent that the malicious

prosecution and IIED claims are dismissed.  Def. Officers' Mot. Dismiss Second Am. Compl.

17.  Brady has argued that the malicious prosecution claim against him should be dismissed, Def.

Prosecutors' Mot. Dismiss Second Am. Compl. 4, thereby dismissing any civil conspiracy claim,

and Hamm concedes that this claim survives against him, *id*. at 8.  The Sheriffs Defendants move

to dismiss on the grounds that the complaint does not plausibly show that they agreed to a

conspiracy, nor are they liable for IIED or malicious prosecution, Def. Sheriffs' Mot. Dismiss

Second Am. Compl. 13, and Riddle seeks to dismiss the claim as well, Def. Prosecutors' Mot.

Dismiss Second Am. Compl. 2.

 While the malicious prosecution claim has been dismissed as to every Defendant, the

IIED claim survives against all, and thus any argument that the civil conspiracy claim should be

dismissed if the state law claims are dismissed fails.  The SAC also plausibly alleges that Riddle

and the Sheriff Defendants agreed to a conspiracy with the other Defendants.  All that is needed

to adequately plead a claim for conspiracy is for "a plaintiff [to] allege an agreement and a

tortious act committed in furtherance of that agreement."  *McClure v. Owens Corning Fiberglas*

*Corp.*, 720 N.E.2d 242, 258 (Ill. 1999).  Active participation in the tortious act is not necessary

for one to be found liable for conspiracy.  *Id*.  In the SAC, Plaintiff alleges that the 1970

Defendants—including Riddle, Koeppel, and Kennedy—agreed to various tortious acts, which

were then accomplished by one or more of them, *see, e.g*., Second Am. Compl. ¶¶ 90–92 ("[The

1970 Defendants] agreed that Sack, DeCremer and Watson would prepare fabricated police

reports . . . the 1970 Defendants further agreed that Sack, DeCremer and Watson would falsely

testify that Heidelberg was the driver of the Chevy . . . the 1970 Defendants agreed that Bernard and Schalk would prepare a fabricated police report . . ."), and that Brady later agreed to join the conspiracy, *see, e.g.*, *id*. ¶¶ 146–49 ("Brady joined in the continuing agreement and conspiracy to cover-up the misconduct of the 1970 Defendants . . . To that end, Brady . . . sat on the evidence for months and then summarily informed Heidelberg's counsel that . . . he would not be reopening Heidelberg's case . . . Brady also suppressed additional documents."). The civil conspiracy claim survives against all 1970 Defendants and Brady.

### J. Abuse of Process

Plaintiff's abuse of process claim in Count IX against Brady and Hamm is another that he repleaded after it was dismissed in the first Order. *See* Mar. 26, 2019 Order 50–51. Hamm and Brady move to dismiss the repleaded claim because of Plaintiff's continued failure to explain how any process was abused. Def. Prosecutors' Mot. Dismiss Second Am. Compl. 5–6. Plaintiff argues in response that the SAC sufficiently pleads that Hamm and Brady abused judicial process by having Heidelberg detained and then placed on twenty-four-hour monitoring after his conviction had been vacated even though they had no intention of retrying him. Pl.'s Resp. Def. Prosecutors' Mot. Dismiss Second Am. Compl. 2–3, ECF No. 116. They allegedly achieved this result by, along with Jones, "misrepresenting the law to the circuit court by claiming that the court lacked jurisdiction to grant bail to Mr. Heidelberg, thus obtaining an order denying bail." *Id*. Furthermore, they allegedly abused process by obtaining an order requiring a $50,000 cash bond despite knowing that they lacked probable cause to pursue the charges. *Id*. at 4.

"Abuse of process is the misuse of legal process to accomplish some purpose outside the scope of the process itself." *Neurosurgery & Spine Surgery, S.C. v. Goldman*, 790 N.E.2d 925,

929 (Ill. App. Ct. 2003).  A plaintiff must allege two elements to plead an abuse of process claim: "(1) the existence of an ulterior purpose or motive and (2) some act in the use of process that is not proper in the regular course of proceedings."  *Id.*  Because Plaintiff focuses on the circuit court's orders of detention, monitoring, and a cash bond, it is clear that the allegations do concern the use of process.  *See Rubloff Dev. Grp., Inc. v. SuperValu, Inc.*, 863 F. Supp. 2d 732, 747 (N.D. Ill. 2012) (commenting that for abuse of process claims, "'process' . . . is used in the literal, legal sense of something issued by the court").  The question is, rather, whether that process was "used to accomplish some result that is beyond the purview of the process." *Neurosurgery*, 790 N.E.2d at 930; *see, e.g.*, *Community Nat'l Bank in Monmouth v. McCrery*, 509 N.E.2d 122, 124 (Ill. App. Ct. 1987) (noting that "[t]he usual case of abuse of process is one of some form of extortion, using the process to put pressure on someone to compel him to pay a different debt or to take or refrain from taking some other action").

Plaintiff contends that Brady and Hamm's ultimately successful pursuit of these orders was an abuse of process because "they had no intention of ever retrying him and in fact had no evidence to support probable cause for the charges."  Second Am. Compl. ¶ 230.  However, as discussed above, the appeal of the order vacating the conviction was pending at the time of Heidelberg's death, *id.* ¶ 169, meaning that the order was not final, *see* Ill. Sup. Ct. R. 301 ("An appeal is a continuation of the proceeding."), and the State may seek an order denying bail where a person has been convicted and an appeal is pending, 725 ILCS 5/110-6.2.  Plaintiff's bare statement that "Brady and Hamm in conspiracy with Jones misrepresented the law to the circuit court claiming that the court had no jurisdiction to grant bail," Second Am. Compl. ¶ 230, provides no details that would allow the Court to infer that there was, in fact, a misrepresentation

and that the misrepresentation led to the denial of bail.  Because Plaintiff has not plausibly

shown how process was abused, this claim is dismissed.

### vi. Supervisory Liability of Koeppel and Kennedy

In addition to moving to dismiss claims brought against them in their individual

capacities, Defendants Koeppel and Kennedy seek dismissal of all claims attempting to hold

them liable as supervisors because supervisory liability under § 1983 instead requires "some

personal involvement in the constitutional deprivation."  Def. Sheriffs' Mot. Dismiss Second

Am. Compl. 11.  They argue that the SAC barely mentions Koeppel and Kennedy by name and

offers nothing more than conclusory allegations as to their actions as supervisors of other

Defendants.  *Id*. at 12–13.  Plaintiff, however, believes that the allegation that "Koeppel and

Kennedy themselves were co-conspirators" and therefore knew about the unlawful conduct of

their deputies, yet "turn[ed] a blind eye to the misconduct," more than suffices.  Pl.'s Resp. Def.

Sheriffs' Mot. Dismiss Second Am. Compl. 9, ECF No. 115.

In order to allege supervisory liability under § 1983, one must show more than a mere

employment relationship.  Instead, "[s]upervisory liability will be found . . . if the supervisor,

with knowledge of the subordinate's conduct, approves of the conduct and the basis for it."

*Lanigan*, 110 F.3d at 477.  A supervisor who is "merely negligent in failing to detect and prevent

subordinates' misconduct" cannot be held liable.  *Jones*, 856 F.2d at 992 (holding that "[t]he

supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind

eye for fear of what they might see.").

As explained above, Koeppel and Kennedy's inclusion in the "1970 Defendants" group is

sufficient at the pleading stage to infer liability for their individual conduct as to several claims.

*See supra* II(b)(v)(A), (B).  They have also been plausibly alleged to be members of a conspiracy

to deprive Heidelberg of his rights.  *See supra* II(b)(v)(I).  Thus, by extension, they are assumed, at this stage, to have known about the actions of their subordinates and, through their own participation in the conspiracy, to have facilitated it.  Because this is enough to survive a motion to dismiss, it is not necessary to reach Koeppel and Kennedy's argument that the SAC fails to show condonation of Manias's eavesdropping in particular, Def. Sheriffs' Mot. Dismiss Second Am. Compl. 12–13.

It may be that discovery shows that Koeppel and Kennedy played a much more limited role than Plaintiff claims, and if that is true, they can revisit the issue of their personal and supervisory liability through a motion for summary judgment.  At this time, however, their motion to dismiss any claim brought against them in their supervisory role is denied.

### vii. *Monell* Claim Against City and County of Peoria

Under *Monell v. Department of Social Services of City of New York*, municipalities may be sued directly under § 1983 where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  436 U.S. 658, 690 (1978).  In their current Motion to Dismiss, the City and County of Peoria urge this Court to dismiss any § 1983 claims made directly against the City and County because the SAC does not contain "nearly enough to make it plausible that the City or the County maintain the policy or practice in question and otherwise meet *Monell* pleading requirements."  Defs. City of Peoria's & County of Peoria's Mot. Dismiss Second Am. Compl. 3, ECF No. 108.  According to Plaintiff, this is for the simple reason that he has not yet pleaded a *Monell* claim.  Pl.'s Resp. Defs. City of Peoria's & County of Peoria's Mot. Dismiss Second Am. Compl. 2, ECF No. 114.  As he did in his response to the Municipal Defendants' first motion to dismiss, Pl.'s Resp. Def. Brady's & Municipal Defs.' Mot. Dismiss

First Compl. 9, ECF No. 50, Plaintiff "respectfully reserves [the] . . . right to amend his complaint at the appropriate time and against the appropriate parties at this time." Pl.'s Resp. Defs. City of Peoria's & County of Peoria's Mot. Dismiss Second Am. Compl. 2. Thus, as the Order on the first round of motions to dismiss stated, "there is currently nothing for the Court to decide," Mar. 26, 2019 Order 51.

### viii. *Respondeat Superior* and Indemnification Claims Against the City and County of Peoria

Defendants City of Peoria and County of Peoria also assert that the *respondeat superior* and indemnification claims brought against them should be dismissed to the extent that the state law claims against the individual Defendants have been dismissed. Defs. City of Peoria's & County of Peoria's Mot. Dismiss Second Am. Compl. 1.[25] Further, the *respondeat superior* claim should be dismissed as a whole against the County because it was not the employer of any of the individual Defendants. *Id.*

As the IIED claim against every 1970 Defendant and Brady survives, so too do the *respondeat superior* claim against the City of Peoria and the indemnification claim against the City and County of Peoria. The County of Peoria, however, will only be liable under a *respondeat superior* theory for the actions of individual defendants if it qualified as their employer—"[a]bsent an employment relationship, the doctrine [of *respondeat superior*] does not apply," *Moy v. County of Cook*, 640 N.E.2d 926, 928 (Ill. 1994). Taking each group of Defendants in turn: first, Officers Hibser, Watson, and Hilst were employed by the City of Peoria, Second Am. Compl. ¶ 29, and so the County of Peoria is not liable for their actions.

---

[25] Only state law claims are at issue here; "[t]here is no respondeat superior liability for municipalities under 42 U.S.C. § 1983." *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 598 (7th Cir. 2019).

Next, the Sheriff's Office:[26] in Illinois, because "[t]he county is given no authority to control the office of the sheriff," the sheriff and his deputies are not employees of the county. *Moy*, 640 N.E.2d at 929–930. "As such, the doctrine of *respondeat superior* has no application." *Id.* at 930. Finally, Hamm and Riddle were Assistant State's Attorneys for Peoria County, and Brady was the State's Attorney for Peoria County. Second Am. Compl. ¶¶ 27–28, 30. Like sheriffs and their deputies, State's Attorneys and Assistant State's Attorneys are not employees of the county for which they work, and therefore the county is not vicariously liable under the *respondeat superior* doctrine for their tortious acts. *Biggerstaff v. Moran*, 671 N.E.2d 781, 199–200 (Ill. App. Ct. 1996).

Because none of the individual Defendants are employees of Peoria County, the *respondeat superior* claim against the County is dismissed. The indemnification claim against the City and County of Peoria survives, as does the *respondeat superior* claim against the City of Peoria.

### ix. Punitive Damages for State Law Claims as to All Individual Defendants

In his complaint, Plaintiff seeks punitive damages from each individual Defendant. Second Am. Compl. 54. In the previous Order, this Court found that punitive damages for claims brought under Illinois state law are unavailable due to Heidelberg's death. Mar. 26, 2019 Order 49; *see, e.g.*, *Vincent v. Alden-Park Strathmoor, Inc.*, 948 N.E.2d 610, 615 (Ill. 2011) ("That the right to recover common law punitive damages abates upon the death of the injured party has not been altered by the Survival Act."). This applies equally to the Second Amended

---

[26] This includes Defendants Koeppel, Kennedy, Manias, Sack, DeCremer, Bernard, and Schalk. Second Am. Compl. ¶¶ 23, 25, 26. Although the SAC does not mention it, Macklin was also employed by the Sheriff's Office. Def. City of Peoria & County of Peoria Mot. Dismiss Second Am. Comp. 4.

Complaint.  Punitive damages for Counts VI through IX of the Second Amended Complaint are

not available against any individual Defendant.

### x. Punitive Damages for Federal Law Claims as to Deceased Defendants

The deceased Defendants (Koeppel, Kennedy, Macklin, Schalk, Sack, Hilst, DeCremer,

Riddle, Watson, and Brady) further argue that punitive damages cannot be assessed against them

for any of the § 1983 claims due to their deaths.  Def. Sheriffs' Mot. Dismiss Second Am.

Compl. 14; *see also* Def. Officers' Mot. Dismiss Second Am. Compl. 21; Def. Prosecutors' Mot.

Dismiss Second Am. Compl. 2.  Plaintiff disagrees, asserting that punitive damages are a critical

tool for deterrence, even if it is the estates rather than the liable parties who have to pay them,

especially where, as here, the defendants may not have to personally pay compensatory damages

because they will be indemnified.  Pl.'s Resp. Def. Sheriffs' Mot. Dismiss Second Am. Compl.

12–13.

Punitive damages serve several goals: they "are awarded . . . to punish [the defendant] for

his outrageous conduct and to deter him and others like him from similar conduct in the future."

*Smith v. Wade*, 461 U.S. 30, 54 (1983) (alteration in original) (quotation marks omitted).

Generally, a plaintiff may recover punitive damages from defendants found liable under § 1983.

*Id*. at 35–36.  Very few courts, however, have decided on whether punitive damages may be

assessed against § 1983 defendants who are deceased.  Those that have confronted this question

have held that awarding punitive damages in this situation "would not serve two of the three

purposes of punitive damages": punishment and specific deterrence.  *Kahlily v. Francis*, No. 08

C 1515, 2008 WL 5244596, at *6 (N.D. Ill. Dec. 16, 2008); *see also Flournoy v. Estate of

Obaisi*, No. 17 CV 7994, 2020 WL 5593284, at *14 (N.D. Ill. Sept. 18, 2020) ("[T]he purpose of

punitive damages is to 'punish blameworthy behavior and deter defendants from committing

future bad acts.'  Imposing punitive damages on [the defendant's] estate would not serve those ends.") (quoting *Beard v. Wexford Health Sources, Inc.*, 900 F.3d 951, 953 (7th Cir. 2018)). While punitive damages might nonetheless operate to deter others from committing similar acts, "other forms of deterrence already exist," such as an "interest in avoiding liability for compensatory damages."  *Kahlily*, 2008 WL 5244596, at *6.  Thus, "awarding punitive damages in such situations would not serve the overall policies behind punitive damages."  *Id.*; *see also Tighe v. Purchase*, No. 1:11-cv-224, 2015 WL 1962304, at *6 (W.D. Pa. May 1, 2015) ("At least one other federal district court has addressed this question, and found that imposing punitive damages on a decedent's estate would not serve two of the primary goals of punitive damages—punishment and individual deterrence."); *Doe v. Indyke*, No. 19 Civ. 7773 (ER), 2020 WL 3073219, at *16 (S.D.N.Y. Jun. 9, 2020) ("[T]he general deterrence purpose of punitive damages . . . is served by the availability of punitive damages against defendants who are alive.).

The Court finds no reason to deviate from the reasoning expressed in these opinions.  The deceased Defendants are not relieved from responsibility for compensatory damages, and other state actors will continue to be deterred by the availability of punitive damages against living Defendants.  Plaintiff may not recover punitive damages from the deceased Defendants.

## CONCLUSION

For the foregoing reasons, the motions to dismiss filed by Koeppel and Kennedy, ECF No. 104; Watson, Hilst, DeCremer, Macklin, Schalk, Sack, Manias, Bernard, and Hibser, ECF No. 105; Brady, Hamm, and Riddle, ECF No. 107; and the City of Peoria and the County of Peoria, ECF No. 108, are GRANTED IN PART and DENIED IN PART.  Defendants' Motion for Leave to File a Reply, ECF No. 120; Motion for Leave to File Supplemental Authority, ECF No. 121; and Motion to Apprise Court of Case Law Development, ECF No. 124, are

GRANTED.  Count I's Fourteenth Amendment claim is dismissed.  Any failure to investigate claim in Count II is dismissed.  Count III is dismissed as to all Defendants except for Manias, Hamm, and Riddle.  Count V is dismissed, as is the malicious prosecution claim in Count VIII.  The abuse of process claim against Hamm and Brady is dismissed.  To the extent any of the claims against Riddle are based on actions for which he is entitled to absolute immunity, those claims are dismissed.  All *respondeat superior* claims against the County of Peoria are dismissed.  Punitive damages are not available against any Defendant for the state law claims and against the deceased Defendants for the federal constitutional claims.  Count I's Fourth Amendment claim, Count VI's IIED claim, and Count VII's civil conspiracy claim survive against all Defendants.  Count II's fabrication of evidence and destruction of evidence claim and Count IV's failure to intervene claim survive against all 1970 Defendants.  The *Brady* claim in Count II survives against the Officer and Sheriff Defendants.  Count III's deprivation of counsel claim survives against Manias, Hamm, and Riddle.  The indemnification claim in Count XI survives against the City of Peoria and the County of Peoria, and the *respondeat superior* claim in Count X survives against the City of Peoria.


Entered this 30th day of November, 2020.

s/ Sara Darrow
_____
SARA DARROW
CHIEF UNITED STATES DISTRICT JUDGE