UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| KAYLA HEIDELBERG, Administrator of the Estate of CLEVE HEIDELBERG, JR., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:18-cv-01161-SLD-JEH |
| EMANUEL MANIAS; LARRY BERNARD; HOLLI BAIN as the Independent Executor of the Estate of PAUL HIBSER; DAVID WENTWORTH II as the Independent Administrator of the Estates of KENNETH DECREMER, PAUL HILST, NOLAN MACKLIN, WILLIAM SCHALK, WILLARD KOEPPEL, and JOHN SACK; ROBERT WATSON JR. as the Independent Administrator of the Estate of ROBERT LEE WATSON; UNKNOWN OFFICERS OF THE PEORIA POLICE DEPARTMENT and THE PEORIA COUNTY SHERIFF'S OFFICE; the CITY OF PEORIA, ILLINOIS; and the COUNTY OF PEORIA, ILLINOIS, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

ORDER

In 1970, Cleve Heidelberg, Jr. ("Heidelberg") was convicted of attempted armed robbery

and murder of a sheriff's deputy.  He spent 47 years in prison until his conviction was vacated in

2017 based on new evidence.  Heidelberg died less than a year after being released.  Plaintiff

Kayla Heidelberg,[1] granddaughter of Heidelberg and administrator of his estate, brings this suit

---

[1] Stephen Heidelberg, son of Cleve Heidelberg, Jr., originally filed this suit, ECF No. 1, as administrator of the estate of his father on April 19, 2018.  Stephen died on December 30, 2022, *see* Mot. Substitute Adm'r Estate of Cleve Heidelberg, Jr. 1 n.1, ECF No. 165, and the Court substituted Kayla Heidelberg pursuant to Federal Rule of Civil Procedure 25, *see* Mar. 24, 2023 Text Order (Hawley, J.); Fed. R. Civ. P. 25(a)(1).  All subsequent references to "Heidelberg" and "Plaintiff" will refer to Cleve Heidelberg, Jr., and accordingly, the Court will use masculine he/him/his pronouns.

pursuant to 42 U.S.C. § 1983 and Illinois state law.  Before the Court are a motion for summary judgment filed by Holli Bain as the Independent Executor of the Estate of Paul Hibser, Robert Watson Jr. as the Independent Administrator of the Estate of Robert Lee Watson, and David Wentworth II as the Independent Administrator of the Estate of Paul Hilst (collectively, "City Defendants"),[2] and City of Peoria, ECF No. 175; and a motion for summary judgment filed by Larry Bernard, Emanuel Manias, and David Wentworth II as the Independent Administrator for the Estates of Kenneth DeCremer, Willard Koeppel, Nolan Macklin, John Sack, and William Schalk (collectively, "County Defendants"),[3] and County of Peoria, ECF No. 184.[4]  For the following reasons, the motions are GRANTED.

---

[2] Though the administrators of the estates of Hibser, Watson, and Hilst are the technical Defendants in this case, "City Defendants" is used to refer to the deceased individuals.

[3] Though the administrators of the estates of DeCremer, Koeppel, Macklin, Sack, and Schalk are the technical Defendants in this case, "County Defendants" is used to refer to the deceased individuals, along with Bernard and Manias.

[4] Plaintiff also named as defendants Ronald Hamm and Stephen Heidelberg as the Administrator of the Estates of Bernard Kennedy and John Riddle in the June 25, 2019 Second Amended Complaint, ECF No. 97.  On Defendants' motion, the Court substituted David Wentworth II as the Independent Administrator of the Estates of Bernard Kennedy and John Riddle pursuant to Federal Rule of Civil Procedure 25(c).  *See* Aug. 21, 2019 Order, ECF No. 101 (Hawley, J.).  In Plaintiff's response to County Defendants' Motion for Summary Judgment, Plaintiff voluntarily dismissed all claims against Hamm, Kennedy, and Riddle.  *See* Pl.'s Resp. Cnty. Defs.' Mot. Summ. J. 1 n.1, ECF No. 202 ("Plaintiff does not oppose the dismissal of claims against Bernard Kennedy, John Riddle, and Ronald Hamm."); Mar. 27, 2024 Text Order ("The claims against Defendants Ronald Hamm, David Wentworth II as the Independent Administrator of the Estate of Bernard Kennedy, and David Wentworth II as the Independent Administrator of the Estate of John Riddle are accordingly DISMISSED WITH PREJUDICE.  The Clerk is directed to terminate Ronald Hamm, David Wentworth II as the Independent Administrator of the Estate of Bernard Kennedy, and David Wentworth II as the Independent Administrator of the Estate of John Riddle as Defendants on the docket.").

# BACKGROUND[5]

## I.      The Parties

Hibser, Watson, and Hilst are sued for their actions as police officers with the Peoria

Police Department ("PPD").  Koeppel is sued for his actions as Sheriff of Peoria County, and

Manias, Sack, DeCremer, Bernard, Schalk, and Macklin[6] for their actions as sheriff's deputies

("PCSD") of the Peoria County Sheriff's Office ("PCSO").  Each of these Defendants is sued in

his individual capacity.  The City of Peoria is sued as Hibser, Watson, and Hilst's employer and

statutory indemnitor.  The County of Peoria is sued as the statutory indemnitor of Manias, Sack,

DeCremer, Bernard, Schalk, and Macklin.

## II.     Armed Robbery of the Bellevue Drive-In and Shooting of Espinoza

Around 1:00 a.m. the morning of May 26, 1970, an armed Black man attempted to rob

the Bellevue Drive-In Theater in Peoria, Illinois, holding Mayme Manuel, the theater manager,

and Maurice Creemens, the projectionist, at gunpoint.  PCSO Sergeant Raymond Espinoza,

riding with confidential informant Jerry Lucas, was the first to arrive at the scene at about 1:30

a.m.  The armed robber shot and killed Espinoza before absconding with Manuel in a blue Chevy

II.  Lucas called for help using Espinoza's radio.

A few hours earlier, Heidelberg had gathered with his friends Lester Mason, James Clark,

Matthew Clark, and Junius Whitt at the TT Club, a bar in Peoria, Illinois.  Heidelberg lent Mason

---

[5] At summary judgment, a court must "constru[e] the record in the light most favorable to the nonmovant."  *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).  Unless otherwise noted, the factual background of this case is drawn from City Defendants' statement of undisputed material facts, City Defs.' Mot. Summ. J. 3–30, ECF No. 175; County Defendants' statement of undisputed material facts, Cnty. Defs.' Mot. Summ. J. 4–54, ECF No. 184; Plaintiff's statements of disputed material facts and additional material facts, Pl.'s Resp. Cnty. Defs.' Mot. Summ. J. 2–39; Pl.'s Resp. City Defs.' Mot. Summ. J. 1–15, ECF No. 204; City Defendants' reply to Plaintiff's additional material facts, City Defs.' Reply 1–14, ECF No. 209; County Defendants' reply to Plaintiff's additional material facts, Cnty. Defs.' Reply 3–37, ECF No. 211; and exhibits to the filings.
[6] The June 25, 2019 Second Amended Complaint does not list Macklin as a sheriff's deputy, but he is sued for his actions in that role.  *See generally* Cnty. Defs.' Mot. Summ. J.

his car that night, the same blue Chevy II that was used as the getaway car after the Bellevue Drive-In armed robbery and shooting.

The first description of the suspect communicated over the PPD radio frequency was "colored male, probably in a Rambler, . . . yellow shirt, brown jacket."  Dispatch Tr. 1:33.55, City Defs.' Mot. Summ. J. Ex. 9, ECF No. 175-10.  In 1970, PCSDs had access to the PPD radio frequency and PSCO dispatchers could phone PPD dispatchers with information they wanted broadcast over the PPD frequency.

A little after 1:30 a.m., PCSDs Bernard and Schalk arrived at the Bellevue Drive-In and interviewed Lucas and Cremeens.  Bernard and Schalk did not write down a description of Lucas's clothing, but at Heidelberg's criminal trial they both testified that Lucas was wearing a yellow shirt and brown jacket that night.  Lucas testified that he was wearing a gold shirt, black pants, and black shoes the night of the shooting.

At about the same time, PCSDs Sack and DeCremer — together in their squad car, unit 714 — were driving west toward the Bellevue Drive-In when they saw a blue Chevy II (similar in body type to a Rambler) drive past them heading east.  Sack and DeCremer did a U-turn, and followed the vehicle east on Plank Road then Harmon Highway away from the drive-in.  Sack and DeCremer communicated over the PPD radio frequency: "We have blue Chevy II pass us as we were going out.  Two subjects in the car.  The colored subject does have the woman from the drive-in with him.  Does have the woman with the drive-in with him."  *Id.* at 1:34.05.  Phyllis Fondriest, PPD radio operator, responded, "10-4," and Unit 714 replied, "Colored male, yellow shirt."  *Id.* at 1:34.25;[7] Dispatch Audio 6:10–6:14, Cnty. Defs.' Mot. Summ. J. Ex. 36, ECF No.

---

[7] The dispatch transcript reads "colored man, yellow shirt" and incorrectly attributes the statement to Fondriest.  On the dispatch audio recording, one can clearly hear a masculine voice state "colored *male*, yellow shirt."

186-12.  Sack and DeCremer lost sight of the car for a short while as the highway curved but caught up with it again at a stop sign where Harmon Highway merged with Lincoln Street.

City Defendants Watson and Hilst were each parked near the intersection of Lincoln Avenue and Laramie Street.  They saw the blue Chevy II drive by with Sack and DeCremer in hot pursuit, and quickly followed them as the Chevy II turned left (north) onto Blaine Street, and then right (east) onto Butler Street, where it crashed into a parked car near 1803 West Butler Street.  The driver of the blue Chevy II got out of the vehicle and fled on foot.

Hilst relayed over the PPD radio that PCSD DeCremer saw the suspect wearing a "dark blue sweater over a light blue shirt."  Dispatch Tr. 1:41.00;[8] Dispatch Audio 12:56.  About fifteen minutes later, Fondriest repeated that description of the suspect's clothing over the PPD radio frequency.  Dispatch Tr. 1:57.10; Dispatch Audio 22:35.

County and City officers searched the area on foot for about twenty minutes.  At 2:08 a.m., Heidelberg was arrested on the back porch of 1612 W. Butler, a few houses away from the crash site, wearing a blue shirt and gray sport coat.  The arresting officers sicced their dogs on Heidelberg and kicked his head and body.  He was taken to the PPD and processed, then to a hospital where he was treated for cuts and dog bites, requiring six stitches.  Sack and DeCremer then transported Heidelberg to the Peoria County Jail.

III.    **The Investigation**

Around 3:30 a.m. on May 26, 1970, a lineup was conducted by Manias at the Peoria County Jail that was viewed by eyewitnesses Lucas, Cremeens, and Manuel.  Heidelberg stood in the lineup with three other Black male fillers.  Koeppel and Macklin were in the viewing room

---

[8] The dispatch transcript identifies the speaker as Hilst but incorrectly transcribes the statement as "*light* blue sweater over a light blue shirt."  The dispatch audio recording clearly states "*dark* blue sweater over a light blue shirt."

with the witnesses.  Manuel was unable to identify any of the men as the suspect.  Cremeens identified Heidelberg in the first run of the lineup but identified a different man in the second run of the lineup.  Lucas personally knew Heidelberg and identified him by name during the lineup. Manias wrote a report falsely stating that all three eyewitnesses positively identified Heidelberg as the shooter.  Macklin told Manias to redraft the report omitting Lucas's name because Lucas was a confidential informant.

That same day, the Illinois State Police confirmed that the 1964 Chevy II with the license plate "TT 8665" found at the crash site of Blaine and Butler was registered to Heidelberg.

After Heidelberg's arrest, Manias spoke with officers who were involved in the police chase, including PCSDs Sack and DeCremer and PPD Officers Hibser and Hilst.  Manias did not consider these to be formal interviews and did not make his own report of his conversations.  He instead instructed the individual officers to write their own reports.  On May 31, 1970, Manias listened in on a privileged conversation between Heidelberg and his appointed attorney and learned of Heidelberg's intent to pursue an alibi defense.  He wrote a report documenting what he heard and turned it in to Macklin.

During the investigation, officers found the murder weapon in the blue Chevy II, along with a few other items there and at the theater, which were sent to the FBI for a ballistics and fingerprint examination.  On June 5, 1970, the FBI sent a telegram to Sheriff Koeppel informing him that Heidelberg's prints were not on the murder weapon.  Neither this telegram nor a further FBI latent fingerprint report documenting the results of the fingerprint testing done on the items was disclosed to Heidelberg.

## IV.  Heidelberg's Criminal Trial and Appeal

On June 10, 1970, Heidelberg was indicted by a grand jury and charged with attempted armed robbery and the murder of Espinoza.  On July 30, 1970, Heidelberg moved to suppress the

lineup eyewitness identifications, alleging due process violations.  Manuel testified at the
evidentiary hearings held in August and September, stating that during the lineup, her "glasses
were broken and [she] couldn't see," and that she did not identify any suspect.  Aug. 25, 1970
Mot. Suppress Tr. 62–63, Cnty. Defs.' Mot. Summ. J. Ex. 42, ECF No. 187-1.  Manias testified
that he wrote a second lineup report solely to remove Lucas's name to keep his name from
becoming public prior to trial.  Heidelberg's motion to suppress was denied on September 16,
1970.

On November 5, 1970, the court heard several motions including a rule to show cause
based on the prosecution's alleged discovery violations.  For several months prior, Heidelberg
had persistently requested that the prosecution provide him with the audio recording of the police
dispatch from the night of the murder.  At the hearing, the prosecutor stated that he had been told
by the PPD that the tapes were only kept for thirty days and that the tape from May 26, 1970 had
since been destroyed.  In lieu of the audio recording, the prosecutor tendered to the defense a
typed transcript of the May 26, 1970 PPD dispatch which had been prepared by a PPD secretary.

Heidelberg's criminal trial began on December 1, 1970 and lasted two weeks. During the
trial, Heidelberg's attorney presented an alternate suspect theory that the murder was committed
either by Heidelberg's friend Lester Mason or a "Curtis Smith."  Heidelberg was convicted by a
jury of attempted armed robbery and murder and sentenced on January 25, 1971 to life in prison.

After Heidelberg's trial, it became known that Curtis (or Curt) Smith was an alias for
James Clark.  On February 19, 1971, a *Peoria Journal Star* article titled "Heidelberg Is Innocent,
I Killed Espinoza, Convict Tells Reporter" reported that James Clark signed a statement
admitting to the murder but "refuse[d] to discuss many of the details of the crime which would
permit an interviewer to determine how his story compares with witnesses' accounts of what

happened." Feb. 19, 1971 *Peoria Journal Star* Article, City Defs.' Mot. Summ. J. Ex. 44, ECF No. 178-8. Heidelberg fought for a new trial and habeas relief, presenting four affidavits from James Clark written between 1971 and 1973 in which James attested to his own guilt. The court denied Heidelberg's requests for relief and his convictions were affirmed on appeal in 1975.

## V.    The 1973 Lawsuit

In 1973, Heidelberg filed a *pro se* civil rights complaint ("March 1, 1973 Complaint") in federal court against numerous PPD and PCSO defendants under 42 U.S.C. § 1983, including current Defendants Hibser, Watson, Koeppel, Macklin, Manias, and Sack. Heidelberg alleged that Koeppel and PCSDs Macklin and Manias conspired to destroy and suppress an original lineup report that contained exculpatory evidence and then falsified a new document purporting to be the original lineup report. He also alleged that the prosecutors for his criminal trial conspired to suborn perjury during a December 1, 1970 meeting with Sack, DeCremer, Watson, Hilst, Hibser, and others. He further alleged that Macklin paid and instructed confidential informant Lucas to commit perjury at Heidelberg's criminal trial and destroyed and suppressed official documents before the trial. Additionally, he alleged that Sheriff Bernard Kennedy[9] and his PCSDs interfered with his efforts to interview various witnesses and destroyed his legal documents. He also alleged that Manias unlawfully eavesdropped on conversations between Heidelberg and his attorneys around May 27, 1970, and August 1970. He further alleged that PCSD Sack, along with City Defendants Watson and Hibser and other PPD officers physically brutalized Heidelberg during his arrest, which he alleged was without probable cause.

---

[9] Bernard Kennedy was Sheriff of Peoria County from July 1970 until December 1975, and he was a named defendant in the 1973 Lawsuit. In the instant suit, Heidelberg also named Kennedy as a defendant in the June 25, 2019 Second Amended Complaint but all claims against Kennedy have since been dismissed with prejudice. *See supra* note 4.

The PCSO Defendants (Koeppel, Macklin, Manias, and Sack) and the PPD Defendants (Watson and Hibser) both filed motions to dismiss based on lack of subject matter jurisdiction and failure to state a claim.  On May 17, 1973, the federal court dismissed all claims against the PCSO Defendants (except Sack) finding first, that it had subject matter jurisdiction over the suit because Heidelberg sought monetary damages for violations of federal civil rights and that the case did not interfere with Heidelberg's ongoing criminal appeal in state court, and second, that the complaint failed to state a claim, specifically finding that "[t]he existence of the alleged police tapes, and access thereto, was apparently fully explored at a state court hearing."  May 17, 1973 Order 3–5, Cnty. Defs.' Mot. Summ. J. Ex. 109, ECF No. 191-6.  The excessive force claim against Sack, Watson, and Hibser survived.

On July 29, 1975, the court entered summary judgment in favor of Sack on the excessive force claim.  The case was set for trial on September 8, 1975 against the PPD Defendants on the excessive force claim, but after Heidelberg failed to appear or obtain a writ of habeas corpus to allow him to appear in court, and upon motion from Watson and Hibser, the case was dismissed with prejudice on September 19, 1975 for failure to prosecute.

Heidelberg appealed the district court's dismissals with prejudice and grant of summary judgment.  In January 1977, the Seventh Circuit appointed Charles Crutchfield, an attorney and professor at Notre Dame Law School, to represent Heidelberg in his appeal.  On June 8, 1978, the Seventh Circuit affirmed summary judgment in favor of Sack on the excessive force claim, and remanded the remainder of the case to the district court, finding that the suit should not have been dismissed for failure to prosecute, and that the district court should carefully review the allegations of eavesdropping on privileged conversations, destruction of favorable evidence (including the PPD dispatch recording and falsified lineup report), and subornation of perjury.

9

On remand, District Judge J. Waldo Ackerman appointed attorneys from the Chicago law firm Jenner & Block to represent Heidelberg.  Heidelberg and his attorneys filed a Second Amended Complaint on January 18, 1980 ("January 18, 1980 Second Amended Complaint") against numerous PPD and PCSO defendants, again alleging a host of civil rights violations pursuant to § 1983, many of which were identical to those he alleged in his March 1, 1973 Complaint.  The January 18, 1980 Second Amended Complaint named PCSO Defendants Koeppel, Manias, and Macklin, and PPD Defendants Watson and Hibser, among others.

Heidelberg brought Count I against City Defendants Watson and Hibser, alleging that when the police officers arrested him on May 26, 1970, they "kicked, hit and physically brutalized plaintiff, and ordered and permitted trained police dogs to bite and maim plaintiff." Jan. 18, 1980 Second Am. Compl. 3, City Defs.' Mot. Summ. J. Ex. 73, ECF No. 181-2.  In Count II, Heidelberg alleged that County Defendants Manias and Macklin destroyed material evidence, namely the original police lineup report from May 26, 1970, and falsified a second lineup report.  Count III alleged that Manias eavesdropped on privileged attorney-client communications between Heidelberg and his attorney and wrote a report documenting at least one instance of this eavesdropping.  Count IV alleged that two sheriff's deputies destroyed Heidelberg's legal documents and interfered with his defense.  Finally, Count V alleged that a sheriff's deputy inflicted cruel treatment on Heidelberg when he was housed at the Peoria County Jail.  Heidelberg asserted that all of the actions committed by PCSD defendants were done with the knowledge and/or approval of Sheriffs Kennedy and Koeppel.

The PCSO Defendants moved to dismiss Count II based on collateral estoppel, averring that the issue of the destruction of the first lineup report had already been fully litigated during Heidelberg's criminal trial and appeal.  Judge Ackerman disagreed and denied the motion to

dismiss, finding that the destruction of the original lineup report was not addressed during Heidelberg's state court proceeding and therefore collateral estoppel did not apply.

In December 1981, Heidelberg settled Count I, the excessive force claim, against the PPD defendants for $7,000.  On January 15, 1982, Count I was dismissed with prejudice.

In February 1982, Heidelberg settled his claims against County Defendants Manias, Macklin, and Koeppel in Counts II through V for $20,000 by entering into a settlement agreement and general release.  On April 5, 1982, those claims were dismissed with prejudice.

## VI.    Heidelberg's 2016 Post-Conviction Proceedings

In 2016, Heidelberg filed a post-conviction petition in Illinois state court, based in part on new evidence of Matthew Clark's testimony.  During Heidelberg's criminal trial in 1970, Matthew Clark was called as a witness, but invoked the Fifth Amendment and refused to testify. Matthew's older brother James Clark died in May 2015, and the next year Matthew signed an affidavit swearing that James had confessed to him that he was responsible for the killing of Sergeant Espinoza at the Bellevue Drive-In Theater on May 26, 1970.

The court found Matthew Clark's testimony sufficiently compelling to undermine confidence in Heidelberg's conviction.  On April 20, 2017, Heidelberg's conviction was vacated, and he was released from prison on May 22, 2017.  Heidelberg died on March 24, 2018.

## VII.   Instant Litigation

Plaintiff brought this suit on April 19, 2018.  Compl., ECF No. 1.  On March 26, 2019, the Court granted in part and denied in part Defendants' motions to dismiss Plaintiff's original complaint.  Mar. 26, 2019 Order, ECF No. 59.  On June 25, 2019, Plaintiff filed an eleven-count Second Amended Complaint ("June 25, 2019 Second Amended Complaint"), ECF No. 97.  On November 30, 2020, the Court granted in part and denied in part Defendants' motions to dismiss the June 25, 2019 Second Amended Complaint.  Nov. 30, 2020 Order, ECF No. 129.  City and

11

County Defendants filed their separate motions for summary judgment on August 7, 2023.  The

remaining counts from the June 25, 2019 Second Amended Complaint are:

- Count I (§ 1983): Post-Legal Process Pretrial Detention Without Probable Cause (Deprivation of Liberty Without Probable Cause) (Fourth Amendment) (against all Defendants), June 25, 2019 Second Am. Compl. ¶¶ 180–83, 185;

- Count II (§ 1983): Due Process, Wrongful Conviction & Illegal Confinement (Fourteenth Amendment) (*Brady v. Maryland*, fabrication of evidence, and destruction of evidence) (against all Defendants), *id*. ¶¶ 186–92, 194;

- Count III (§ 1983): Deprivation of Right to Counsel and to Present a Defense (Sixth and Fourteenth Amendments) (against Manias only), *id*. ¶¶ 195–98;

- Count IV (§ 1983): Failure to Intervene (against all Defendants), *id*. ¶¶ 199–202;

- Count VI (state law): Intentional Infliction of Emotional Distress (against all Defendants), *id*. ¶¶ 213–15;

- Count VII (state law): Civil Conspiracy (against all Defendants), *id*. ¶¶ 216–21;

- Count X (state law): *Respondeat Superior* (against City of Peoria only), *id*. ¶¶ 232–34;

- Count XI (state law): Indemnification (against City of Peoria and County of Peoria), *id*. ¶¶ 235–38.

## DISCUSSION

### I.    **Legal Standard**

Summary judgment is proper where "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury

could return a verdict for the nonmoving party."  *Pugh v. City of Attica*, 259 F.3d 619, 625 (7th

Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

In ruling on a motion for summary judgment, the court must view the evidence in the

light most favorable to the nonmoving party.  *SMS Demag Aktiengesellschaft v. Material Scis.*

*Corp.*, 565 F.3d 365, 368 (7th Cir. 2009).  The court construes all facts and draws all reasonable

inferences in favor of the nonmoving party.  *Moore v. Vital Prods., Inc.*, 641 F.3d 253, 256 (7th Cir. 2011).

Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  To defeat summary judgment, the "nonmov[ing party] must show through specific evidence that a triable issue of fact remains on issues on which he bears the burden of proof at trial."  *Warsco v. Preferred Tech. Grp.*, 258 F.3d 557, 563 (7th Cir. 2001) (citing *Celotex Corp.*, 477 U.S. at 324).  The nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts" in order to establish a genuine issue of material fact.  *Payne v. Pauley,* 337 F.3d 767, 773 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).  A party will be successful in opposing summary judgment only if it presents "definite, competent evidence to rebut the motion."  *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000) (quotation marks omitted).

## II.  Analysis

Defendants assert several grounds for granting summary judgment in their favor, primarily contending that this lawsuit is barred by *res judicata*, also known as claim preclusion. In the alternative, County Defendants Koeppel, Macklin, and Manias argue that Heidelberg is barred from pursuing his current claims against them because he signed a binding settlement and release agreement in 1982.  Cnty. Defs.' Mot. Summ. J. 61–62.  Because Defendants' claim preclusion arguments are dispositive, the Court will address those arguments first.[10]

---

[10] The Court does not address the arguments regarding the Illinois Probate Act, *see* Cnty. Defs.' Mot. Summ. J. 55–56; City Defs.' Mot. Summ. J. 31–36; City Defs.' Suppl. Mot. Summ. J., ECF No. 212; Pl.'s Not. Suppl. Auth., ECF No. 215; Pl.'s Second Not. Suppl. Auth., ECF No. 218; Wentworth's Resp. Pl.'s Nots. Suppl. Auth., ECF No. 219;

a. **Claim Preclusion**

Two defendants (City Defendant Hibser and County Defendant Manias) put forth a *res judicata* defense in their first motions to dismiss, ECF Nos. 28, 30, in July 2018. But Plaintiff challenged the authenticity of the complaints relied upon by Defendants, and the Court determined that it could not consider the unauthenticated complaints at the motion to dismiss stage. Mar. 26, 2019 Order 13 ("The Court cannot say that the questions Plaintiff raises about the purported complaints are unreasonable and therefore must conclude that these documents are not proper subjects of judicial notice."). Here, all Defendants assert that *res judicata* bars all claims against them. *See* City Defs.' Mot. Summ. J. 36–42; Cnty. Defs.' Mot. Summ. J. 56–61. As the Court foretold, the time has come to evaluate Defendants' *res judicata* defense. *See* Mar. 26, 2019 Order 14 ("Consideration of the [*res judicata*] defense will . . . have to await summary judgment.").

*Res judicata* protects the finality of a judgment and forecloses parties from attempting to relitigate claims from prior suits. *McDonald v. Adamson*, 840 F.3d 343, 346 (7th Cir. 2016). *Res judicata* is often used as an umbrella term to refer to two distinct doctrines: (1) claim preclusion, and (2) issue preclusion, also known as collateral estoppel. *See* 18 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 4402 (3d ed.); *Allen v. McCurry*, 449 U.S. 90, 94 n.5 (1980) ("Some courts and commentators use 'res judicata' as generally meaning both forms of preclusion."). The Court will use the terms "claim preclusion" and "issue preclusion" for clarity.

Under claim preclusion, "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen*,

---

nor does it address the qualified immunity and merits arguments, *see* Cnty. Defs.' Mot. Summ. J. 69–92; City Defs.' Mot. Summ. J. 42–49.

14

449 U.S. at 94.  Under issue preclusion, "once a court has decided an issue of fact or law

necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a

different cause of action involving a party to the first case." *Id.*

Claim preclusion is a shield, an affirmative defense that litigants may use against their

adversaries when the required elements are met.  *Garcia v. Vill. of Mount Prospect*, 360 F.3d

630, 636 (7th Cir. 2004); *see also Robbins v. MED-1 Sols., LLC*, 13 F.4th 652, 657 (7th Cir.

2021) ("[C]laim preclusion applies *defensively*; it is invoked by a defendant who seeks to prevent

a plaintiff from asserting a claim that the plaintiff has previously litigated and lost." (quotation

marks omitted)).

> The doctrine of claim preclusion rests on the pragmatic insight that one fair
> opportunity to litigate a claim is normally enough.  The logjam that would develop
> if people could take second, third, or nth bites at the apple without restriction would
> end up greatly delaying, or even denying, access to the courts for people with new
> claims.  By requiring people to raise all theories that relate to a single claim in one
> proceeding, dispute resolution is accomplished efficiently, people focus their
> efforts on the main event, and to the extent humanly possible, both factfinding and
> legal analysis are accurate.  Those incentives and consequences are preserved by
> the claim-preclusion doctrine, under which "a final judgment on the merits bars
> further claims by parties or their privies based on the same cause of action."

*Daza v. Indiana*, 2 F.4th 681, 683–84 (7th Cir. 2021) (quoting *Montana v. United States*, 440

U.S. 147, 153 (1979)).  Claim preclusion is intended "to minimize 'the expense and vexation

attending multiple lawsuits, conserve[ ] judicial resources, and foster[ ] reliance on judicial

action by minimizing the possibility of inconsistent decisions'" so long as parties have a full and

fair opportunity to litigate their claims.  *Matrix IV, Inc. v. Am. Nat'l Bank & Tr. Co. of Chi.*, 649

F.3d 539, 547 (7th Cir. 2011) (alterations in original) (quoting *Montana*, 440 U.S. at 153–54.

When the prior civil litigation was brought in federal court — as it was here — the

federal rule of claim preclusion applies, *Shaver v. F.W. Woolworth Co.*, 840 F.2d 1361, 1364

(7th Cir. 1988), which has three elements: (1) a final judgment on the merits; (2) an identity of

the parties; and (3) an identity of the causes of action, *Palka v. City of Chicago*, 662 F.3d 428,

437 (7th Cir. 2011). Where it applies, claim preclusion prohibits the relitigation of claims

already litigated as well as those that could have been litigated based on the same operative facts.

*McDonald*, 840 F.3d at 346.

Claim preclusion does not apply where the party against whom claim preclusion is

asserted did not have a "full and fair opportunity to litigate" the claim in the prior suit.

*Dookeran v. County of Cook*, 719 F.3d 570, 576 (7th Cir. 2013) (quoting *Kremer v. Chem.*

*Constr. Corp.*, 456 U.S. 461, 480 (1982)). The "full and fair opportunity to litigate" requirement

refers to a "procedural opportunity rather than to a judicial determination of the merits of the

issue." *Lim v. Cent. DuPage Hosp.*, 972 F.2d 758, 763 (7th Cir. 1992) (citing *Kremer*, 456 U.S.

at 481). A party "is presumed to have had a full and fair opportunity to litigate" where he "is

represented by counsel, had ample opportunity to present evidence and exhibits, and also had

appellate review." *Studio Art Theatre of Evansville, Inc. v. City of Evansville*, 76 F.3d 128, 131

(7th Cir. 1996).

Heidelberg filed his civil rights suit in the Northern District of Illinois; it was docketed as

*Heidelberg v. Calkins*, No. 73 C 256 (N.D. Ill.). *See* Mar. 1, 1973 Compl., Cnty. Defs.' Mot.

Summ. J. Ex. 106, ECF No. 191-3. The case was subsequently transferred to the Southern

District of Illinois on March 1, 1973, and docketed as *Heidelberg v. Calkins*, No. 73-20 (S.D.

Ill.). *See* Case No. 73-20 Docket Rep., Cnty. Defs.' Mot. Summ. J. Ex. 103, ECF No. 190-15.

After an unfavorable result at the district court, Heidelberg appealed to the Seventh Circuit

which affirmed in part and reversed and remanded in part. *Heidelberg v. Hammer*, 577 F.2d

429, 433 (7th Cir. 1978). On remand, the case proceeded as *Heidelberg v. Hammer*, No. 78-

3159 (C.D. Ill.), in the Central District of Illinois.[11]  *See* Case No. 78-3159 Docket Rep., Cnty.

Defs.' Mot. Summ. J. Ex. 121, ECF No. 192-1.  On January 18, 1980, Heidelberg filed an

amended complaint.  *See* Jan. 18, 1980 Second Am. Compl.

Because "claim preclusion prevents parties from raising issues that could have been

raised and decided in a prior action—even if they were not actually litigated," *Lucky Brand*

*Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 140 S. Ct. 1589, 1594 (2020), it is necessary for

the Court to examine the full course of Heidelberg's prior litigation from 1973 to 1982.  Both the

March 1, 1973 and January 18, 1980 complaints are relevant to claim preclusion and the Court

will refer to both complaints throughout its analysis.  *See, e.g.*, *Crosby v. City of Chicago*, No. 18

C 4094, 2018 WL 6198483, at *10 (N.D. Ill. Nov. 28, 2018) (analyzing both the original and

amended complaints in determining what claims the plaintiff "did initially bring and could have

maintained" throughout the proceeding).  Although renamed several times, there is only one

lawsuit comprising the March 1, 1973 and January 18, 1980 complaints which the Court will

refer to as the "1973 Lawsuit."

Defendants argue that the 1973 Lawsuit resulted in three final judgments which preclude

the instant litigation: (1) The grant of summary judgment in favor of County Defendant Sack

which was affirmed on appeal from the March 1, 1973 Complaint; (2) An order dismissing with

prejudice the claim (Count I of the January 18, 1980 Second Amended Complaint) against

certain City Defendants signed on January 15, 1982; and (3) An order dismissing with prejudice

the remaining claims (Counts II through V of the January 18, 1980 Second Amended Complaint)

against certain County Defendants signed on April 5, 1982.  *See* City Defs.' Mot. Summ. J. 36–

---

[11] The Central District of Illinois was established on March 31, 1979 pursuant to 28 U.S.C. § 93(b).  *See* Pub. L. 95-408, 92 Stat. 883 (Oct. 2, 1978) (amending 28 U.S.C. § 93(b) to provide for three federal judicial districts in Illinois with an effective date 180 days after enactment).  On remand, Heidelberg's case was assigned to the Central District (instead of remaining with the Southern District) because Peoria County was recategorized into the Central District.

42; Cnty. Defs.' Mot. Summ. J. 56–61.  The Court will discuss each element as it applies to each set of Defendants in turn.

### i.  City Defendants

In the March 1, 1973 Complaint, Heidelberg alleged against City Defendants Watson and Hibser[12] that when the officers arrested him on May 26, 1970, they, "in conspiracy," brutally kicked and hit him, and allowed K9 police dogs to attack him.  Mar. 1, 1973 Compl. 10.  Upon remand, Heidelberg continued this claim as Count I of the January 18, 1980 Second Amended Complaint alleging that the officers "kicked, hit and physically brutalized plaintiff, and ordered and permitted trained police dogs to bite and maim plaintiff."  Jan. 18, 1980 Second Am. Compl. 2–3.  Plaintiff alleged that Watson and Hibser's conduct "deprived plaintiff of his right to be free from physical abuse and punishment, and to due process and equal protection of the law, as secured to plaintiff by the Eighth and Fourteenth Amendments to the Constitution of the United States."  *Id.* at 3.

As stated above, claim preclusion "bars any claims that were litigated or could have been litigated in a previous action when three requirements are met: (1) an identity of the causes of action; (2) an identity of the parties or their privies; and (3) a final judgment on the merits."  *Bell v. Taylor*, 827 F.3d 699, 706 (7th Cir. 2016).  City Defendants assert that all three elements are satisfied.

---

[12] Heidelberg named other PPD and PCSDs as defendants to this claim but because they are not parties to the instant litigation, the Court has omitted their names for clarity.  *See* Mar. 1, 1973 Compl. 10; Jan. 18, 1980 Second Am. Compl. 2.  PCSD Sack was also a named defendant to this claim; he is discussed in Section II.a.ii. *infra*.

1.    **Final Judgment on the Merits**

In November 1981, counsel for Heidelberg and counsel for City Defendants Watson and

Hibser signed a Stipulation to Dismiss Count I of the January 18, 1980 Second Amended

Complaint which stated:

> It is hereby stipulated and agreed by and between Cleve Heidelberg, Jr. ("Plaintiff")
> and . . . Robert Lee Watson . . . [and] Paul J. Hibser . . . ("Defendant City
> Policemen") by and through their respective attorneys that Count I of the [January
> 18, 1980 Second Amended] complaint herein be dismissed with prejudice and with
> attorneys' fees as stipulated and agreed, all matters and controversies with respect
> to Count I having been settled and compromised between all parties.  This
> stipulation does not in any way affect the remaining counts of the [January 18, 1980
> Second Amended] complaint.

Nov. 1981 Stipulation Dismiss, Nemenoff[13] Decl. Ex. C, City Defs.' Mot. Summ. J. Ex. 70, ECF

No. 180-8 at 20.

On January 15, 1982, Judge Ackerman signed an order dismissing Count I of the January

18, 1980 Second Amended Complaint pursuant to the parties' stipulation:

> This matter coming on to be heard on the stipulation of Cleve Heidelberg, plaintiff,
> and . . . Robert Lee Watson . . . [and] Paul J. Hibser . . . , defendants, to dismiss
> Count I of the [January 18, 1980 Second Amended] Complaint, and the Court
> having jurisdiction of the parties and being fully advised in the premises, IT IS
> HEREBY ORDERED that Count I of the [January 18, 1980 Second Amended]
> Complaint is hereby dismissed with prejudice, without costs and with attorneys'
> fees.  Counts II, III, IV and V of the [January 18, 1980 Second Amended]
> Complaint remain pending.

Jan. 15, 1982 Order, City Defs.' Mot. Summ. J. Ex. 82, ECF No. 181-11.

City Defendants argue that the 1982 dismissal order satisfies the final judgment on the

merits element because "dismissal with prejudice based on a settlement agreement is a final

judgment for purposes of [claim preclusion]."  City Defs.' Mot. Summ. J. 37 (quoting *Kilburn-*

---

[13] Brian Nemenoff is an attorney who represented City Defendants Watson and Hibser in the 1973 Lawsuit starting in December 1976 and signed the Stipulation to Dismiss on their behalf.  Nemenoff Decl., City Defs.' Mot. Summ. J. Ex. 70, ECF No. 180-8 at 2–4.

*Winnie v. Town of Fortville*, 891 F.3d 330, 334 (7th Cir. 2018)).  Plaintiff does not address the effects of a dismissal with prejudice but instead argues that claim preclusion does not apply when "there is a settlement agreement that governs."  Pl.'s Resp. Cnty. Defs.' Mot. Summ. J. 49, ECF No. 202 (citing *Levinson v. United States*, 969 F.2d 260, 264 (7th Cir. 1992)).[14]

 *Levinson* involved an attorney who embezzled money from his clients but did not report it as income on his tax returns.  969 F.2d at 261.  He entered into a stipulation with the Internal Revenue Service agreeing to pay a certain amount in back taxes and penalties for negligence, and the government agreed that Levinson did not have to pay any penalties for fraud.  *Id.* at 262.  Some years later, Levinson filed for bankruptcy and filed suit in the bankruptcy court to determine whether his stipulated tax debts were dischargeable.  *Id.*  The government contended that his debts were not dischargeable because his returns were fraudulent, but Levinson argued that *res judicata* pursuant to the earlier stipulation precluded the government from later claiming fraud.  *Id.*  The *Levinson* court held that applying *res judicata* would "neither protect the interests served by res judicata (e.g., encouraging reliance on judicial decisions, barring vexatious litigation, and freeing courts to resolve other disputes, nor serve the policies of bankruptcy law, one of which is to give a fresh start to the *honest* debtor."  *Id.* at 263 (quotation marks omitted) (citing *Brown v. Felsen*, 442 U.S. 127, 128, 131 (1979)).

 *Levinson* relied on the Supreme Court's decision in *Brown v. Felsen* which had remarkably similar facts.  The Supreme Court declined to apply claim preclusion to bar a creditor's action in bankruptcy court, giving weight to the fact that the creditor was not asserting some new ground for recovery, or seeking to increase his recovery, or challenging the validity of

---

[14] Plaintiff incorporated the claim preclusion arguments from his response to County Defendants' Motion for Summary Judgment into his response to City Defendants' Motion for Summary Judgment.  Pl.'s Resp. City Defs.' Mot. Summ. J. 16.

its prior consent decree with the debtor.  Rather, the creditor "was simply trying to defend his

pre-existing rights against the debtor's attempt to evade the debt by means of the Bankruptcy

Act." *Levinson*, 969 F.2d at 263 (citing *Brown*, 442 U.S. at 133–34).

The government in *Levinson* was trying to enforce its judgment against the debtor, but to

do so, the government had to argue that the debtor acted fraudulently.  For policy reasons, the

*Levinson* court held that "it would be inconsistent with the 'fresh-start' policy of the Bankruptcy

Code to permit a pre-bankruptcy proceeding in a tax court in which the debtor could have

contested the issue of 'fraud,' but for whatever reason did not, to foreclose that debtor from

actually litigating the fraud issue in the bankruptcy court for the purpose of determining the

dischargeability of tax liabilities." *Id.* at 264 (quoting *In re Graham*, 131 B.R. 275, 279 (E.D.

Pa. 1991)).

The Supreme Court has explained that settlement agreements typically do not trigger

issue preclusion unless explicitly intended by the parties, whereas settlements do generally

support claim preclusion.

> [S]ettlements ordinarily occasion no issue preclusion (sometimes called collateral
> estoppel), unless it is clear . . . that the parties intend their agreement to have such
> an effect.  'In most circumstances, it is recognized that consent agreements
> ordinarily are intended to preclude any further litigation on the claim presented but
> are not intended to preclude further litigation on any of the issues presented.  Thus
> consent judgments ordinarily support claim preclusion but not issue preclusion.'
> 18 Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice
> and Procedure § 4443, pp. 384–385 (1981).  This differentiation is grounded in
> basic res judicata doctrine.

*Arizona v. California*, 530 U.S. 392, 414 (2000).  Here, Plaintiff's attempt to argue that claim

preclusion does not apply because a settlement agreement was involved fails as a matter of law.

Dismissal with prejudice based on a stipulation constitutes a final judgment for purposes

of claim preclusion.  *See Brooks-Ngwenya v. Indianapolis Pub. Schs.*, 564 F.3d 804, 809 (7th

Cir. 2009) (per curiam); *Daniels v. Rivers*, No. 14 C 1533, 2014 WL 6910492, at *7 (N.D. Ill.

Dec. 9, 2014) ("A voluntary dismissal with prejudice pursuant to a settlement agreement operates as a final judgment on the merits that is entitled to full *res judicata* effect." (quotation marks omitted)); Wright & Miller, *supra*, § 4435 ("A stipulated dismissal with prejudice operates as an adjudication on the merits for claim-preclusion purposes."); *cf. Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 505 (2001) ("'With prejudice' is an acceptable form of shorthand for 'an adjudication upon the merits.'") (quoting Wright & Miller, *supra*, § 2374 n.4 (4th ed.)).  Judge Ackerman's January 15, 1982 order dismissing Count I of Heidelberg's January 18, 1980 Second Amended Complaint is unequivocally a final judgment.

### 2. Identity of the Parties

City Defendants Watson and Hibser were named as defendants in the 1973 Lawsuit, but Hilst was not.  Nevertheless, City Defendants assert that there is an identity of the parties which bars the claims against all of them in the instant litigation.  City Defendants argue that "Hilst is entitled to the benefits of [claim preclusion]" because he was "alleged [to be] a known coconspirator at the time of the earlier proceeding."  City Defs.' Mot. Summ. J. 37.  Heidelberg "expressly allege[d] during that [earlier] litigation that Hilst conspired to suborn perjury with Hibser, Watson, and virtually all the Peoria County codefendants named in both the 1973 and present-day litigations."  *Id.*  Plaintiff responds that "Hilst was not sued at all in the 1973 lawsuit," "the only claims that Heidelberg ever alleged against the PPD officers he did sue in 1973 was excessive force [which] has nothing to do with any of the claims in this lawsuit . . . and there is no allegation that Hilst conspired to use excessive force on Heidelberg."  Pl.'s Resp. City Defs.' Mot. Summ. J. 16–17, ECF No. 204.

For claim preclusion to apply, a court must find an identity of the parties or their privies. *In re Kmart Corp.*, 362 B.R. 361, 380 (Bankr. N.D. Ill. 2007).  Privity is found when the

22

successive parties "adequately represent the same legal interests" as the earlier parties, *Chi. Title Land Tr. Co. v. Potash Corp. of Saskatchewan Sales*, 664 F.3d 1075, 1080 (7th Cir. 2011), meaning that "[s]trict identity of the parties is not necessary," *Donovan v. Est. of Fitzsimmons*, 778 F.2d 298, 301 (7th Cir. 1985). When determining whether privity exists, a court must view the facts of each case with sufficient specificity to "ensure fair notice to litigants and to yield predictable results." *Andersen v. Chrysler Corp.*, 99 F.3d 846, 852–53 (7th Cir. 1996).

Where the parties in the prior and current lawsuits are not identical, some courts use the term "nonmutual claim preclusion" to describe the situation wherein a nonparty to the prior suit uses the prior judgment defensively against a party to the first judgment. *See, e.g.*, *Andrews-Clarke v. Lucent Techs., Inc.*, 157 F. Supp. 2d 93, 100–01 (D. Mass. 2001) ("It has long been recognized that the federal doctrine of 'non-mutual claim preclusion' permits a non-party defendant in a prior action to raise a defense of res judicata in a subsequent suit.").[15] This Court, however, finds the term "nonmutual" in claim preclusion jurisprudence to be imprecise because the Supreme Court has never decisively abolished the mutuality requirement for claim preclusion and the Seventh Circuit is clear that mutuality is still required. *Burton v. Ghosh*, 961 F.3d 960, 971–72 (7th Cir. 2020) ("Courts still apply the mutuality requirement for claim preclusion even though that requirement has been abandoned for issue preclusion."); *see also Blonder-Tongue Lab'ys, Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 349–50 (1971) (authorizing non-mutual defensive issue preclusion); *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329–31 (1979) (authorizing non-mutual offensive issue preclusion).

---

[15] *See also Elbert v. Carter*, 903 F.3d 779, 783 (8th Cir. 2018); *In re El San Juan Hotel Corp.*, 841 F.2d 6, 10–11 (1st Cir. 1988); *Randles v. Gregart*, 965 F.2d 90, 93 (6th Cir. 1992); *In re Micro-Time Mgmt. Sys., Inc.*, 983 F.2d 1067, Nos. 91–2260, 91–2261, 1993 WL 7524, at *4 (6th Cir. 1993) (unpublished table decision); *Silva v. City of New Bedford*, 660 F.3d 76, 78 (1st Cir. 2011); *Airframe Sys., Inc. v. Raytheon Co.*, 601 F.3d 9, 17–18 (1st Cir. 2010).

What some may view as an "'exception' to mutuality," is more appropriately analyzed as an "'extension' of privity." *Lubrizol Corp. v. Exxon Corp.*, 871 F.2d 1279, 1289 (5th Cir. 1989). "[T]he crux of the privity inquiry" is fact-specific and requires a court to determine "whether there was (or should be implied at law) the kind of link between the earlier and later [parties] that justifies binding the second group to the result reached against the first." *Tice v. Am. Airlines, Inc.*, 162 F.3d 966, 971 (7th Cir. 1998). Essentially, the "privity label simply expresses a conclusion that preclusion is proper." Wright & Miller, *supra*, § 4449.

Some courts have found it appropriate to apply claim preclusion in limited situations "only if the new party can show good reasons why he should have been joined in the first action and the old party cannot show any good reasons to justify a second chance." *Id.* § 4464.1 (citing cases); *see also Elbert v. Carter*, 903 F.3d 779, 783–84 (8th Cir. 2018) (applying claim preclusion because the plaintiff "could have brought the new claims against [the defendant] in the first action and failed to do so"); *Silva v. City of New Bedford*, 660 F.3d 76, 80–81 (1st Cir. 2011) (applying claim preclusion because the prior and current defendants were "sufficiently closely related" and the plaintiff "provide[d] no good reason to allow her claims" against the new defendant to proceed).

Many courts have concluded that claim preclusion is appropriate when there is a "sufficiently close identity of interests" between the prior and current defendants, *Tartt v. Nw. Cmty. Hosp.*, 453 F.3d 817, 823 (7th Cir. 2006), such as when the new defendants were named as co-conspirators in the first proceeding but were not joined in the action. *See, e.g.*, *Gambocz v. Yelencsics*, 468 F.2d 837, 841–42 (3d Cir. 1972) (holding that unnamed co-conspirators sued in a subsequent suit could assert a claim preclusion defense when plaintiff had sued other co-conspirators on the same claims in the first suit); *McLaughlin v. Bradlee*, 599 F. Supp. 839,

24

847–48  (D.D.C. 1984), *aff'd*, 803 F.2d 1197 (D.C. Cir. 1986) (finding that new defendants could assert claim preclusion due to their close relationship with defendants named in earlier suits, all of whom were alleged to be part of the same conspiracy); *Burns v. Town of Lamoine*, No. Civ. 00–89–B–S., 2000 WL 1612704, at *3 (D. Me. Sept. 21, 2000) (finding identity between the original defendants and new defendants because plaintiff alleged they acted as co-conspirators); *Betances v. Quiros*, 603 F. Supp. 201, 205–07 (D.P.R. 1985) (finding that new defendant could assert claim preclusion because plaintiff alleged they participated in the same conspiracy as the original defendants).  The common thread throughout these cases is that "the later claims were or could have been brought against the original defendant in the original suit and the subsequent suit tried to hold related defendants liable on related claims."  *Airframe Sys., Inc. v. Raytheon Co.*, 601 F.3d 9, 17–18 (1st Cir. 2010) (quotation marks and alterations omitted).

Heidelberg argues that courts have rejected the co-conspirators-in privity theory.  Pl.'s Resp. Cnty. Mot. Summ. J. 52.  But the cases he cites do not support that argument.  First, he cites to dicta in a footnote of *Novak v. World Bank*, 703 F.2d 1305 (D.C. Cir. 1983), for the proposition that co-conspirators should not be treated as privies for claim preclusion purposes. *See* Pl.'s Resp. Cnty. Mot. Summ. J. 52 (citing 703 F.2d at 1309 n.11).  Defendants correctly point out that the *Novak* court did not outright reject the co-conspirators-in-privity theory, but rather declined to rule in the appellee's favor on privity grounds because the appellee "cite[d] no precedent for the proposition that co-conspirators are to be treated as privies for the purposes of res judicata."  Cnty. Defs.' Reply 47, ECF No. 211 (quoting *Novak*, 703 F.2d at 1309 n.11).  A court need not weigh in on an undeveloped and unsupported argument put forth by a party.  Next, Plaintiff cites to *F.T.C. v. Garvey*, 383 F.3d 891 (9th Cir. 2004).  In that case, the district court found that the defendants in the current and prior suits were "tantamount to 'co-

conspirators,'" but the Ninth Circuit disagreed, finding that the defendants were not sufficiently connected. 383 F.3d at 897–98. The court did not reject the co-conspirators-in-privity theory, but instead simply found that the defendants were not co-conspirators at all. *Id.*

The Court agrees with City Defendants that there is an identity of parties which allows Hilst to take advantage of claim preclusion. "Whether a 'close and significant relationship' exists between an original defendant and a defendant only named in a later suit varies with the facts," *Airframe Sys.*, 601 F.3d at 17, and the Court finds that the undisputed facts here demonstrate a very close relationship between Hilst and Defendants in the 1973 Lawsuit.

In the current lawsuit, Heidelberg alleges a conspiracy among Defendants, that they "reached an agreement among themselves to frame Heidelberg for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose and/or to achieve a lawful purpose by unlawful means" and that "these coconspirators agreed among themselves to protect one another from liability for depriving Heidelberg of these rights." June 25, 2019 Second Am. Compl. ¶ 217. In the 1973 Lawsuit, Heidelberg similarly alleged that the defendants conspired to commit illegal acts to deprive him of his constitutional rights. Mar. 1, 1973 Compl. 2. Though not named as a defendant in the 1973 Lawsuit, Hilst was named as an attendee—along with Hibser and Watson—of an "illegally planned and conducted" meeting involving prosecution witnesses that took place at night during Heidelberg's criminal trial in a State's Attorney's office at the Peoria County Courthouse. *Id.* There exists a "congruence of legal interests" between Hilst and the other City Defendants: In 1973, Watson and Hibser were sued in their roles as PPD officers, which is the same role in which Hilst is sued in the current litigation. Watson and Hibser "had every reason to . . . defend the case as vigorously," *Vas-Cath Inc. v. Mahurkar*, 745 F. Supp. 517, 531 (N.D. Ill. 1990), *rev'd on other grounds*, 935 F.2d 1555 (7th

26

Cir. 1991), as Hilst would have because they were all accused of violating Heidelberg's civil rights during Heidelberg's arrest and prosecution. Heidelberg was clearly aware of Hilst's role in the 1970 criminal trial, and Heidelberg has provided no reason why he could not have joined Hilst as a defendant in the 1973 Lawsuit. Heidelberg "had a full and fair opportunity" to bring his claims against Hilst in the 1973 Lawsuit and "there is no basis for letting [him] proceed against [Hilst] in this new case." *Andrews-Clarke*, 157 F. Supp. 2d at 101.

### 3.    Identity of the Causes of Action

According to City Defendants, this element of claim preclusion is met because Plaintiff's claims "necessarily—and *entirely*—concern Heidelberg's arrest, prosecution, and conviction, the very same core nucleus of operative facts that was at play in the [1973] lawsuit." City Defs.' Mot. Summ. J. 39. Plaintiff disagrees because the "only claim against Watson and Hibser concerned excessive force at the time of [Heidelberg's] arrest." Pl.'s Resp. City Defs.' Mot. Summ. J. 16.

Plaintiff dedicates a section of his brief to arguing that the causes of action are not "identical," and asserts that "Defendants have not met their burden of showing that the causes of action are identical." Pl.'s Resp. Cnty. Defs.' Mot. Summ. J. 55–56. But claim preclusion does not just bar *identical* claims; it goes further and "prevents parties from raising issues that could have been raised and decided in a prior action—even if they were not actually litigated." *Lucky Brand Dungarees*, 140 S. Ct. at 1594.

"[T]he function of [claim preclusion] is to require the joinder of all legal challenges to a wrong, and all claims for relief arising out of those events," and therefore all "claims based on the same, or nearly the same, factual allegations must be joined." *Perkins v. Bd. of Trs. of Univ. of Ill.*, 116 F.3d 235, 236–37 (7th Cir. 1997) (quotation marks omitted). The test for determining

whether two suits involve the same claim or cause of action is whether the claims "arise from the same transaction," *Lucky Brand Dungarees*, 140 S. Ct. at 1595 (alteration omitted) (citing *United States v. Tohono O'Odham Nation*, 563 U.S. 307, 316 (2011)), or involve a "common nucleus of operative facts," Restatement (Second) of Judgments § 24, cmt. b (Am. L. Inst. 1982). "Anything falling within that common nucleus, whether or not actually raised, falls within the scope of the claim and is thus subject to claim preclusion in a later case." *Daza*, 2 F.4th at 684.

There is not a categorical rule defining what constitutes a single transaction. *See Perkins*, 116 F.3d at 236–37. The "same transaction test" is inherently fact-dependent and dictates that "[o]nce a transaction has caused injury, all claims arising from that transaction must be brought in one suit or be lost." *Car Carriers, Inc. v. Ford Motor Co.*, 789 F.2d 589, 593 (7th Cir. 1986). Courts must balance the need to view the facts of a case "at a sufficient level of specificity" "to ensure fair notice . . . and . . . predictable results," *Andersen*, 99 F.3d at 852–53, with the competing need to define a transaction for claim preclusion purposes "with sufficient breadth to encourage parties to present all their related claims at one time," *Car Carriers*, 789 F.2d at 593–94. Certain factors are relevant to the determination of whether two claims are based on the same transaction, including "relatedness in time, space, origin, or motivation, and whether, taken together, [the two causes of action] form a convenient unit for trial purposes." Restatement (Second) of Judgments § 24, cmt. b.

Plaintiff's allegations against the City Defendants clearly arise from the same core of operative facts as that in the 1973 Lawsuit, *i.e.*, Heidelberg's arrest, investigation, prosecution, and conviction for the May 26, 1970 shooting of Sergeant Espinoza. Plaintiff alleges that the City Defendants suppressed the May 26, 1970 PPD dispatch audio tape and that Watson fabricated his May 26, 1970 police report which stated that he saw the suspect wearing a light

blue shirt.[16]  June 25, 2019 Second Am. Compl. ¶¶ 88, 90; Pl.'s Resp. City Defs.' Mot. Summ. J. 16–17.  Plaintiff brings these claims pursuant to 42 U.S.C. § 1983 and *Brady v. Maryland*, 373 U.S. 83 (1963).[17]  Plaintiff does not argue he did not have a "full and fair opportunity to litigate" his prior claims and he points to no good reason why he could not have raised these claims in his earlier suit.

With respect to the PPD dispatch audio tape, Heidelberg states that claim preclusion does not apply because in the 1973 Lawsuit, he "alleged that [Peoria County State's Attorneys] Hamm, Riddle, and Calkins suppressed the PPD recording tape, . . . whereas here, [he] alleges— based on the facts developed during discovery in this case—that the City Defendants withheld the tape from the prosecutors."  Pl.'s Resp. Cnty. Defs.' Mot. Summ. J. 56.  As Heidelberg concedes, he is bringing the exact same claim from his 1973 Lawsuit but asserting it against different defendants.  But Heidelberg cannot merely "switch[] adversaries," *Bernhard v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 122 P.2d 892, 895 (Cal. 1942), to evade claim preclusion.  *See Parungao v. Cmty. Health Sys., Inc.*, 858 F.3d 452, 458 (7th Cir. 2017) (finding claim preclusion to be appropriate even when the plaintiff's first complaint attributed defamatory letters to one defendant, but the subsequent complaint attributed the letters to different defendants).

---

[16] Defendants are correct that Plaintiff did not address the theories that (1) Hibser, Hilst, and Watson intentionally failed to view the May 26, 1970 lineup, and (2) the transcript of the dispatch audio was produced too close to trial to be of use to Heidelberg.  City Defs.' Reply 25.  City Defendants are entitled to summary judgment on those claims. *Nichols v. Mich. City Plant Plan. Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment.").

[17] As discussed at length by the Court in a prior Order, Defendants had an obligation to comply with *Brady* by disclosing exculpatory evidence during the investigation and prosecution of Heidelberg in 1970.  *See Heidelberg v. Manias*, 503 F. Supp. 3d 758, 783 (C.D. Ill. 2020) ("If *Brady* created duties for police officers in 1963, then those duties certainly existed in 1970, when the events of the case at hand took place.").  In 1963, the *Brady* Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.  A *Brady* claim is comprised of three elements: a plaintiff must show (1) that evidence was suppressed by the government, either willfully or inadvertently; (2) the evidence at issue is favorable to the accused, being either exculpatory or for the purpose of impeachment; and (3) there is a reasonable probability that the accused was prejudiced by the suppression, *i.e.*, that the evidence was material.  *Carvajal v. Dominguez*, 542 F.3d 561, 566–67 (7th Cir. 2008).

As for Watson's alleged fabrication of his police report, Plaintiff asserts that he could not have litigated that claim in 1973 "given that he did not have the information that officers knew the suspect was wearing a yellow shirt and brown jacket until after the radio tape was produced decades later." Pl.'s Resp. City Defs.' Mot. Summ. J. 17. There is no dispute that Heidelberg had access to Watson's police report in 1970, and indeed his attorney used the report to impeach Watson during cross-examination at Heidelberg's criminal trial. City Defs.' Mot. Summ. J. 12. It was known at trial that the first description of the suspect broadcast over the PPD radio frequency was a "colored male, yellow shirt, brown jacket" and police officers heeded this description during their search for the culprit. *See, e.g.*, Dec. 2, 1970 Trial Tr. 70, Cnty. Defs.' Mot. Summ. J. Ex. 9, ECF No. 185-9 ([Peoria County State's Attorney] MR. HAMM: "For example, the city police were originally looking for a man in a yellow shirt and brown jacket. Certain officers testified that they did not stop a car because the occupant in that car did not have the yellow shirt and brown jacket."). The Court is not persuaded that Heidelberg could not have brought this claim in his 1973 action.

In *Okoro v. Bohman*, 164 F.3d 1059 (7th Cir. 1999), a case with analogous facts, the Seventh Circuit determined that a subsequent suit was barred because the plaintiff's two prior suits "arose from the same event cluster, namely the investigation and prosecution of Okoro for federal drug offenses." 164 F.3d at 1062.[18] Okoro alleged that the defendant law enforcement officers engaged in "a massive conspiracy to frame him" for federal drug offenses, as part of which the officers met together with Okoro, stole Okoro's property, and testified falsely at

---

[18] The Seventh Circuit ultimately found that claim preclusion did not apply to the facts of the case because Okoro's two prior suits had been dismissed as frivolous, and dismissal on the basis of frivolity is a form of jurisdictional dismissal. *Okoro*, 164 F.3d at 1064. Jurisdictional dismissal is akin to issue preclusion (rather than claim preclusion) and thus only barred Okoro from "filing a new suit with the same jurisdictional defect." *Id.* The court found that Okoro's prior "suits were frivolous because [they were] *so clearly* barred by *Heck* [*v. Humphrey*], but Okoro was "free to file a new suit provided it was not barred by *Heck*." *Id.*

Okoro's criminal trial.  *Id.*  Because the allegations of Okoro's current suit stemmed "from the same incident, events, transaction, circumstances, or other factual nebula as a prior suit," the court found that "it was incumbent on him to allege the theft, along with the conspiracy to frame him, in his first suit."  *Id.*

Likewise, the Court finds it readily apparent that there is common nucleus of operative facts here evincing an identity of the causes of action thereby satisfying the third element of claim preclusion.  Heidelberg has added "[n]o new facts or series of events," *Andrews-Clarke*, 157 F. Supp. 2d at 102, and his "two suits stem from the same core of operative facts—the same actions taken by the same [people] in the same time frame," *Talano v. Bonow*, No. 00 C 1208, 2002 WL 31061198, at *2 (N.D. Ill. Sept. 16, 2002).

Because all three elements are met — final judgment on the merits, identity of the parties, and identity of the causes of action — claim preclusion applies, and City Defendants are entitled to summary judgment on all claims.

### ii.   County Defendants

In his March 1, 1973 Complaint, Heidelberg alleged numerous wrongs against several of the current City and County Defendants, including Sack, Manias, Macklin, and Koeppel.  Mar. 1, 1973 Compl. 0.  His claims included conspiracy to destroy and suppress an original lineup report that contained exculpatory evidence and then falsify a new document purporting to be the original lineup report; participation in a meeting where prosecutors conspired to suborn perjury; interference with efforts to meet and interview witnesses; destruction of legal documents; eavesdropping on privileged conversations; arrest without probable cause; and physical brutality at the hands of the officers.  *See generally id.*

All of the claims against County Defendants Koeppel, Macklin, and Manias were dismissed on May 17, 1973 for failure to state a claim because the court found that the allegations regarding the dispatch recording "was fully explored at a state court hearing" and the allegations concerning the lineup were "devoid of merit." May 17, 1973 Order 4–5. That decision was reversed on appeal. *Heidelberg*, 577 F.2d at 432 (holding that the allegations that PCSDs "destroyed and falsified a line-up report and police tapes of incoming telephone calls . . . should not have been dismissed"). As for PCSD Sack, summary judgment was entered in his favor on the excessive force claim, *see* July 29, 1975 Order 2, Cnty. Defs.' Mot. Summ. J. Ex. 115, ECF No. 191-12, and affirmed by the Seventh Circuit on appeal, *Heidelberg*, 577 F.2d at 433.

On remand, Heidelberg filed his January 18, 1980 Second Amended Complaint, alleging four counts against the PCSO defendants:

- Count II alleged that Manias and Macklin destroyed material evidence when they "destroyed a certain police report of a lineup held on May 26, 1970, in which plaintiff was a participant, and prepared a second report which omitted information contained in the first report and falsified the circumstances of the lineup," and that this was done with the approval of Sheriff Koeppel. Jan. 18, 1980 Second Am. Compl. 3–4.

- Count III alleged that Manias eavesdropped on privileged attorney-client communications "[o]n repeated occasions during the period May 26, 1970 to December 21, 1970, while plaintiff was being held at the Peoria County jail prior to his [criminal] trial in state court" and that "[o]n at least one such occasion, on or about May 30 and May 31, 1970, defendant Manias filed a written report with his superiors summarizing the content of the conversation between plaintiff and his attorney on which he eavesdropped," and that this was done with the approval of Sheriff Koeppel. *Id.* at 4–5.

- Count IV alleged that two PCSDs destroyed Heidelberg's legal documents and interfered with his defense when they "refused to give plaintiff legal materials[,] . . . required plaintiff to state the names of potential witnesses," and "seize[d] from plaintiff and destroy[ed] various legal notes, papers, and transcripts relating to the state criminal proceedings," and that this was done with the approval of Sheriff Kennedy. *Id.* at 6–7.[19]

---

[19] Kennedy was named as a defendant in the June 25, 2019 Second Amended Complaint but all claims against Kennedy have since been dismissed with prejudice. *See supra* note 4.

- Count V alleged that a PCSD inflicted "cruel treatment [on Plaintiff] while imprisoned" at the Peoria County Jail when he "caused plaintiff to suffer extreme abuse and deprivation by failing to provide common items of personal hygiene, failing to provide adequate heat, blankets and bedding, failing and refusing to cause necessary plumbing repairs to be made, and threatening plaintiff's life without reason or provocation," and that this was done with the approval of Sheriff Koeppel.  *Id.* at 7–8 (capitalization altered).

DeCremer, Bernard, and Schalk were not named as defendants at all in the 1973 Lawsuit.

### 1.    Final Judgment on the Merits

In early 1982, Heidelberg and certain County Defendants executed a settlement agreement to dismiss then-pending Counts II through V of the January 18, 1980 Second Amended Complaint in exchange for $20,000.  Settlement Agreement & General Release, Cnty. Defs.' Mot. Summ. J. Ex. 144, ECF No. 193-6 at 5–7.  The agreement also contained a release which is discussed below in section II.b.

In March 1982, counsel for Heidelberg and counsel for County Defendants Koeppel, Macklin, and Manias signed a Stipulation to Dismiss in Case No. 78-3159 which stated:

> It is hereby stipulated and agreed by and between CLEVE HEIDELBERG, JR., Plaintiff; and George P. Shadid, substituted as successor in interest to Willard M. Koeppel in his official capacity . . . ; Nolan Macklin in his official capacity, Emanuel Manias in his official and individual capacity, Dorothy Koeppel, (widow of the late Willard M. Koeppel) as successor in interest to Willard M. Koeppel in his individual capacity, . . . defendants; by and through their respective attorneys, that Counts II, III, IV and V of the [January 18, 1980] Second Amended Complaint herein be dismissed with prejudice, with attorneys fees and costs, if any, to be paid from the proceeds of the payment described in paragraph 4 of the SETTLEMENT AGREEMENT AND GENERAL RELEASE, a separate document executed by and on behalf of the aforenamed parties, and it is stipulated and agreed, all matters and controversies with respect to Counts II, III, IV and V having been settled and compromised between all parties.

March 1982 Stipulation Dismiss, Cnty. Defs.' Mot. Summ. J. Ex. 144, ECF No. 193-6 at 8–9.

On April 5, 1982, Judge Ackerman issued an order in Case No. 78-3159 dismissing Counts II through V of the January 18, 1980 Second Amended Complaint:

This matter coming on to be heard on the Stipulation of CLEVE HEIDELBERG, JR., Plaintiff; George P. Shadid, substituted party as successor in interest to Willard M. Koeppel, . . . Nolan Macklin in [his] . . . official capacit[y], Dorothy Koeppel, substituted party for Willard M. Koeppel in his individual capacity, . . . and Emanuel Manias, in his individual and official capacity, defendants; the Court housing jurisdiction of the parties and being fully advised in the premises.

IT IS HEREBY ORDERED that Counts II, III, IV and V of the [January 18, 1980] Second Amended Complaint are hereby dismissed with prejudice, without costs and with attorneys fees; said attorneys fees to be paid pursuant to the Stipulation entered into on behalf of the aforenamed parties.

Apr. 5, 1982 Order, Cnty. Defs.' Mot. Summ. J. Ex. 146, ECF No. 193-8.

County Defendants argue that the 1982 settlement and order dismissing with prejudice satisfy the adjudication on the merits element because "dismissal with prejudice based on a settlement agreement is a final judgment for purposes of [claim preclusion]." Cnty. Defs.' Mot. Summ. J. 56-57 (quoting *Kilburn-Winnie*, 891 F.3d at 334). As stated *supra*, dismissal with prejudice based on a stipulation constitutes a final judgment for purposes of claim preclusion. *See Brooks-Ngwenya*, 564 F.3d at 809; Wright & Miller, *supra*, § 4435 ("A stipulated dismissal with prejudice operates as an adjudication on the merits for claim-preclusion purposes."). Judge Ackerman's April 5, 1982 order dismissing Counts II through IV of Heidelberg's January 18, 1980 Second Amended Complaint is undeniably a final judgment and satisfies the first element.

As for PCSD Sack, summary judgment was entered in his favor on the excessive force claim from the March 1, 1973 Complaint, and affirmed by the Seventh Circuit on appeal. A grant of summary judgment, affirmed on appeal, is certainly a final judgment. *Czarniecki v. City of Chicago*, 633 F.3d 545, 549 (7th Cir. 2011) ("There is no question that the district court's grant of summary judgment to the City has given rise to a final judgment in favor of the City.").

## 2.    Identity of the Parties

County Defendants Koeppel, Macklin, and Manias were parties to the agreement which settled the claims against them, but Bernard, Schalk, DeCremer, and Sack were not.

34

Nevertheless, County Defendants argue that: (1) Sack was a named defendant in the 1973 Lawsuit, (2) DeCremer was alleged to have conspired to suborn perjury in the 1973 Lawsuit, and (3) Bernard and Schalk are alleged to have conspired with the other County Defendants in the current lawsuit, thereby rendering all County Defendants in privity and thus entitled to the benefits of claim preclusion.  Cnty. Defs.' Mot. Summ. J. 57–58.  Plaintiff does not dispute that there is an identity of parties with respect to Sack but states that County Defendants cannot show an identity of interest for Bernard, Schalk, and DeCremer, arguing that Defendants improperly rely on principles of corporate law and that the conspiracy alleged in 1973 is different than the conspiracy alleged in the current suit.  *See* Pl.'s Resp. Cnty. Mot. Summ. J. 51–55.  Plaintiff argues that the 1973 Lawsuit's alleged conspiracy and the current lawsuit's alleged conspiracy are different because the claims against the individual defendants are different.  *See, e.g.*, *id.* at 54 (asserting that in 1973, Heidelberg alleged that DeCremer conspired to suborn perjury, but in the current suit, Heidelberg alleges that DeCremer fabricated evidence).  The Court is not persuaded.

As explained above, courts have held that "where some alleged conspirators are sued in the first . . . action and the remainder in a second suit based on the same allegations, . . . the later defendants could raise claim preclusion as a defense." *Airframe Sys.*, 601 F.3d at 17 (quotation marks omitted).  In the instant litigation, Heidelberg alleges that all of the City and County Defendants conspired to frame him for the shooting of Espinoza and to deprive him of his constitutional rights, June 25, 2019 Second Am. Compl. ¶ 217, and the conspiracy alleged in the 1973 Lawsuit had the exact same purpose, Mar. 1, 1973 Compl. 2.

Like City Defendant Hilst, DeCremer was not named as a defendant in the 1973 Lawsuit but was named as an attendee of the same "illegally planned and conducted" meeting during

35

Heidelberg's criminal trial as other City and County Defendants were. *Id.* In 1973, Koeppel, Macklin, Manias, and Sack were sued in their roles as employees of the Peoria County Sheriff's Office — the same roles in which Bernard, Schalk, and DeCremer are now sued. Bernard, Schalk, and Decremer's "interests in defending against the claims set forth in this case are so closely aligned with those of [Koeppel, Macklin, Manias, and Sack] in the first suit that they represent the same legal interest." *Graham v. Healthplex Assocs., Inc.*, No. 1:21-cv-03079-JPH-MKK, 2023 WL 2330706, at *3 (S.D. Ind. Mar. 1, 2023) (quotation marks omitted), *aff'd*, No. 23-1525, 2023 WL 5989541 (7th Cir. Sept. 15, 2023). Bernard and Schalk were not named in the 1973 Lawsuit but are named as co-conspirators in the instant suit which is based on the same underlying factual allegations. *See Gambocz*, 468 F.2d at 841 ("[Claim preclusion] may be invoked against a plaintiff who has previously asserted essentially the same claim against different defendants where there is a close or significant relationship between successive defendants."). The undisputed facts here demonstrate a very close relationship and a congruence of legal interests "that justifies binding [Bernard, Schalk, and DeCremer] to the result reached against the [defendants in the 1973 Lawsuit]," *Tice*, 162 F.3d at 971, and Plaintiff has shown no reason why they could not have been joined in his prior suit. The Court agrees with County Defendants that there is an identity of parties which allows Bernard, Schalk, and DeCremer to invoke claim preclusion.

### 3.   Identity of the Causes of Action

County Defendants aver that this element of claim preclusion is met because "[b]oth [the prior and current] cases—and all their facts, theories and claims—arise entirely out of Heidelberg's arrest, prosecution, and conviction for the Espinoza murder." Cnty. Defs.' Mot. Summ. J. 59. Plaintiff rebuts this argument by bringing up the settlement agreement and general

release, stating that "whether there is an identity of causes of action between this case and the 1973 lawsuit is irrelevant because, even if there are identical claims, they are not now barred unless the parties *intended* to release them." Pl.'s Resp. Cnty. Defs.' Mot. Summ. J. 50. But Plaintiff fails to address the impact of the 1982 order dismissing his claims with prejudice, again arguing that claim preclusion does not apply when "there is a settlement agreement that governs." *Id.* at 49 (citing *Levinson*, 969 F.2d at 264). As the Court explained above, settlements "ordinarily support claim preclusion but not issue preclusion." *Arizona*, 530 U.S. at 414 (quoting Wright & Miller, *supra*, § 4443 (1981)); *see also Heard v. Tilden*, 809 F.3d 974, 978 (7th Cir. 2016) ("[S]ettlement agreements generally do not give rise to issue preclusion—as opposed to claim preclusion—unless it is clear that preclusion is what the parties intended.").

To determine whether two suits involve the same claim, a court must decide whether the claims "arise from the same transaction," or comprise a "common nucleus of operative facts." *Lucky Brand Dungarees, Inc.*, 140 S. Ct. at 1595 (alterations and quotation marks omitted). The purpose of claim preclusion "is to require the joinder of all legal challenges to a wrong, and all claims for relief arising out of those events." *Perkins*, 116 F.3d at 236–37. The doctrine of claim preclusion is broad — it bars claims that were actually raised, as well as any claims that *could have been* raised, even if they were not. *Lucky Brand Dungarees, Inc.*, 140 S. Ct. at 1594; *Allen*, 449 U.S. at 94.

Plaintiff's current allegations against County Defendants are: (1) DeCremer and Sack fabricated evidence, *i.e.*, their May 26, 1970 police reports, falsely identifying Heidelberg as the driver of the blue Chevy II during the high-speed chase; (2) Bernard and Schalk failed to disclose exculpatory evidence from their interview of Lucas, specifically withholding what Lucas was

wearing;[20] (3) Manias, Macklin, and Koeppel falsified a second lineup report regarding Manuel's and Cremeens's identification of Heidelberg and created an unduly suggestive identification procedure that caused Lucas to falsely identify Heidelberg;[21] (4) Manias withheld exculpatory evidence from his interviews with other officers regarding the suspect's and Lucas's attire the night of the shooting; (5) Koeppel and Manias suppressed FBI fingerprint testing results; and (6) Manias did not disclose his knowledge that James Clark was interviewed during the Espinoza murder investigation.  Pl.'s Resp. Cnty. Defs.' Mot. Summ. J. 56.

Plaintiff admits that his allegations against Manias, Macklin, and Koeppel regarding their fabrication of a second lineup report are based on the same facts as the claims alleged in the 1973 Lawsuit.  *Id.*  Indeed, Count II of his January 18, 1980 Second Amended Complaint is nearly

---

[20] County Defendants assert that Lucas was wearing a yellow shirt and brown jacket the night of the shooting, and that Lucas announced his attire over Espinoza's radio when he called for help so that he would not be mistaken for the shooter.  Cnty. Defs.' Mot. Summ. J. ¶ 30.  The PPD dispatch recording did not capture any statements from Lucas so it is impossible to use the recording to verify what Lucas said that night, but it is undisputed that the first description of the suspect communicated over the radio was a Black man wearing a yellow shirt and brown jacket. Plaintiff's argument is that the yellow shirt and brown jacket description of the suspect was correct because the real shooter, James Clark, was wearing a yellow shirt and brown jacket.  Pl.'s Resp. Cnty. Defs.' Mot. Summ J. 57; *see id*. at 30 ("What Jerry Lucas was wearing on the night of the murder was important because, at trial, the State claimed that the description, 'yellow shirt, brown jacket' in the dispatch transcript, was a description of what Lucas was wearing, not what the suspect was wearing."); *id.* at 5 ("Lucas never communicated that he was wearing a yellow shirt and brown jacket over the dispatch from Espinoza's radio.").  County Defendants' explanation is that the yellow shirt and brown jacket description of the suspect was a mistake because it described Lucas's clothing rather than the shooter's.  Cnty. Defs.' Mot. Summ. J. 70 n.21.  Plaintiff avers that "Schalk knew that Jerry Lucas was not wearing a yellow shirt and brown jacket."  Pl.'s Resp. Cnty. Defs.' Mot. Summ. J. 74.  But Schalk's trial testimony contradicts that assertion.  Dec. 1, 1970 Trial Tr. 37, Cnty. Defs.' Mot. Summ. J. Ex. 11, ECF No. 185-11 ("Q [Defense Attorney]: Did you see what [Jerry Lucas] had on?  A [Schalk]: He had a sport coat, I think, brown, and he had on a yellow shirt.").  Lucas himself testified at trial that he was wearing a gold shirt the night of the shooting.  *Id.* at 107–08 ("Q [Prosecutor]: What color clothing did you have on that evening, or tell the Jury what you had on?  A [Lucas]: This same jacket, gold shirt, black pair of pants, black shoes.").

[21] Plaintiff's allegation that the lineup procedure was unduly suggestive is new at summary judgment and is thus barred.  *See Moran v. Calumet City*, 54 F.4th 483, 497 (7th Cir. 2022) ("[I]t would prejudice the defendants if they had to contend with allegations at summary judgment that [the plaintiff] did not disclose during discovery." (citing Fed. R. Civ. P. 37(c)(1))).  Moreover, the same issue was litigated and resolved in state court during Heidelberg's criminal appeal.  *See* Nov. 13, 1975 Order 27–28, Cnty. Defs.' Mot. Summ. J. Ex. 99, ECF No. 190-11 ("The content of the original report was fully disclosed at a pretrial hearing on suppression of evidence, and the conclusion by defendant that the original report was exculpatory and its suppression prejudicial is not supported by the record.").

identical: it alleges that Macklin and Manias, with the approval of Koeppel, destroyed a police lineup report, and prepared a second falsified report.  Jan. 18, 1980 Second Am. Compl. 3–4.

Similarly, Plaintiff's allegation regarding the FBI fingerprint report in this lawsuit mirrors a nearly identical claim from his prior action.  In the 1973 Lawsuit, Heidelberg brought this same claim against Peoria County State's Attorneys Calkins, Hamm, and Riddle.  Mar. 1, 1973 Compl. 3.  Heidelberg also brought up the issue of FBI fingerprint reports during a pretrial discovery hearing.  *See* Nov. 5, 1970 Discovery Mot. Tr. 35, 49, Cnty. Defs.' Mot. Summ. J. Ex. 68, ECF No. 188-9.

Heidelberg is emphatic that he could not have litigated several of his current claims in his 1973 Lawsuit because "he did not have the information that officers [DeCremer and Sack] knew the suspect was wearing a yellow shirt and brown jacket until after the [May 26, 1970 PPD dispatch] radio tape was produced decades later."  Pl.'s Resp. City Defs.' Mot. Summ. J. 17. Despite numerous requests, Heidelberg never received the PPD dispatch tape during his criminal trial or the 1973 Lawsuit.  But nearly 50 years later, in 2016, a PPD employee fortuitously discovered, in the bottom drawer of a locked cabinet, a box labeled "Espinoza-Case Radio Tape Bellevue Armed Robber" which contained the dispatch tape from May 26, 1970.  Pl.'s Resp. City Defs.' Mot. Summ. J. 15.

Heidelberg homes in on the dispatch audio recording as his exonerating smoking gun — specifically, the statement describing the suspect as "colored male, yellow shirt" which one can clearly hear was made by Unit 714 (Sack and DeCremer) but is incorrectly attributed to Fondriest on the transcript.  Dispatch Tr. 1:34.25; Dispatch Audio 6:10–6:14.  This detail is crucial, according to Heidelberg, because it proves that Sack and DeCremer saw the suspect wearing a yellow shirt, and therefore any reports of the suspect wearing blue were necessarily

fabricated.  Unfortunately for Heidelberg, "new evidence does not relieve a litigant of the preclusive effect of a (federal) judgment."  *Hudson v. Hedge*, 27 F.3d 274, 276 (7th Cir. 1994).[22]

The Court again finds that there is a common nucleus of operative facts underlying Heidelberg's 1973 Lawsuit and his current claims against County Defendants.  Certainly the claims from 1973 and the instant action "form a convenient trial unit," and arise from the same series of transactions relating to Heidelberg's arrest, investigation, prosecution, and conviction.  *See Hayes v. City of Chicago*, 670 F.3d 810, 813–14 (7th Cir. 2012) (affirming dismissal on claim preclusion grounds in part because the "similarity of the underlying conduct would have undoubtedly created a convenient trial unit and preserved the [court's] judicial resources").  Heidelberg does not argue he did not have a full and fair opportunity to litigate his claims in the 1973 Lawsuit and provides no compelling explanation for why he could not have brought these claims against County Defendants at that time.

Because all three elements are met, the Court finds that claim preclusion applies.  In the interest of completeness, the Court will additionally evaluate how the settlement agreement and general release affects the preclusion of Heidelberg's current claims against County Defendants Koeppel, Macklin, and Manias.

---

[22] Even so, the Court is unpersuaded that the dispatch recording supports Heidelberg's arguments as unequivocally as he seems to believe.  Later on the PPD dispatch audio tape, Hilst is heard saying "County Officer [DeCremer] said that the guy had on a [dark] blue sweater over a light blue shirt, when he bailed out of his car."  Dispatch Tr. 1:41.00; Dispatch Audio 12:56.  Plaintiff asserts that Hilst "made up" this description of the suspect's clothing because (1) Hilst knew that DeCremer never communicated that description to anyone, and (2) the suspect had already fled the crash site by the time DeCremer arrived on the scene.  Pl.'s Resp. City Defs.' Mot. Summ. J. 20–21. The description of the suspect as wearing a "yellow shirt" was last communicated over the radio frequency at 1:34 a.m.  Hilst announced over the radio that Officer DeCremer had said that the suspect was wearing a dark blue sweater over a light blue shirt at 1:41 a.m.  To accept Plaintiff's version of events that Hilst "made up" the blue shirt description, a jury would have to infer that in the span of seven minutes during a high-speed chase, County Defendants DeCremer and Sack and City Defendant Hilst *saw Heidelberg* in a blue shirt and gray sports coat and made the quick decision to communicate a fake description over the radio frequency to frame Heidelberg.  Even drawing all reasonable inferences in Plaintiff's favor, this inference is too tenuous to support Plaintiff's contention.  *See Coleman v. City of Peoria*, 925 F.3d 336, 345 (7th Cir. 2019) ("[I]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." (quotation marks omitted)).

**b. County Defendants Koeppel, Macklin, and Manias's Settlement and Release[23]**

As an alternative defense, County Defendants Koeppel, Macklin, and Manias argue that the binding settlement and release agreement which resolved the 1973 Lawsuit precludes Plaintiff from bringing any of his current claims against them. Cnty. Defs.' Mot. Summ. J. 61–62; Cnty. Defs.' Reply 40–42. In early 1982, Heidelberg and Koeppel, Macklin, and Manias executed a "Settlement Agreement and General Release" to resolve then-pending Counts II through V of the January 18, 1980 Second Amended Complaint which stated:

> 1.    The parties to this Settlement Agreement and General Release are: Cleve Heidelberg, hereinafter referred to as "plaintiff;" and Willard M. Koeppel, . . . Nolan Macklin, and Emanuel Manias, hereinafter collectively referred to as "defendants."
>
> 2.    Plaintiff has filed suit against defendants, among others, alleging that defendants violated his civil rights in contravention of the laws of the United States. That action, entitled <u>Heidelberg</u> v. <u>Hammer, et al.</u>, Case No. 78-3159, is now pending before the United States District Court, Central District, Springfield Division, the Honorable J. Waldo Ackerman presiding ("the lawsuit"). Plaintiff's claims against the defendants constitute Counts II, III, IV and V of the lawsuit.
>
> 3.    Plaintiff and defendants acknowledge that there have been no findings of fact or conclusions of law of any sort made by the Court or stipulated to by the parties with respect to the lawsuit. However, in order to resolve their differences and avoid the cost and inconvenience of further litigation, plaintiff and defendants have agreed to settle their dispute on the terms outlined herein.
>
> 4.    Immediately upon execution of this Agreement, defendants will deliver to counsel for plaintiff a cashier's check in the amount of $20,000 made payable to Jenner & Block, One IBM Plaza, Chicago, Illinois, 60611.
>
> 5.    Plaintiff agrees to release and forever discharge defendants from any and all manner of causes of action, claims, demands, notes, expenses, losses and liability of every kind, nature and character which plaintiff has, ever had or may have had against defendants, based in whole or in part upon any act or omission existing on or prior to the date upon which this Agreement and General Release is finally executed, whether known or unknown to plaintiff at that date. Plaintiff agrees to cause the lawsuit to be dismissed with prejudice and with attorneys fees.

---

[23] County Defendant Manias asserted the Settlement Agreement and General Release as an affirmative defense in his motion to dismiss, *see* Manias Mot. Dismiss 6–11, ECF No. 30, but the Court determined it could not consider the document at that stage in litigation pursuant to Federal Rule of Civil Procedure 12(d), finding that "assessment of Manias's release defense must . . . await summary judgment." Mar. 26, 2019 Order 14–15; Fed. R. Civ. P. 12(d).

Settlement Agreement & General Release ¶¶ 1–5.  Plaintiff emphasizes that the language of the release refers to claims Heidelberg "has, ever had or *may have had*," as opposed to "*may have*" in the future.  Pl.'s Resp. Cnty. Defs.' Mot. Summ. J. 47–48.  Based on that language, Plaintiff argues that his current claims do not fall within the scope of the release and he "did not intend to and did not release any future claims."  *Id.* at 48 (emphasis omitted).  County Defendants assert that "may have had" is not fatal to their defense because that language is broad enough to encompass future claims.  Cnty. Defs.' Reply 41 (emphasis and quotation marks omitted).

A release within a settlement agreement is a contract and is therefore governed by contract law.  *Cannon v. Burge*, 752 F.3d 1079, 1088 (7th Cir. 2014).  Illinois law applies here even though the settlement of the 1973 Lawsuit occurred in federal court.  *Capocy v. Kirtadze*, 183 F.3d 629, 632 (7th Cir. 1999).  Illinois courts have held a release to be a contract in which "a party relinquishes a claim to a person against whom the claim exists."  *Carona v. Ill. Cent. Gulf R.R. Co.*, 561 N.E.2d 239, 242 (Ill. App. Ct. 1990).  The intent of the parties governs the scope and effect of a release, and courts determine that intent "from the language used *and the circumstances of the transaction*."  *Carlile v. Snap-on Tools*, 648 N.E.2d 317, 321 (Ill. App. Ct. 1995) (quotation marks omitted).

If the contract language is unambiguous, then its interpretation is a question of law.  *Capocy*, 183 F.3d at 632.  When a release uses broad language, but also refers to specific claims, Illinois courts limit the scope of the release to the particular claims arising out of the more specific reference.  *Heard*, 809 F.3d at 979 (citing *Carona*, 561 N.E.2d at 242).  "Unless there is language to the contrary, Illinois law considers a general release to cover all claims of which a signing party has actual knowledge or that he could have discovered upon reasonable inquiry," *Ramos v. Piech*, 55 F.4th 1118, 1121 (7th Cir. 2022) (quotation marks omitted), and "a party

need not enumerate the specific claims [the party] is waiving in a general release," *Hampton v. Ford Motor Co.*, 561 F.3d 709, 716 (7th Cir. 2009). Illinois courts do not require that a general "release be construed as a release of only those persons expressly named," but instead have held that "an unconditional release of one co-obligor releases all unless a contrary intent appears from the face of the instrument." *Cannon*, 752 F.3d at 1090 (quoting *Porter v. Ford Motor Co.*, 449 N.E.2d 827, 830 (Ill. 1983)).

To determine the intent of the parties, the Court first looks to the relevant language used by the parties to the 1982 agreement:

> Plaintiff agrees to release and <u>forever</u> discharge defendants from <u>any and all</u> manner of causes of action, claims, demands, notes, expenses, losses and liability of every kind, nature and character which plaintiff has, ever had or may have had against defendants, based in whole or in part upon any act or omission existing on or prior to the date upon which this Agreement and General Release is finally executed, whether <u>known or unknown</u> to plaintiff at that date.

Settlement Agreement & General Release ¶ 5 (emphasis added). The Court finds that this language is clear, unambiguous, and broad enough to encompass Heidelberg's current claims. Specifically, the use of the word "forever" and the phrases "known or unknown" and "any and all" strongly indicates an intent to cover future claims.

County Defendants rely on *Hurd v. Wildman, Harrold, Allen & Dixon*, 707 N.E.2d 609 (Ill. App. Ct. 1999), to argue that "the language of 'may have had' and 'whether known or unknown to plaintiff' is sufficiently broad to include claims not yet accrued." Cnty. Defs.' Reply 41 (emphasis and quotation marks omitted). In *Hurd*, the plaintiff signed an agreement to "<u>forever</u> release" the defendants "from <u>any and all</u> claims . . . which arise out of its/his/her/their conduct . . . whether <u>known or unknown</u>, or suspected to exist, which [the plaintiff] ever had or may now have against the [defendant]." 707 N.E.2d at 612 (emphasis added) (quotation marks omitted). The *Hurd* court held that the language of the release was clear and unambiguous and

43

that it covered claims that had not yet accrued.  *Id.* at 613; *see also Rakowski v. Lucente*, 472 N.E.2d 791, 792, 794 (Ill. 1984) (finding that the language "releases and <u>forever</u> discharges [the defendant] . . . from <u>any and all</u> claims . . . <u>known and unknown</u>" was broad enough to preclude the subsequent suit (emphasis added)); *Seward v. B.O.C. Div. of Gen. Motors Corp.*, 805 F. Supp. 623, 626, 628 (N.D. Ill. 1992) (finding plaintiff's claim to be barred based on the clear and unambiguous language of a release in which he "waive[d]," "release[d]," and "<u>forever</u> discharge[d]" "<u>all</u> claims, demands, and causes of action, <u>known or unknown</u>, which [he] may have" (emphasis added)).

"Forever" means "for a limitless time."  *Forever*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/forever (last visited Mar. 27, 2024).  Of the cases cited by Plaintiff wherein courts held that future claims were not barred by a prior settlement agreement, none of the releases contained the word "forever."  *See Sirmans v. Caldera*, 138 F. Supp. 2d 14, 20 (D.D.C. 2001); *LaGrange Fed. Sav. & Loan Ass'n v. Rock River Corp.*, 423 N.E.2d 496, 500 (Ill. App. Ct. 1981); *Keeran v. Wahl Co.*, 51 N.E.2d 598, 602 (Ill. App. Ct. 1943).  In contrast, when the word "forever" is used in a release, Illinois courts have often found that language broad enough to encompass future claims.  *See, e.g.*, *Rakowski*, 472 N.E.2d at 792, 794; *Hurd*, 707 N.E.2d at 612, 613; *Seward*, 805 F. Supp. at 628.

In *Cannon*, the Seventh Circuit held that the language of the release applied to claims that had not yet accrued, 752 F.3d at 1091–92, but Heidelberg attempts to distinguish the General Release he signed from the one in *Cannon* because the release in *Cannon* explicitly used the word "future."  *See* Pl.'s Resp. Cnty. Defs.' Mot. Summ. J. 49; *Cannon*, 752 F.3d at 1091 ("Cannon . . . agreed to a 'final and total settlement of all claims he has, *or may have in the future*,' arising from the incident underlying the 1983 suit.").  Heidelberg asserts that "Illinois

44

courts will not construe a release whose language is expressly directed at then-held (present) and/or past claims to include *future* claims." Pl.'s Resp. Cnty. Defs.' Mot. Summ. J. 48–49. Plaintiff cites to *LaGrange* and *Keeran* for support of this proposition, *id.* at 49, but the Court finds both cases distinguishable.

The release in *LaGrange* covered claims "known or unknown" "arising out of the subject matter" of a then-pending lawsuit. 423 N.E.2d at 500. Interpreting the release's language, the court found that the plaintiff's new claims were not barred because they were based on *new events* that happened *after* the signing of the release. *Id.* at 500–01 ("There is no indication in the record that the parties intended the release to cover subsequent breaches of the Contract. . . . [T]he release does not preclude an action to enforce the Contract against later alleged breaches."). Similarly, in *Keeran*, the plaintiff's new claims stemmed from events that occurred after the signing of the release and the court interpreted the release not to bar claims based on new acts. 51 N.E.2d at 602 ("Giving full effect to the language of the release . . . , it is our judgment that it could not be possible that the parties intended to include in the release all future overt acts of defendants . . . ."). Here, Plaintiff does not argue that any of the events underlying his current allegations happened after the signing of the Settlement Agreement and General Release in 1982, thereby making *LaGrange* and *Keeran* inapposite to his argument.

Finally, the Court finds that the circumstances surrounding the settlement agreement negotiation denote the parties' intent that the release cover future claims. The shooting of Sergeant Espinoza occurred in 1970, and Heidelberg filed his first civil rights complaint in 1973. By the time the Settlement Agreement and General Release was executed in 1982, the parties had been litigating for nearly a decade, encompassing multiple rounds of motions and a trip to the Seventh Circuit. Two of the defendants, Koeppel and Macklin, had passed away. Based on

45

these circumstances, it contravenes logic to believe that the parties intended to leave the door open to future litigation based on the same underlying events that occurred in 1970.  The language of the agreement and the circumstances of the transaction evince an intent by the parties to release future claims.  Accordingly, the Court finds that the Settlement Agreement and General Release bars all claims against County Defendants Koeppel, Macklin, and Manias.[24]

### c.  Remaining Claims

Plaintiff's remaining claims are failure to intervene, intentional infliction of emotional distress, civil conspiracy, *respondeat superior*, and indemnification.  The parties address these claims separately from the more specific constitutional claims, so the Court does as well.

Defendants put forth a compelling argument questioning the constitutional basis and legitimacy of the failure to intervene tort, citing Judge Easterbrook's recent concurrence in *Mwangangi v. Nielsen*, 48 F.4th 816 (7th Cir. 2022).  *See* City Defs.' Mot. Summ. J. 49–53; *Mwangangi*, 48 F.4th at 834 (Easterbrook, J., concurring) ("What statute or constitutional rule *requires* one employee of the government to stop another from making a mistake?  The Supreme Court has held many times that § 1983 supports only direct, and not vicarious, liability.  'Failure to intervene' sounds like vicarious liability." (citations omitted)).  But the Court need not reach the merits of that argument because it finds that this claim is barred by claim preclusion as well.  "[T]he seminal case in this circuit on the duty of an officer to intervene" is *Byrd v. Brishke*, 466 F.2d 6 (7th Cir. 1972).  *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994).  In *Brishke*, the

---

[24] Plaintiff hints at an argument that *Heck v. Humphrey*, 512 U.S. 477 (1994), alters the claim preclusion and release analyses, but he fails to develop the argument such that the Court can fully address it.  To the extent he is arguing he could not have brought his claims earlier or that his claims had not yet accrued under *Heck*, the Court finds the reasoning in *Johnson v. Spencer*, 950 F.3d 680 (10th Cir. 2020), persuasive.  "[E]ven though *Heck changed* our understanding of which claims are cognizable under § 1983, it did nothing to disturb civil judgments entered under a prior understanding of the statute—at least where those judgments . . . were undisputedly final when *Heck* was decided."  *Johnson*, 950 F.3d at 696.  Plaintiff's 1973 Lawsuit was litigated and finalized well before *Heck* was decided in 1994 so he was not barred from bringing his claims earlier.  Indeed, he brought them, settled them, and final judgment was entered on them.

Seventh Circuit held that "one who is given the badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person in his presence or otherwise within his knowledge." 466 F.2d at 11. *Brishke* was decided in 1972 meaning that the failure to intervene tort was recognized in the Seventh Circuit before Heidelberg filed his March 1, 1973 Complaint and it was well established by the time Heidelberg filed his January 18, 1980 Second Amended Complaint. Heidelberg's failure to intervene claim is based on the same factual allegations underlying his § 1983 claims which the Court determined are barred by claim preclusion, and there is no compelling reason he could not have brought this claim in his 1973 Lawsuit.

Likewise, the intentional infliction of emotional distress tort existed in Illinois well before 1973 when Heidelberg filed his March 1, 1973 Complaint. *See Knierim v. Izzo*, 174 N.E.2d 157, 165 (Ill. 1961) (holding that an action could be maintained for intentional infliction of emotional distress caused by outrageous conduct). There is no reason that Heidelberg could not have brought that claim in the 1973 Lawsuit and he is precluded from bringing it now.

Similarly, Heidelberg's civil conspiracy claim is grounded in the same common nucleus of operative facts, so this claim is also barred by claim preclusion. But even if that were not the case, the Court finds that Plaintiff has not presented sufficient evidence to show the existence of a conspiracy among the Defendants. Plaintiff states that "Defendants' assertion that there is no evidence of conspiracy is insufficient to shift the summary judgment burden." Pl.'s Resp. Cnty. Defs.' Mot. Summ. J. 80. But Plaintiff misunderstands the law and the respective burdens at the summary judgment stage. A defendant bears the initial burden of demonstrating he has met the summary judgment requirements, and he can do so "by showing that there is an absence of evidence to support the non-moving party's case." *Carmichael v. Village of Palatine*, 605 F.3d

47

451, 460 (7th Cir. 2010) (quoting *Celotex Corp.*, 477 U.S. at 325).  The nonmoving party must

then present definite, competent evidence to oppose the motion and the existence of a mere

scintilla of evidence is insufficient to fulfill this requirement.  *Id.* at 460 (citing *Anderson*, 477

U.S. at 252).  Plaintiff has failed to present such evidence and therefore summary judgment must

be granted in Defendants' favor.

Finally, the Court can briefly resolve the *respondeat superior* (against the City of Peoria

only) and indemnification claims (against both the City and County of Peoria).  *Respondeat*

*superior* and indemnity are "derivative liability claims that depend on [a plaintiff] prevailing

against at least one . . . individual defendant[]."  *Moran v. Calumet City*, 54 F.4th 483, 500 (7th

Cir. 2022).  Because summary judgment is granted in favor of the individual defendants, the

claims against the City of Peoria and the County of Peoria necessarily must fail.

## CONCLUSION

For the foregoing reasons, the motion for summary judgment filed by Defendants City of

Peoria, Holli Bain as the Independent Executor of the Estate of Paul Hibser, Robert Watson Jr. as

the Independent Administrator of the Estate of Robert Lee Watson, and David Wentworth II as

the Independent Administrator of the Estate of Paul Hilst, ECF No. 175; and the motion for

summary judgment filed by Defendants County of Peoria, Larry Bernard, Emanuel Manias, and

David Wentworth II as the Independent Administrator for the Estates of Kenneth DeCremer,

Willard Koeppel, Nolan Macklin, John Sack, and William Schalk, ECF No. 184, are

GRANTED.  The Clerk is directed to enter judgment and close the case.

Entered this 27th day of March, 2024.

s/ Sara Darrow
SARA DARROW
CHIEF UNITED STATES DISTRICT JUDGE